**CHARLES A. BONNER, ESQ.**
**State Bar No. 85413**
**A. CABRAL BONNER, ESQ.**
**State Bar No. 247528**
**LAW OFFICES OF BONNER & BONNER**
475 Gate Five Road, Suite 212
Sausalito, CA 94965
Tel: (415) 331-3070
Fax: (415) 331-2738
cbonner799@aol.com
cabral@bonnerlaw.com

**JOHN R. EDWARDS, ESQ.**
**(N.C. State Bar No. 7706)**
**(*pro hac vice pending*)**
**CATHARINE E. EDWARDS, ESQ.**
**State Bar No. 304137**
**EDWARDS KIRBY**
3201 Glenwood Ave. Suite 100
Raleigh, NC 27612
Tel: (919) 780-5400
Fax: (919) 800-3099
jedwards@edwardskirby.com
cedwards@edwardskirby.com

**PAUL C. GARNER, ESQ.**
**State Bar No. 132524**
**C/O LAW OFFICES OF BONNER & BONNER**
475 Gate Five Road, Suite 212
Sausalito, CA 94965
Mail to: P.O. Box 232472
Encinitas, CA 92024
Tel: (760) 558-9267
Fax: (760) 918-1984
pcg@garnerlaw.com

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SAN DIEGO DIVISION

| | |
|---|---|
| DUSTIN BARTEL, PAMELA AHLBERG, CHRISTOPHER ALBA, CONTRAIL ALLEN, ANDREW ANDERSON, MATTHEW ANDERSON, JEFFREY ARMSTRONG, MATTHEW AYRES, DANIEL BARBIERO, MONTY BARHAM JR., JESSICA BARLOW, BEATRICE BARTHELEMY, BRENDEN BESKOW, JENNIFER BOYLE, LOGAN BLACK, | Case No.: **'18CV0537 BAS MDD** <br><br> **INDIVIDUAL AND CLASS ACTION COMPLAINT FOR DAMAGES** |

JOHNATHAN BURBACH, ADRIANA CABARCAS, DEREK CAMBRIDGE, DEREK CAMBRIDGE, on behalf of and for his minor son, D.C., DEREK CAMBRIDGE, on behalf of and for his minor son, D.C., CAMRY CAMPBELL, ALEXANDRA RENEE CAMPOS, CHRISTOPHER CARR, AMY CHAMBERLAIN, CARISSA CLARK, THOMAS CLARKE, JAIME CLAVITO, JESTINE CLAYTON, ASHLEY COCHRAN, CHRISTOPHER COLEMAN, JEFF COOK, PATRICK CRESPO, BRIAN CROSS, MICHAEL CROSS, JOSHUA CUNNINGHAM, DAKOTA DAVIS, GERALD H. DAVIS, KATARINA DAVISON, ADAM DAWSON, GADIEL DEL ORBE, THE ESTATE OF DONALD H. DELLINGER, OLIVIA DIMAS, MATTHEW DONALDSON, SHARONDA DOUGLAS, DANIEL DRESSLER, COREY DREW-BELL, LAWRENCE EDWARDS, EDWARD ELUERE, RAMON ENCISO, JR., ERIC I. EPPS, BRIAN EUBANKS, JASON FERGUSON, JUSTINE FRALEY, MARLON FRANCIS, RUTH FREEMAN, STEVEN GARDNER, LISSET GARNER, DEREK KEITH GAY, JOSHY GEORGE, RAYMOND GILES, KIRK GODAIR, individually and as administrator of the ESTATE OF RUBY PEREZ, KIRK GODAIR, on behalf of and for his minor daughter, C.G., RODOLFO GUERRA, TYMESHIA GUIDRY, CECILIA GUITIERREZ, CYRINTHIA HAMBLEY HALDANE HAMILTON, NATHAN HANSEN, COREY HART, MICHAEL HARVEY, JOSEPH K. HENRY, DARREN HENSON, MARTY B. HILL, MARTIN HITSON, MITCHELL HODGES, NICHOLAS HOLLAND, WILLIAM HOLT,

1. NEGLIGENCE
2. GROSS NEGLIGENCE
3. STRICT LIABILITY FOR MANUFACTURING DEFECT
4. STRICT LIABILITY FOR DESIGN DEFECT
5. STRICT LIABILITY FOR ULTRAHAZARDOUS ACTIVITIES
6. NEGLIGENCE *PER SE*: *RES IPSA LOQUITUR*
7. PRESUMPTION OF NEGLIGENCE PER SE
8. SURVIVAL ACTION
9. WRONGFUL DEATH
10. LOSS OF CONSORTIUM

**JURY TRIAL DEMANDED**

INDIVIDUAL AND CLASS ACTION COMPLAINT

JOHN WESLEY HYATT, NANCY JACKSON, KEVIN JACOBSON, JUSTIN JAEHNIG, MATTHEW JENKINS, GREGGORY JORDAN, RODERICK JESSAMY, JUSTIN KENWORTHY, MATTHEW KNAUST, ANDREW KOEPKE, NICHOLAS KOVACHEV, RYAN KUNIN, RENE LANDEROS, MICHAEL LELAND, MELISSA M. LESTER, LAWRENCE M. LEVAN, JOSEPH LEWIS,SCOTT LIENG, ARNULFO LIMON, ADRIAN LUCINA, ANNETTE LUCKEY, individually and as administrator of the ESTATE OF DANIELLE LUCKEY, DERRICK LUCKEY, EDWIN MAHER, FRANCISCO E. MARIGUNDON, JR., CHAD MARTINS, JANETH MASINDE, individually and as administrator of the ESTATE OF BRENDA DOWNING, TRAVIS MCKNIGHT, EDWARDS MELLO, RACHEL MENDEZ, ANAIS MENDOZA-GASTELUM, ROBERT MEYER, JEREMY MICHAUD, ZACHARY MILLER, BRANDON MONTGOMERY, HERBERT MOORE, ESMERELDA MORALES, JOSEPH MULDER, JONATHAN MULDOWNEY, CHARLES R. MURPHY, EION NELSON, GARRETT NELSON, ROBERT OCHOA, GLENN OFORI, LUKE OPYD, TIM PALMER, JAYSEN PATAO, NATHAN PENA, JOSHUA PEOPLES, ALEJANDRO PEREZ, TRANG PHAM, CHANRATHANA PHUN, TIMOTHY PIERCE, CHELSEA QUINTOG, CLINTON RAMSIARE, BRIAN RAWLINS, CYRUS REA, TERESA READY, individually and as administrator of the ESTATE OF JESSE READY, TERESA READY, on behalf of and for her minor daughter, A.R., JACOB

INDIVIDUAL AND CLASS ACTION COMPLAINT

REED, BALTHAZAR REFORSADO,
CAMERON REID, ANGELINA REYNA,
QUENTIN RICHARDSON, WILLIAM E.
RIGBY, DEVIN RITCHEY, PEDRO
RODRIGUEZ, CESAR SALGADO, TYLER
SATTERWHITE, TIFFANY SCHAD,
BRETT SCHMIDT, MICHELLE SCOTT,
JOSHUA SEGREE, JOSHUA SEGREE, on
behalf of and for his minor son, H.S., ERIC
SEIBERT, JERRID SEVART, QUINCY
SHEPHERD, CARL SLAUBAUGH,
AARON SMITH, GREGORY SMITH,
JUSTIN SMITH, MELLONY SNYDER,
SHENNY SOLIS, CRYSTAL SOUDER,
JAMES SOUDER, KYLE SPURLOCK,
JUSTIN STEINMETZ, AMANDA
STEMEN, RONALD STEMEN, LOWELL
STEWART, DANIEL STROHL, JOSE
SUERO, MARK SURTEL, NICHOLAS
SWANN, BYRON SY, ALEXANDER
TIDD, LOUIS TORRES, CASEY TUCKER,
RANDY VALENTIN, GABRIEL
VASQUEZ, SHAWN VELASQUEZ,
ROBERT VENABLE, DONALD
VOORHEES, BRITTNEY WACHNER,
WILLIAM WALSH, PATRICK WALTON,
BRIDGET WATERS, KENNETH
WETHERED, CAROLYN FELIX WHITE,
TIM WHITE, ELOI WHITEMAN,
JEFFREY WILLHOITE, CHRISTOPHER
WOODS, DEREK YODER, BRANDON
ZACHARIE, EDWARD ZIMMERMAN,
*on behalf of themselves and others similarly
situated,*

Plaintiffs,

v.

4

INDIVIDUAL AND CLASS ACTION COMPLAINT

TOKYO ELECTRIC POWER COMPANY,
INC, and GENERAL ELECTRIC
COMPANY,

                    Defendants.

PLAINTIFFS, by their attorneys, respectfully allege, on behalf of themselves and others similarly situated, as follows:

## INTRODUCTION

1.  Plaintiffs were all members of the United States Armed Forces, primarily the Navy, who were sent to Japan in or around March 2011 to provide humanitarian aid to the people of Japan following the earthquake and tsunami that devastated the country.

2.  On or around March 11, 2011, due to Defendants' longstanding gross negligence, the boiling water reactors at the Fukushima Daiichi Nuclear Power Plant melted down. The Fukushima Nuclear Power Plant was and is owned by Defendant Tokyo Electric Power Company Holdings ("TEPCO), and the reactors in question were designed and built by Defendant General Electric ("GE").

3.  As a result of the meltdown, significant amounts of radiation were released into the surrounding environment.

4.  In subsequent investigations, including one conducted by the Japanese Government, TEPCO was found to have been grossly negligent.

5.  Due to the radiation exposure that Plaintiffs experienced as a result of Defendants' negligence and gross negligence, Plaintiffs have experienced severe physical and mental injury, including cancers, thyroid conditions and, in some cases, death.

## PARTIES

### PLAINTIFFS

6. **PLAINTIFFS** were among the members of the U.S. Navy crews of the U.S.S. Ronald Reagan (CVN-76), with its home port in San Diego, California, the crews of other

vessels participating as part of the Reagan Strike Force, 7th Fleet, land-based service personnel, and/or their dependents.  All of the Plaintiffs were repeatedly exposed to ionizing radiation on or after March 11, 2011, due to the release of radioisotopes from the Fukushima Nuclear Power Plant (hereinafter, "FNPP").  All of the Plaintiffs were exposed during and as a result of the mission known as "Operation Tomodachi."[1]

7.    Plaintiffs' injuries, losses, damages, and harms are the results of Defendants' illegal conduct, including the negligently designed and maintained GE Boiling Water Reactor, which contains numerous design and manufacturing defects.  These harms include, but are not limited to, the following: illnesses such as Leukemia, ulcers, gall bladder removals, brain cancer, brain tumors, testicular cancer, dysfunctional uterine bleeding, thyroid illnesses, stomach ailments, birth defects, death, and a host of other complaints unusual in such young adults and victims. The injured servicemen and women will require treatment for their deteriorating health, medical monitoring, payment of their medical bills, appropriate health monitoring for their children, and monitoring for possible radiation-induced genetic mutations.  Some of the radioactive particles inside these service personnel have long half-lives, from 6 to 50 to 100 years.

8.  Plaintiffs have only recently, within all the relevant statutes of limitation periods, discovered the facts pertaining to the nature and extent of their injuries. Plaintiffs returned home to the United States, where their injuries later arose and manifested.  Plaintiffs also have just recently discovered facts which show Defendants' illegal conduct, as well as Defendants' negligent conduct in the engineering, construction, maintenance, operation, management and control of the defectively designed Fukushima Nuclear Power Plant.

---

[1] On March 14, 2011, the U.S. 7th Fleet, U.S. Naval personnel, and aircraft aboard the vessels were repositioned away from Japan's FNPP after detecting contamination in the air and on the helicopters returning to the U.S.S. Ronald Reagan (CVN-76) from ferrying supplies to the land on aircraft deployed by the U. Sed.

INDIVIDUAL AND CLASS ACTION COMPLAINT

Plaintiffs recently discovered facts showing that Defendants' negligence and defective design of FNPP which caused injuries to Plaintiffs occurred before, during and after the March 11, 2011 earthquake and tsunami. Within all the relevant statutes of limitation periods, Plaintiffs discovered the facts which prove that Defendants, and each of them, are the actual and proximate cause of their injuries, damages and harm. This delayed discovery tolls, both in equity and in law, the expiration of the statutes of limitation.

### INDIVIDUAL PLAINTIFFS

9.   Plaintiff, DUSTIN BARTEL, was born February 5, 1988 and is currently a resident of the State of California.  At the time of Operation Tomodachi, he was a Petty Officer Third Class in the Navy attached to the U.S.S. Ronald Reagan, whose home port was Naval Base San Diego in San Diego, California.  Mr. Bartel served as a helicopter pilot with the HS-4 during Operation Tomodachi, acting as a first responder and flying missions within twenty miles of the Fukushima Nuclear Power Plant.  He experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein.

10.  Plaintiff, PAMELA AHLBERG, was born February 3, 1988 and is currently a resident of the Commonwealth of Virginia.  At the time of Operation Tomodachi, she was a Seaman stationed at Naval Air Facility Atsugi in Japan.  Ms. Patouille served as an Aviation Maintenance Administrator during Operation Tomodachi, responsible for logging and documenting equipment as it came back to the base to be scanned for radiation, decontaminated, packed and sent off.  She experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein, including but not limited to migraines. Ms. Ahlberg is married to Chris Ahlberg, and they have a child together. As a result of the wrongful and negligent acts of the Defendants, Mr. and Mrs. Ahlberg were caused to suffer, and will continue to suffer in the future, loss of consortium, affection, and conjugal fellowship, all to the detriment of their marital relationship.

11.  Plaintiff, CHRISTOPHER ALBA, was born November 10, 1981 and is currently a resident of the State of California.  At the time of Operation Tomodachi, he was a Petty

Officer First Class stationed with the VAQ 139 Squadron attached to the U.S.S. Ronald Reagan, whose homeport was Naval Base San Diego in San Diego, California.  Mr. Alba served as a Maintenance Quality Assurance Representative during Operation Tomodachi, responsible for sending food to the flight deck and sending supplies to shore to provide relief.  He experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein, including but not limited to hematuria and hematochezia.  Mr. Alba is married to Abigail Alba, and they have three children together. As a result of the wrongful and negligent acts of the Defendants, Mr. and Mrs. Alba were caused to suffer, and will continue to suffer in the future, loss of consortium, affection, and conjugal fellowship, all to the detriment of their marital relationship.

12.  Plaintiff, CONTRAIL ALLEN, was born August 22, 1976 and is currently a resident of the State of Mississippi. At the time of Operation Tomodachi, he was a Chief Petty Officer stationed aboard the U.S.S. Ronald Reagan, whose homeport was Naval Base San Diego in San Diego, California. Mr. Allen served as the Carrier Air Wing Communication Officer during Operation Tomodachi, responsible around the clock for leading the Information Technology operation watch that supported the Carrier Air Group Staff of over 1,500 personnel.  He experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein, including hematochezia, hip problems and pain, depression and anxiety over exposure to radiation, difficulty focusing, symptoms of post-traumatic stress disorder, and asthma.  Mr. Allen had significant abnormalities in his left hip, requiring left hip replacement surgery.  Mr. Allen is married to Janeen Allen, and they have five children together. As a result of the wrongful and negligent acts of the Defendants, Mr. and Mrs. Allen were caused to suffer, and will continue to suffer in the future, loss of consortium, affection, and conjugal fellowship, all to the detriment of their marital relationship.

13.  Plaintiff, ANDREW ANDERSON, was born November 15, 1986 and is currently a resident of the State of Arizona.  He was a Petty Officer Third Class stationed aboard the

INDIVIDUAL AND CLASS ACTION COMPLAINT

U.S.S. Ronald Reagan, whose homeport was Naval Base San Diego in San Diego, California. Mr. Anderson served as a Culinary Specialist and Security Guard, and was responsible for assisting with the decontamination of the U.S.S. Ronald Reagan during the 18 months immediately following Operation Tomodachi. He experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein, including but not limited to extreme weight fluctuations, loss of appetite, excessive swelling and ongoing anxiety.

14. Plaintiff, MATTHEW ANDERSON, was born March 16, 1984 and is currently a resident of the State of California. At the time of Operation Tomodachi, he was a Petty Officer Second Class stationed aboard the U.S.S. Ronald Reagan, whose homeport was Naval Base San Diego in San Diego, California. Mr. Anderson served as a helicopter pilot with the HS-4 during Operation Tomodachi, acting as a first responder and flying missions within twenty miles of the Fukushima Nuclear Power Plant. He experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein, including but not limited to sleep deprivation, migraines, bodily pains, stomach issues, post-traumatic stress disorder, and severe depression and anxiety.

15. Plaintiff, KYLE APPLEGATE, is currently a resident of the State of California. He participated in Operation Tomodachi, and experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein.

16. Plaintiff, JEFFREY ARMSTRONG, participated in Operation Tomodachi, and experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein.

17. Plaintiff, MATTHEW AYRES, was born December 4, 1987 and is currently a resident of the Commonwealth of Pennsylvania. At the time of Operation Tomodachi, he was a Petty Officer Third Class stationed aboard the U.S.S. Chancellorsville, part of the U.S.S. Ronald Reagan Carrier Strike Group. Mr. Ayres served as a Culinary Specialist during Operation Tomodachi, responsible for providing the crew and officers with daily

meals, and working on the replenishment team, loading the helicopters with food supplies. He experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein, including but not limited to rashes on his arms and back and severe mental stress over his exposure to dangerous levels of radiation. At the time of Operation Tomodachi, Mr. Ayres was married and continues to be married to Amanda Ayres. Mr. and Mrs. Ayres were caused to suffer, and will continue to suffer in the future, loss of consortium, affection, and conjugal fellowship, all to the detriment of their marital relationship.

18. Plaintiff, DANIEL BARBIERO, was born February 26, 1982, and is currently a resident of the State of California. At the time of Operation Tomodachi, he was a Petty Officer First Class stationed aboard the U.S.S. Ronald Reagan, whose homeport was Naval Base San Diego in San Diego, California. Mr. Barbiero served as an Aircraft Director on the flight deck during Operation Tomodachi, responsible for the safe and expeditious launching and movement of aircrafts and helicopters on the flight deck conducting surveillance and humanitarian relief missions. He experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein, including but not limited to the removal of a benign melanoma fatty deposit, and fear and anxiety over the extent of his radiation exposure. Mr. Barbiero is married to Brenda Barbiero and they have one son. The Barbieros have suffered reproductive issues, and worry about the health of their future children. As a result of the wrongful and negligent acts of the Defendants, Mr. and Mrs. Barbiero were caused to suffer, and will continue to suffer in the future, loss of consortium, affection, and conjugal fellowship, all to the detriment of their marital relationship.

19. Plaintiff, MONTY BARHAM, JR., was born June 7, 1983, and is currently a resident of the State of Nevada. At the time of Operation Tomodachi, he was a Petty Officer Third Class stationed aboard the U.S.S. Ronald Reagan, whose homeport was Naval Base San Diego in San Diego, California. Mr. Barham served as an Engineman

during Operation Tomodachi, responsible for working on the hydraulics in aircrafts and small boats going on missions. He experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein, including but not limited to weight fluctuations, hematuria, and frequent migraines.

20. Plaintiff, JESSICA BARLOW, was born April 17, 1982 and is currently a resident of the State of Washington. At the time of Operation Tomodachi, she was a Petty Officer Second Class in the Navy attached to the U.S.S. Ronald Reagan, whose homeport was Naval Base San Diego in San Diego, California. Ms. Barlow served as an Aviation Boatswain's Mate Fuels (ABF) during Operation Tomodachi, responsible for operating organizational maintenance on aviation fueling and lubricating oil systems and maintaining fuel quality surveillance and control in aviation fuel systems on the flight deck. She experienced serious injury as a result of Defendants' negligent and intentional acts and omissions described herein, including but not limited to severe irritable bowel syndrome, a uterine polyp requiring surgery for its removal and women's health issues. As a result of these injuries, Ms. Barlow is required to take pain medication for the rest of her life.

21. Plaintiff, BEATRICE BARTHELEMY, was born January 28, 1975 and is currently a resident of the State of California. At the time of Operation Tomodachi, she was a Petty Officer Second Class stationed aboard the U.S.S. Ronald Reagan, whose homeport was Naval Base San Diego in San Diego, California. Ms. Barthelemy served as an Operations Specialist during Operation Tomodachi, responsible for a variety of tactical tasks, including tracking and analyzing important reports to maintain an accurate tactical picture, updating navigational readiness charts, making recommendations regarding tactical and combat procedures and providing humanitarian assistance. She has experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein, including but not limited to pseudo-seizures that prevent her from participating in certain daily activities such as driving and other illnesses, which have required multiple surgeries.

22. Plaintiff, BRENDEN BESKOW, is a resident of the State of Mississippi.   Mr. Beskow is the son of Teresa Ready and Jesse Ready, deceased.  At the time of Operation Tomodachi, Mr. Beskow lived with Jesse and Teresa Ready in Yokosuka, Japan, where Mr. Ready was stationed.  Mr. Beskow was thus exposed to radiation from the FNPP.

23. Plaintiff, JENNIFER BOYLE, was born October 14, 1985 and is currently a resident of the State of Washington.  At the time of Operation Tomodachi, she was a Seaman in the Navy attached to the U.S.S. Ronald Reagan, whose homeport was Naval Base San Diego in San Diego, California.  Ms. Boyle served as an Undesignated Seaman during Operation Tomodachi, assigned to the flight deck.  She experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein, including but not limited to a diagnosis of triple negative breast cancer, for which she has undergone rigorous chemotherapy, radiation treatments and bilateral mastectomies.  She has axillary webbing in her arm and across her chest where her lymph nodes were removed, which causes extreme pain and limited movement, requiring extensive physical therapy.   Every six months she requires costly new lymphedema sleeves.  Ms. Boyle also suffers reproductive issues, mental anguish and emotional distress.

24. Plaintiff, LOGAN BLACK, was born May 6, 1990, and is currently a resident of the State of California.  At the time of Operation Tomodachi, he was a Sergeant with the United States Marine Corps stationed aboard the U.S.S. Ronald Reagan, whose homeport was Naval Base San Diego in San Diego, California.  Mr. Black served as a F-18 Corrosion Control Mechanic during Operation Tomodachi, responsible for removing corrosion from various components on aircrafts, daily aircraft decontamination and loading helicopters with food and supplies for humanitarian missions.  He experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein, including but not limited to headaches, breathing difficulties and shortness of breath, fluid sacs and sebaceous cysts requiring surgical removal.

25.  Plaintiff, SHANEE BROWN, was born April 17, 1990, and is currently a resident of the State of Nevada.  At the time of Operation Tomodachi, she was a Petty Officer Second Class stationed at Naval Air Facility Atsugi in the Kanagawa Prefecture, Japan.  Ms. Brown served as a plane captain during Operation Tomodachi, responsible for washing all helicopters, performing fuel-sampling procedures on helicopters, and minor maintenance.  She experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein, including women's health issues, reproductive issues, post-traumatic stress disorder, depression and anxiety.

26.  Plaintiff, JOHNATHAN BURBACH, participated in Operation Tomodachi and experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein.

27.  Plaintiff, ADRIANA CABARCAS, was born July 7, 1977 and is currently a resident of the State of California.  At the time of Operation Tomodachi, she was a Chief Petty Officer stationed aboard the U.S.S. Ronald Reagan, whose home port was Naval Base San Diego in San Diego, California.  Ms. Cabarcas served as a Logistics Chief during Operation Tomodachi, responsible for supplies aboard the flight deck, processing all contaminated filters, and handling other contaminated parts and equipment from the helicopters.  She worked 12-hour shifts aboard the flight deck and tested positive for radiation contamination over 20 times while aboard the ship. She experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein, including but not limited to sudden onset of reproductive issues and ongoing migraines.  Ms. Cabarcas is married to Jose Cabarcas. Mr. and Mrs. Cabarcas were caused to suffer, and will continue to suffer in the future, loss of consortium, affection, and conjugal fellowship, all to the detriment of their marital relationship.

28.  Plaintiff, DEREK CAMBRIDGE, was born September 30, 1986 and is currently a resident of the State of California.  At the time of Operation Tomodachi, he was a Petty Officer Third Class, stationed aboard the U.S.S. Ronald Reagan, whose home port was

INDIVIDUAL AND CLASS ACTION COMPLAINT

Naval Base San Diego in San Diego, California.  He served as a Ship's Serviceman, responsible for loading and unloading the helicopters on the flight deck that were delivering aid and supplies on land.  He experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein, including but not limited to a painful cyst, infection of the pancreas, and depression and anxiety. At the time of Operation Tomodachi, Mr. Cambridge was married and continues to be married to Anna Cambridge.  They have had three children, all of whom were conceived and born after Operation Tomodachi.  Their first two children have developmental delays.  As a result of the wrongful and negligent acts of the Defendants, Mr. and Mrs. Cambridge were caused to suffer, and will continue to suffer in the future, loss of consortium, affection, and conjugal fellowship, all to the detriment of their marital relationship.

29. Plaintiff, DERRICK CAMBRIDGE, on behalf and for his minor son, D.C., is currently a resident of the State of California. D.C. was born January 4, 2013, after his father participated in Operation Tomodachi.  Due to his father's exposure to radiation, D.C. has experienced developmental delays and requires special education.

30. Plaintiff, DERRICK CAMBRIDGE, on behalf and for his minor son, D.C., is currently a resident of the State of California. D.C. was born March 24, 2015, after his father participated in Operation Tomodachi.  Due to his father's exposure to radiation, D.C. has experienced developmental delays.

31. Plaintiff, CAMRY CAMPBELL, participated in Operation Tomodachi, and experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein.

32. Plaintiff, ALEXANDRA RENEE CAMPOS, was born November 1, 1988 and is currently a resident of the State of Texas.  At the time of Operation Tomodachi, she was a Petty Officer Third Class stationed aboard the U.S.S. Ronald Reagan, whose homeport was Naval Base San Diego in San Diego, California. Ms. Campos served as a Culinary Specialist during Operation Tomodachi, responsible for providing the crew and officers

with daily meals.  She experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein, including but not limited to depression, anxiety, inability to focus, and women's health issues.  Ms. Campos is married to Carlos Campos and they have three children.  As a result of the wrongful and negligent acts of the Defendants, Mr. and Mrs. Campos were caused to suffer, and will continue to suffer in the future, loss of consortium, affection, and conjugal fellowship, all to the detriment of their marital relationship.

33.  Plaintiff, CHRISTOPHER CARR, was born January 29, 1989 and is currently a resident of the State of Illinois.  At the time of Operation Tomodachi, he was a Seaman stationed aboard the U.S.S. Ronald Reagan, whose homeport was Naval Base San Diego in San Diego, California. Mr. Carr served as a Logistics Specialist during Operation Tomodachi, responsible for assisting in the maintenance of the F-18 jets and acting as the supply person for his squadron.  Throughout Operation Tomodachi, he assisted in watches on the flight deck, as well as handled supplies and aviation parts that were radiated.  He experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein, including but not limited to hair loss, severe migraine headaches and spells of dizziness that interfered with his ability to drive and perform his work duties.  Mr. Carr was diagnosed with vertigo, and due to this illness was unable to go on his next deployment and was honorably discharged from the Navy in 2016.  Mr. Carr is married to Chazz Carr and they have one daughter. As a result of the wrongful and negligent acts of the Defendants, Mr. and Mrs. Carr were caused to suffer, and will continue to suffer in the future, loss of consortium, affection, and conjugal fellowship, all to the detriment of their marital relationship.

34. Plaintiff, AMY M. CHAMBERLAIN, was born November 14, 1988 and is currently a resident of the State of Minnesota.  At the time of Operation Tomodachi, she was a Seaman stationed aboard the U.S.S. Ronald Reagan, whose homeport is Naval Base San Diego in San Diego, California, and aboard the U.S.S. Nimitz, whose homeport is

Naval Base Kitsap in Washington State.  Ms. Campbell served as an Aviation Machinist during Operation Tomodachi. She experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein, including but not limited to reproductive issues, abnormal cell growth, and depression. Ms. Chamberlain was married to Melvin Chamberlain, and they have one daughter, L.C.   Mr. Chamberlain also participated in Operation Tomodachi, and died of synovial sarcoma on March 26, 2015 due to his radiation exposure.  As a result of the wrongful and negligent acts of the Defendants, Mrs. Chamberlain was caused to suffer, and will continue to suffer in the future, loss of consortium, affection, and conjugal fellowship.

35. Plaintiff, CARISSA CLARK, was born February 12, 1992, and is currently a resident of the State of New York.  At the time of Operation Tomodachi, she was a Seaman stationed aboard the U.S.S. Ronald Reagan, whose homeport was Naval base San Diego in San Diego, California.   Ms. Clark served as an Aviation Boatswain's Mate during Operation Tomodachi, responsible for maintenance operations on the flight deck, loading helicopters with supplies for humanitarian aid, flight deck decontamination, and standing watch for external hatches.  She experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein, including but not limited to back pain, narrowing of the spine, bulging discs and deterioration of joints in back, anxiety and post-traumatic stress disorder, daily headaches and migraines, heartburn, hyperthyroidism, bradycardia heart rhythm, dizziness upon standing, and insomnia.

36. Plaintiff, JAIME CLAVITO, was born September 13, 1979, and is currently a resident of the State of California.  At the time of Operation Tomodachi, he was a Petty Officer Second Class stationed at Naval Air Facilities Atsugi in Japan.  Ms. Clavito served as an Executive Assistant during Operation Tomodachi, responsible for administrative duties to support the Helicopter Anti-Submarine Squadron (HS-14) providing humanitarian assistance and disaster relief.  During Operation Tomodachi, she and the HS-14 Squadron relocated to the Misawa Air Base to administer relief to those nearby affected

INDIVIDUAL AND CLASS ACTION COMPLAINT

areas. She experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein, including but not limited to rashes, hemorrhoids, nosebleeds, and depression.

37. Plaintiff, JESTINE CLAYTON, was born January 20, 1975, and is currently a resident of the State of California. At the time of Operation Tomodachi, she was a Petty Officer Second Class stationed aboard the U.S.S. Ronald Reagan, whose homeport was Naval Base San Diego in San Diego, California. Mrs. Clayton served as a Corrections Officer and Security Personnel during Operation Tomodachi, responsible for securing detainees in the brig, ensuring personnel did not go outside the skin of the ship when unauthorized, securing hatches, and directing personnel to decontamination stations before being authorized for reentry into the ship. She experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein, including but not limited to severe mental and emotional distress, anxiety disorder and mental health issues. Mrs. Clayton is married to Darren Clayton. As a result of the wrongful and negligent acts of the Defendants, Mr. and Mrs. Clayton were caused to suffer, and will continue to suffer in the future, loss of consortium, affection, and conjugal fellowship, all to the detriment of their marital relationship.

38. Plaintiff, ASHLEY COCHRAN, participated in Operation Tomodachi and experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein.

39. Plaintiff, CHRISTOPHER COLEMAN, was born July 26, 1988 and is currently a resident of the State of Texas. At the time of Operation Tomodachi, he was a Seaman stationed aboard the U.S.S. Ronald Reagan, whose homeport was Naval Base San Diego in San Diego, California. Mr. Coleman served as a Logistics Specialist during Operation Tomodachi, responsible for the maintenance of aviation parts and supplies for his squadron. He experienced injury as a result of Defendants' negligent and intentional acts

and omissions described herein, including but not limited to inflammation of the colon, severe stomach pain, hematochezia, and irritable bowel syndrome.

40.  Plaintiff, JEFF COOK, was born May 5, 1978 and is currently a resident of the State of Tennessee.  At the time of Operation Tomodachi, he was a Petty Officer First Class with the VFA-147 unit attached to the U.S.S. Ronald Reagan, whose homeport was Naval Base San Diego in San Diego, California.  Mr. Cook served as a logistics specialist and storeroom keeper during Operation Tomodachi, responsible for turning in the radioactive components of all the F-18 aircrafts and swapping them for clean components.  He experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein, including but not limited to frequent migraines, Chiari malformations in his brain, sleep apnea, epididymitis, depression, anxiety, and asthma.  Mr. Cook is married to Amber Cook, and together they have two children.  As a result of the wrongful and negligent acts of the Defendants, Mr. and Mrs. Cook were caused to suffer, and will continue to suffer in the future, loss of consortium, affection, and conjugal fellowship, all to the detriment of their marital relationship.

41.  Plaintiff, PATRICK CRESPO, was born July 9, 1976 and is currently a resident of the State of Hawaii.  At the time of Operation Tomodachi, he was a Petty Officer First Class stationed aboard the U.S.S. Ronald Reagan, whose homeport is Naval Base San Diego in San Diego, California.  Mr. Crespo served as a Work Center Supervisor during Operation Tomodachi, responsible for operating detectors to check for radiation on supplies and equipment and sending contaminated equipment to be cleaned.  He experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein, including but not limited to respiratory issues and joint pain.  Mr. Crespo is married to Lui-ann Crespo, and they have two children.  As a result of the wrongful and negligent acts of the Defendants, Mr. and Mrs. Crespo were caused to suffer, and will continue to suffer in the future, loss of consortium, affection, and conjugal fellowship, all to the detriment of their marital relationship.

INDIVIDUAL AND CLASS ACTION COMPLAINT

42.  Plaintiff, BRIAN CROSS, participated in Operation Tomodachi, and experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein.

43.  Plaintiff, MICHAEL CROSS, was born May 13, 1983, and is currently a resident of the State of Florida.  At the time of Operation Tomodachi, he was a Petty Officer Second Class stationed aboard the U.S.S. Ronald Reagan, whose homeport was Naval Base San Diego in San Diego, California.  Mr. Cross served as an Aviation Boatswain's Mate during Operation Tomodachi, responsible for assisting the decontamination team to scan the flight deck for radiated areas and then clean those radiated areas.  He experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein, including but not limited to anxiety and fear over the unknown extent of his radiation exposure.

44.  Plaintiff, JOSHUA CUNNINGHAM, was born December 6, 1986, and is currently a resident of the State of Texas.  At the time of Operation Tomodachi, he was a Seaman stationed aboard the U.S.S. Ronald Reagan, whose homeport was Naval Base San Diego in San Diego, California.  Mr. Cunningham served as an Aviation Boatswain's Mate (Aircraft Handling) during Operation Tomodachi, responsible for moving aircrafts and supplies on board, and conducting hatch watches during the contamination period.  He experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein, including but not limited to severe anxiety attacks, blurry vision and numbing sensations, acid reflux issues, and mental anguish over his dangerous radiation exposure.

45.  Plaintiff, DAKOTA DAVIS, was born October 17, 1989 and is currently a resident of the State of Hawaii.  At the time of Operation Tomodachi, he was a Seaman Apprentice stationed aboard the U.S.S. Ronald Reagan, whose homeport was Naval Base San Diego in San Diego, California.  Mr. Davis left from San Diego, California, where he lived at the time, to meet the ship, and continued on the U.S.S. Reagan to Bremerton dry dock in

Washington. Mr. Davis was undesignated during Operation Tomodachi, but his duties included maintenance work on the ship, chipping paint, grinding rust, repainting the ship and general cleanup and decontamination of the ship after deployment. He experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein, including but not limited to migraines, depressive anxiety disorder and Chrohn's disease, for which he has no family history. As a result of the Chrohn's disease, Mr. Davis has undergone a fistula repair, an ileocolectomy, steroid treatment and ongoing chemotherapy treatment.

46. Plaintiff, GERALD H. DAVIS, was born August 8, 1963 and is currently a resident of the State of California. At the time of Operation Tomodachi, he was a Petty Officer Second Class stationed at Naval Air Facility Atsugi. Mr. Davis served as a Logistics Specialist during Operation Tomodachi, responsible for handling radiated materials, repairing certain parts coming off the planes, ships and helicopters, frisking parts for radiation levels and recording the levels, and repackaging parts to send back to the United States for disposal, repair, or replacement. He experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein, including but not limited to elevated stress levels, weight fluctuation, migraines, and anxiety and fear over his radiation exposure. Mr. Davis is married to Wilhelmina Davis. Mr. and Mrs. Davis were caused to suffer, and will continue to suffer in the future, loss of consortium, affection, and conjugal fellowship, all to the detriment of their marital relationship.

47. Plaintiff, KATARINA DAVISON, was born July 24, 1991 and is currently a resident of the State of Iowa. At the time of Operation Tomodachi, she was a Seaman stationed aboard the U.S.S. Ronald Reagan, whose homeport was Naval Base San Diego in San Diego, California. Ms. Davison served as a Logistics Specialist during Operation Tomodachi, responsible for receiving, scanning, and sorting radiated parts from aircrafts on the ship, separating the parts into categories of high, moderate, and low levels of radiation. She experienced injury as a result of Defendants' negligent and intentional acts

and omissions described herein, including but not limited to reproductive health issues, thyroid issues, weight fluctuations, large boils that resulted in scarring, cherry angiomas, and physical pain from injuries.

48. Plaintiff, ADAM DAWSON, was born November 13, 1984 and is currently a resident of the State of Indiana. At the time of Operation Tomodachi, he was a Corporal stationed in Okinawa, Japan. Mr. Irving served as an Anti-Armor Missleman during Operation Tomodachi, responsible for breaking up destroyed homes so engineers could haul away the debris and conducting clean-up on the ground from the destruction. He experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein, including but not limited to testicular cancer metastasized to the colon.

49. Plaintiff, GADIEL DEL ORBE, was born December 11, 1986 and is currently a resident of the State of California. At the time of Operation Tomodachi, he was a Petty Officer Third Class stationed aboard the U.S.S. Ronald Reagan, whose homeport was Naval Base San Diego in San Diego, California. Mr. Orbe served as an Aviation Boatswain Handler during Operation Tomodachi, responsible for directing the launch of aircrafts on the flight deck and loading helicopters with food to deliver to land. He experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein, including but not limited to hyperthyroidism.

50. Plaintiff, ESTATE OF DONALD H. DELLINGER, brings this action on behalf of itself and on behalf of Donald Dellinger. Mr. Dellinger participated in Operation Tomodachi, and experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein, including his untimely death.

51. Plaintiff, OLIVIA DIMAS, was born November 6, 1987 and is currently a resident of the State of Florida. At the time of Operation Tomodachi, she was a Petty Officer Second Class stationed aboard the U.S.S. Ronald Reagan, whose homeport was Naval Base San Diego in San Diego, California. Ms. Dimas served as an Aviation Boatswain Mate during Operation Tomodachi, responsible for directing aircraft on the flight deck. She

experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein, including but not limited to kidney failure, mass on her liver, eye shape distortion, lower back problems, mental health issues, and left wrist pain requiring surgery.

52. Plaintiff, MATTHEW DONALDSON, was born February 13, 1990 and is currently a resident of the State of Colorado. At the time of Operation Tomodachi, he was stationed aboard the U.S.S Chancellorsville, part of the U.S.S. Ronald Reagan Carrier Strike Group. Mr. Donaldson served as a Seaman during Operation Tomodachi, responsible for general watches on the flight deck and lookouts at the head of the ship. He experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein, including but not limited to depression and anxiety.

53. Plaintiff, SHARONDA DOUGLAS, was born August 1, 1987 and is currently a resident of the State of California. At the time of Operation Tomodachi, she was a Petty Officer Second Class stationed aboard the U.S.S. Ronald Reagan, whose home port was Naval Base San Diego in San Diego, California. Ms. Douglas served as a Logistics Specialist during Operation Tomodachi, responsible for inspecting parts from jets on the flight deck, scanning parts for radiation levels, sending some parts to be repaired and calling-in when new parts were necessary. She experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein, including but not limited to Grave's disease and irregular thyroid levels.

54. Plaintiff, DANIEL DRESSLER, was born December 16, 1985 and is currently a resident of the State of California. At the time of Operation Tomodachi, he was a Seaman stationed aboard the U.S.S. Ronald Reagan, whose homeport was Naval Base San Diego in San Diego, California. Mr. Dressler served as a Ship Serviceman during Operation Tomodachi, responsible for ensuring supplies on the ship such as food, water, snacks, toiletries, and magazines for morale were fully stocked. He experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein, including but not limited to ADHD and depression.

55.  Plaintiff, COREY DREW-BELL, was born June 7, 1990 and is currently a resident of the State of California.  At the time of Operation Tomodachi, he was a Lance Corporal stationed aboard the U.S.S. Ronald Reagan, whose homeport was Naval Base San Diego in San Diego, California.  Mr. Drew-Bell served as a Radio Operator during Operation Tomodachi, responsible for assisting with the embarkation, using hovercraft boats to load and unload gear on ship to off the flight deck.  He experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein, including but not limited to difficulty breathing and severe chest strains.

56.  Plaintiff, LAWRENCE EDWARDS, was born September 27, 1988, and is currently a resident of the State of Connecticut.  At the time of Operation Tomodachi, he was a Petty Officer Third Class stationed aboard the U.S.S. Ronald Reagan, whose homeport was Naval Base San Diego in San Diego, California.  Mr. Edwards experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein, including but not limited to abnormal weight fluctuations.

57.  Plaintiff, EDWARD ELUERE, was born October 8, 1987, and is currently a resident of the Commonwealth of Virginia.  At the time of Operation Tomodachi, he was a Petty Officer Second Class stationed aboard the U.S.S. Ronald Reagan, whose homeport was Naval Base San Diego in San Diego, California.  Mr. Eluere served as a Radioman Information Systems Technician during Operation Tomodachi, responsible for performing duties with the decontamination team for six hours daily and hatch door watches.  He experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein, including but not limited to cholecystitis leading to the removal of gallstones and continued pain, severe atopic dermatitis, IgA nephropathy, post-traumatic stress disorder, severe anxiety disorder, hypertension, sleep apnea, fatigue, eyesight issues due to enlarged optic nerve, recurring respiratory infections, temporomandibular joint syndrome, and knee and joint pain causing decreased mobility due to cartilage wearing away.  Mr. Eluere is married to Mrs. Britini M. Eluere, and together they have two children.

INDIVIDUAL AND CLASS ACTION COMPLAINT

As a result of the wrongful and negligent acts of the Defendants, Mr. and Mrs. Eluere were caused to suffer, and will continue to suffer in the future, loss of consortium, affection, and conjugal fellowship, all to the detriment of their marital relationship.

58. Plaintiff, RAMON ENCISO, JR., was stationed during Operation Tomodachi aboard the U.S.S. Ronald Reagan, whose homeport was Naval Base San Diego in San Diego, California.  Mr. Enciso served as an undesignated airman during Operation Tomodachi, responsible for working inside the ventilation systems on ship, checking for radiation, and cleaning the contaminated areas.  He experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein.

59. Plaintiff, ERIC I. EPPS, was stationed during Operation Tomodachi aboard the U.S.S. Ronald Reagan, whose homeport was Naval Base San Diego in San Diego, California.  Mr. Epps experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein, including but not limited to neurological and mental health issues.

60. Plaintiff, BRIAN EUBANKS, was born May 31, 1989 and is currently a resident of the State of Nebraska.  At the time of Operation Tomodachi, he was a Petty Officer Third Class stationed at Naval Base Coronado in San Diego, California.  Mr. Eubanks served as an Aviation Electrician's Mate during Operation Tomodachi, responsible for setting up a decontamination cleaning site for contaminated and faulty parts from Japan to be sent for processing and for decontaminating, repairing, and disposing of the radiated parts and equipment coming directly off the ships based in Japan.  He experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein, including but not limited to bladder cancer, frequent urination, headaches, pelvic area pain, difficulty breathing, and anxiety and depression over his deteriorating health.  Mr. Eubanks is married to Kristen Eubanks.  Mr. and Mrs. Eubanks were caused to suffer, and will continue to suffer in the future, loss of consortium, affection, and conjugal fellowship, all to the detriment of their marital relationship.

61. Plaintiff, JASON FERGUSON, was born May 20, 1980 and is currently a resident of the State of Florida. At the time of Operation Tomodachi, he was a Lead Petty Officer for the Air Crew Survival Equipment Shop, stationed in Japan and assisting aboard the U.S.S. George Washington. Mr. Ferguson was responsible for the air crew and pilot flight equipment, including inspecting the contaminated gear when it was returned to the shop. Mr. Ferguson flew throughout radiation-affected areas of Japan to distribute supplies. He experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein, including but not limited to fear over his radiation exposure. Mr. Ferguson is married to Michelle Ferguson and they have one son. As a result of the wrongful and negligent acts of the Defendants, Mr. and Mrs. Ferguson were caused to suffer, and will continue to suffer in the future, loss of consortium, affection, and conjugal fellowship, all to the detriment of their marital relationship.

62. Plaintiff, JUSTINE FRALEY, was born May 25, 1988 is currently a resident of the State of California. At the time of Operation Tomodachi, she was a Petty Officer Third Class stationed aboard the U.S.S. Ronald Reagan, whose homeport was Naval Base San Diego in San Diego, California. Ms. Fraley served as an Aviation Structural Mechanic during Operation Tomodachi, responsible for mechanical work on aircraft aboard the U.S.S. Reagan. She experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein, including but not limited to hypothyroidism.

63. Plaintiff, MARLON FRANCIS, was born October 12, 1982, and is currently a resident of the State of Georgia. At the time of Operation Tomodachi, he was a Petty Officer Second Class stationed aboard the U.S.S. Essex, whose homeport was Naval Base San Diego. Mr. Francis served as an Electrician and Engineering Watch Supervisor during Operation Tomodachi, responsible for working on the radiation team that surveyed radiation exposure levels on the ship. He experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein, including but not limited to post-traumatic stress disorder, thyroid issues, continuous sinus drainage issues, ongoing

hematochezia, and high levels of radiation following Operation Tomodachi.  Mr. Francis is also a father of three children.

64.  Plaintiff, RUTH FREEMAN, was born March 9, 1991 and is currently a resident of the State of California.  At the time of Operation Tomodachi, she was a Petty Officer Second Class stationed at Misawa Air Force Base.  Mrs. Freeman served as an IT Specialist during Operation Tomodachi, responsible for assisting in on the ground cleanup efforts in Misawa, Japan after the city was hit by the tsunami.  She experienced serious injury as a result of Defendants' negligent and intentional acts and omissions described herein, including but not limited to thyroid cancer requiring removal of thyroid and ninety-six lymph nodes, severe migraines, nerve damage, anemia, depression, reproductive health issues and damaged salivary glands.

65.  Plaintiff, STEVEN GARDNER, was born January 19, 1989, and is currently a resident of the State of Florida.  At the time of Operation Tomodachi, he was a Seaman stationed aboard the U.S.S. Ronald Reagan, whose homeport was Naval Base San Diego in San Diego, California.  Mr. Gardner served as a Plane Captain for an F18 squadron during Operation Tomodachi, responsible for washing and decontaminating the airplanes on the flight deck after they returned from missions.  He experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein, including but not limited to severe muscle spasms, left shoulder and back pain, chronic headaches, and mental and emotional stress.  He is married to Anna Garner and they have one son.  As a result of the wrongful and negligent acts of the Defendants, Mr. and Mrs. Eluere were caused to suffer, and will continue to suffer in the future, loss of consortium, affection, and conjugal fellowship, all to the detriment of their marital relationship.

66.  Plaintiff, LISSET GARNER, is currently a resident of the State of Missouri.  At the time of Operation Tomodachi, she was stationed aboard the U.S.S. Ronald Reagan whose homeport was Naval Base San Diego in San Diego, California.  Mrs. Garner served as an aircraft handler on the flight deck during Operation Tomodachi.  She experienced

injury as a result of Defendants' negligent and intentional acts and omissions described herein, including but not limited to reproductive issues. Mrs. Garner is married to Zacary Garner. Mr. and Mrs. Garner were caused to suffer, and will continue to suffer in the future, loss of consortium, affection, and conjugal fellowship, all to the detriment of their marital relationship.

67. Plaintiff, DEREK KEITH GAY, was born November 7, 1988 and is currently a resident of the State of North Carolina. At the time of Operation Tomodachi, he was a Petty Officer Second Class stationed aboard the U.S.S. Cowpens, whose homeport was Naval Base San Diego in San Diego, California. Mr. Gay served as a Fire Controlman during Operation Tomodachi, responsible for operating and maintaining combat and weapons direction systems, missile systems and gun fire control systems, and scanning equipment to detect and record radiation levels. He experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein, including but not limited to eczema and mental and emotional stress over his radiation exposure.

68. Plaintiff, JOSHY GEORGE, was born August 6, 1989 and is currently a resident of the State of Texas. At the time of Operation Tomodachi, he was a Seaman stationed aboard the U.S.S Ronald Reagan, whose homeport was Naval Base San Diego in San Diego, California. Mr. George served as an Aviation Machinist's Mate during Operation Tomodachi, responsible for maintenance work on helicopters and loading the helicopters on the flight deck with supplies for humanitarian relief missions. He experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein, including but not limited to post-traumatic stress disorder, loss of appetite, insomnia issues and complete hair loss.

69. Plaintiff, RAYMOND GILES, was born July 28, 1987 and is currently a resident of the State of Florida. At the time of Operation Tomodachi, he was a Petty Officer Third Class stationed aboard the U.S.S. Essex, whose homeport was Naval Base San Diego in San Diego, California. Mr. Giles served as an Aviation Boatswain's Mate during

Operation Tomodachi, responsible for supervising movement and securing aircraft and equipment on the flight deck. He experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein, including but not limited to high liver enzymes, glucose level fluctuations, white blood cells prematurely exiting bones, deteriorating cartilage in the knee, stomach issues, irritable bowel syndrome, severe migraines, post-traumatic stress disorder, and difficulty focusing. Mr. Giles is married to Larissa Giles. Mr. and Mrs. Giles were caused to suffer, and will continue to suffer in the future, loss of consortium, affection, and conjugal fellowship, all to the detriment of their marital relationship.

70. Plaintiff, KIRK GODAIR INDIVIDUALLY AND AS THE ADMINISTRATOR OF THE ESTATE OF RUBY PEREZ, is a resident of the State of Texas. Ruby Perez was born February 23, 1989, and prior to her death was a resident of the State of Texas. She was married to Kirk Godair and together they had one daughter. At the time of Operation Tomodachi, she was a Petty Officer Second Class stationed aboard U.S.S. Ronald Reagan, whose homeport was Naval Base San Diego in San Diego, California. Ms. Perez experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein, including ovarian cancer, which resulted in her death on December 7, 2016.

71. Plaintiff, KIRK GODAIR, on behalf and for his minor daughter, C.G. is a resident of the State of Texas. C.G. is the minor daughter of Kirk Godair and Ruby Perez, who died of ovarian cancer after participating in Operation Tomodachi during her military service.

72. Plaintiff, RODOLFO GUERRA, was born January 5, 1991, and is currently a resident of the State of Texas. At the time of Operation Tomodachi, he was a Seaman Apprentice stationed aboard the U.S.S. Ronald Reagan, whose homeport was Naval Base San Diego in San Diego, California. Mr. Guerra served as a deck seaman during Operation Tomodachi, responsible for assisting seaman on the flight deck and standing watch on deck in four hour shifts. He experienced injury as a result of Defendants' negligent and

INDIVIDUAL AND CLASS ACTION COMPLAINT

intentional acts and omissions described herein, including but not limited to hair loss, migraines, acid reflux issues with occasional vomiting, and fear and anxiety due to his radiation exposure.  Mr. Guerra is married to Roxanne Palacious.  As a result of the wrongful and negligent acts of the Defendants, Mr. Guerra and Mrs. Palacious were caused to suffer, and will continue to suffer in the future, loss of consortium, affection, and conjugal fellowship, all to the detriment of their marital relationship.

73.  Plaintiff, TYMESHIA GUIDRY, was born October 3, 1991 and is currently a resident of the State of California.  At the time of Operation Tomodachi, she was a Seaman stationed aboard the U.S.S. Ronald Reagan, whose homeport was Naval Base San Diego in San Diego, California.  Ms. Guidry served as a Boatswain's Mate during Operation Tomodachi, responsible for cleaning and chipping off paint in contaminated areas and standing watch in shifts on the flight deck.  She experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein, including but not limited to depression and anxiety, fibromyalgia, irritable bowel syndrome, and reproductive issues.

74.  Plaintiff, CECILIA GUTIERREZ, was born May 27, 1970, and is currently a resident of the State of Michigan.  At the time of Operation Tomodachi, she was a contracted civilian stationed aboard the U.S.N.S. Pecos.  Ms. Gutierrez served as an Ordinary Seaman during Operation Tomodachi.  She experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein, including but not limited to thyroid nodules, Hashimoto thyroiditis, fatty liver disease and muscular skeletal dysfunction.

75.  Plaintiff, CYRINTHIA HAMBLEY, was born March 22, 1972 and is currently a resident of the Commonwealth of Virginia.  At the time of Operation Tomodachi, she was a Department of Defense contractor stationed aboard the U.S.S. Curtis Wilbur, where she was responsible for providing training to the crew.  She experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein, including but

not limited to reproductive health issues, heightened general anxiety disorder, deteriorating eyesight and extreme weight loss. Ms. Hambley is married to Corey Hambley and they have two children together. As a result of the wrongful and negligent acts of the Defendants, Mr. and Mrs. Hambley were caused to suffer, and will continue to suffer in the future, loss of consortium, affection, and conjugal fellowship, all to the detriment of their marital relationship.

76. Plaintiff, HALDANE HAMILTON, was born September 15, 1986, and is currently a resident of the State of California. At the time of Operation Tomodachi, he was a Seaman stationed aboard the U.S.S. Ronald Reagan, whose homeport was Naval Base San Diego in San Diego, California. Mr. Hamilton served as a Deck Seaman and Gunner's Mate during Operation Tomodachi, responsible for conducting external standing watches, loading packages on the flight deck, and assisting the photo flight team and decontamination efforts. He experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein.

77. Plaintiff, NATHAN HANSEN, was born March 28, 1980, and is currently a resident of the State of California. At the time of Operation Tomodachi, he was a Petty Officer First Class stationed aboard the U.S.S. George Washington, whose homeport was Naval Station Norfolk in Norfolk, Virginia. Mr. Hansen served as an Aviation Mechanic during Operation Tomodachi, responsible for aeronautical welding and aircraft maintenance on the flight deck, and also worked as a quality assurance representative. He experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein, including but not limited to stomach pains, gastrointestinal problems, bloating, acid reflux, mental stress from dangerous radiation exposure, muscle stiffness, pain in joints, and depression and anxiety.

78. Plaintiff, COREY HART, was born January 23, 1989 and is currently a resident of the State of Texas. At the time of Operation Tomodachi, he was a Seaman stationed aboard the U.S.S. Ronald Reagan, whose homeport was Naval Base San Diego in San Diego,

INDIVIDUAL AND CLASS ACTION COMPLAINT

California.  Mr. Hart served as an Aviation Ordnanceman during Operation Tomodachi, responsible for maintaining and repairing the aircrafts' mechanical and electrical armament and ordnance systems.  He experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein, including but not limited to stomach ulcers, hematochezia, gall stones, and kidney stones.  Mr. Hart is married to Courtney Hart.  Mr. and Mrs. Hart were caused to suffer, and will continue to suffer in the future, loss of consortium, affection, and conjugal fellowship, all to the detriment of their marital relationship.

79.  Plaintiff, MICHAEL HARVEY, was born November 8, 1975 and is currently a resident of the Commonwealth of Virginia.  At the time of Operation Tomodachi, he was a Lieutenant Commander stationed aboard the U.S.S. Ronald Reagan, whose homeport was Naval Base San Diego in San Diego, California.  Mr. Harvey served as an Aviation and Weapons Systems Safety Officer during Operation Tomodachi, responsible for commanding his squadron, observing all flight operations on deck, and doing reconnaissance flight missions to obtain video footage of the lay of the land to assist in the humanitarian efforts.  He experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein, including but not limited to mental and emotional distress over his exposure to dangerous radiation and the potential for negative health consequences that may result from that exposure.

80.  Plaintiff, JOSEPH K. HENRY, was born January 1, 1985 and is currently a resident of the State of Texas.  Shortly following Operation Tomodachi, he was a Mineman Second Class stationed in Okinawa, Japan.  Mr. Henry provided maintenance of supplies and equipment that were used on the base.  He experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein, including but not limited to fear and anxiety regarding his health due to his exposure to radiation.

81.  Plaintiff, DARREN HENSON, was born November 12, 1989, and is currently a resident of the State of South Carolina.  At the time of Operation Tomodachi, he was a

INDIVIDUAL AND CLASS ACTION COMPLAINT

Corporal for the U.S. Marine Corps stationed aboard the U.S.S. Ronald Regan, whose homeport was Naval Base San Diego in San Diego, California. Mr. Henson served as an Aircraft Mechanic during Operation Tomodachi, responsible for aircraft inspections, maintenance, services and decontamination washes on the flight deck for up to ten hours daily. He experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein, including but not limited to back spasms, foot numbness, male health issues, and hypothyroidism.

82. Plaintiff, MARTY B. HILL, was born June 1, 1992 and is currently a resident of the State of California. At the time of Operation Tomodachi, he was a Petty Officer Third Class stationed aboard the U.S.S. Ronald Reagan, whose homeport was Naval Base San Diego in San Diego, California. Mr. Hill served as a Machinist Mate in the Reactor Department during Operation Tomodachi, responsible for the overseeing the battle dressing stations for pilots and sailors coming aboard the flight deck, acting as the main machinery watchman, and frisking personnel as they entered and left the ship. He was also responsible for confiscating and bagging radiation-contaminated equipment. He experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein, including but not limited to insomnia, night terrors, depression and anxiety, symptoms of post-traumatic stress disorder, and bodily pains.

83. Plaintiff, MARTIN HITSON, was born April 27, 1969 and is currently a resident of the State of California. At the time of Operation Tomodachi, he was a Chief Warrant Officer Two stationed aboard the U.S.S. Ronald Reagan, whose homeport was Naval Base San Diego in San Diego, California. Mr. Hitson served as an Airborne/Crash and Salvage Officer during Operation Tomodachi working in the flight deck fire and rescue department, responsible for flight deck operations during launch and recovery of aircraft. He experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein, including but not limited to hypothyroidism, skin rashes and anxiety. Mr. Hitson is married to Paula Hitson, and they have three children. As a result of the wrongful

and negligent acts of the Defendants, Mr. and Mrs. Hitson were caused to suffer, and will continue to suffer in the future, loss of consortium, affection, and conjugal fellowship, all to the detriment of their marital relationship.

84. Plaintiff, MITCHELL HODGES, was born April 25, 1985 and is currently a resident of the State of Michigan.  At the time of Operation Tomodachi, he was a Seaman stationed aboard the U.S.S. Ronald Reagan, whose homeport was Naval Base San Diego in San Diego, California.  Mr. Hodges served as plane captain, Aviation Ordnanceman, on the flight deck during Operation Tomodachi.  He experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein, including but not limited to random nose bleeds, painful swollen lymph nodes, weight issues, symptoms of post-traumatic stress disorder, depression and anxiety, and male health issues requiring lifelong therapy.

85. Plaintiff, NICHOLAS HOLLAND, was born November 19, 1989 and is currently a resident of the State of North Carolina.  At the time of Operation Tomodachi, he was a Petty Officer Third Class stationed aboard the U.S.S. Ronald Reagan, whose homeport was Naval Base San Diego in San Diego, California.  Mr. Holland served as a Logistics Specialist during Operation Tomodachi, responsible for identifying, ordering, stocking and issuing repair parts.  He experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein, including but not limited to severe chest and skin irritation resulting in scar tissue and bilateral tinnitus.

86. Plaintiff, WILLIAM HOLT, was born April 30, 1975, and is currently a resident of the Commonwealth of Virginia.  At the time of Operation Tomodachi, he was a Senior Chief Petty Officer stationed aboard the U.S.S. Ronald Reagan, whose homeport was Naval Base San Diego in San Diego, California.  Mr. Holt served as a Logistics Storekeeper during Operation Tomodachi, responsible for coordinating supply drops on the flight deck and closing all ventilation on the ship during transit through the radiation plume.  He experienced injury as a result of Defendants' negligent and intentional acts and omissions

described herein, including but not limited to male health problems.  Mr. Holt is married to Shakira Holt.  As a result of the wrongful and negligent acts of the Defendants, Mr. and Mrs. Holt were caused to suffer, and will continue to suffer in the future, loss of consortium, affection, and conjugal fellowship, all to the detriment of their marital relationship.

87.  Plaintiff, JOHN WESLEY HYATT, participated in Operation Tomodachi, and experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein, including but not limited to sickle cell adenocarcinoma of the stomach.

88. Plaintiff, KEVIN JACOBSON, was born May 18, 1989 and is currently a resident of the State of Washington.  At the time of Operation Tomodachi, he was a Lance Corporal stationed at United States Marine Corps logistics base, Camp Kinser in Okinawa, Japan. Mr. Jacobson served as a Data Network Specialist for Combat Logistics Regiment 35. During Operation Tomodachi, he was flown into Sendai, Japan, where he was responsible for providing communications and leadership support for the Marine Expeditionary Units on the ground clearing out mud and debris outside the Sendai International Airport.  He experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein, including but not limited to reproductive issues and back and joint pain. Mr. Jacobson is married to Rachel-Elle Jacobson and they have had reproductive issues, which have resulted in mental and emotional distress.  In addition, as a result of the wrongful and negligent acts of the Defendants, Mr. and Mrs. Jacobson were caused to suffer, and will continue to suffer in the future, loss of consortium, affection, and conjugal fellowship, all to the detriment of their marital relationship.

89.  Plaintiff, JUSTIN JAEHNIG, participated in Operation Tomodachi, and experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein.

90.  Plaintiff, MATTHEW JENKINS, was born January 19, 1983 and is currently a resident of the State of California.  At the time of Operation Tomodachi, he was a Petty Officer Second Class stationed aboard the U.S.S. Stockdale, whose homeport was Naval

base San Diego in San Diego, California.  Mr. Jenkins served as an Aviation Ordnanceman during Operation Tomodachi, responsible for servicing, inspecting, and handling of weapons and ammunition carried on naval aircrafts, mainly working on helicopters on the ship's flight deck.  He experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein, including but not limited to pancreatic cancer, resulting in the removal the head of his pancreas, part of his liver and a large tumor on his pancreas.  Following surgery, he underwent chemotherapy, lost 65 pounds, and has been diagnosed with diabetes.  Mr. Jenkins is married to Jackie Jenkins.  Mr. and Mrs. Jenkins were caused to suffer, and will continue to suffer in the future, loss of consortium, affection, and conjugal fellowship, all to the detriment of their marital relationship.

91.  Plaintiff, GREGGORY JORDAN, was born November 22, 1962 and is currently a resident of the State of Michigan.  At the time of Operation Tomodachi, he was a Petty Officer Second Class stationed at Naval Air Facilities Atsugi.  Mr. Jordan served as an Electronics Technician during Operation Tomodachi, responsible for parts adjudication and working on the decontamination team.  He experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein, including but not limited to prostate cancer and sleep apnea.

92.  Plaintiff, RODERICK JESSAMY, was born July 19, 1972, and is currently a resident of the Commonwealth of Virginia.  At the time of Operation Tomodachi, he was a Chief Petty Officer stationed aboard the U.S.S. Ronald Reagan, whose homeport was Naval Base San Diego in San Diego, California.  Mr. Jessamy served as a Hazmat Officer during Operation Tomodachi, responsible for overseeing helicopter operations on the flight deck for 8-10 hours per day, and loading supplies and food onto helicopters for humanitarian aid.  He experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein, including but not limited to severe headaches, dizziness, and lingering nasal and thoracic symptoms.  Mr. Jessamy is married to Trish Jessamy.  As a result of the wrongful and negligent acts of the Defendants, Mr.

and Mrs. Jessamy were caused to suffer, and will continue to suffer in the future, loss of consortium, affection, and conjugal fellowship, all to the detriment of their marital relationship.

93.  Plaintiff, JUSTIN KENWORTHY, was born September 18, 1986 and is currently a resident of the Commonwealth of Virginia.  At the time of Operation Tomodachi, he was a Petty Officer First Class with the VAQ-139 unit attached to the U.S.S. Ronald Reagan, whose homeport was Naval Base San Diego in San Diego, California.  Mr. Kenworthy served as an Aviation Structural Mechanic during Operation Tomodachi, responsible for maintaining all aircraft main and auxiliary hydraulic power systems, actuating subsystems and landing gear.    He experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein.  Mr. Kenworthy is married to Brittany Kenworthy.  Mr. and Mrs. Kenworthy were caused to suffer, and will continue to suffer in the future, loss of consortium, affection, and conjugal fellowship, all to the detriment of their marital relationship.

94.  Plaintiff, MATTHEW KNAUST, was born October 23, 1986, and is currently a resident of the State of California.  At the time of Operation Tomodachi, he was a Sergeant in the United States Marine Corps stationed aboard the U.S.S. Ronald Reagan, whose homeport was Naval Base San Diego in San Diego, California.  Mr. Knaust served as a F/A-18 Ordnance Technician during Operation Tomodachi, responsible for safety inspections, ordnance loading, aircraft maintenance and decontamination of living quarters.  He experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein, including but not limited to myxoid lyposarcoma cancer, removal of a large malignant mass, obstructive sleep apnea, and depression.  As a result of the thirty rounds of radiation therapy Mr. Knaust received, he has incurred hair loss, and skin burning.  Mr. Knaust is married to Kari Knaust, and they have had reproductive issues.  As a result of the wrongful and negligent acts of the Defendants, Mr. and Mrs. Knaust were

caused to suffer, and will continue to suffer in the future, loss of consortium, affection, and conjugal fellowship, all to the detriment of their marital relationship.

95.  Plaintiff, ANDREW KOEPKE, is currently a resident of the State of California. He participated in Operation Tomodachi, and experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein.

96.  Plaintiff, NICHOLAS KOVACHEV, was born December 23, 1976.  At the time of Operation Tomodachi, he was a Lieutenant stationed aboard the U.S.S. Ronald Reagan, whose homeport was Naval Base San Diego in San Diego, California.  Mr. Kovachev served as an Assistant Materials, Hazmat and Material Control Officer during Operation Tomodachi, responsible for preparing and loading relief materials for transfer to and from Japan and other ships in the Carrier Strike Group.  Mr. Kovachev was in close proximity to the helicopters flown into Fukushima and the materials they brought back from contaminated areas.  He experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein, including but not limited to rapid unexplained weight loss, hematochezia, kidney pains and irregular heart rhythms.

97.  Plaintiff, RYAN KUNIN, was born August 9, 1985, and is currently a resident of the State of California.  At the time of Operation Tomodachi, he was a Petty Officer Third Class stationed aboard the U.S.S. Mustin, whose homeport was United States Fleet Activities Yokosuka.  Mr. Kunin served as a Naval Aircrewmen (Tactical Helicopter) attached to HS-14 helicopter command during Operation Tomodachi, responsible for conducting search and rescue operations and distributing food, clothes and blankets in and out of contaminated zones.  He experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein, including but not limited to severe anxiety, worsening eyesight and aching joints.

98.  Plaintiff, RENE LANDEROS, was born May 8, 1988, and is currently a resident of the State of California.  At the time of Operation Tomodachi, he was a Petty Officer Second Class stationed aboard the U.S.S. Ronald Reagan, whose homeport was Naval Base

San Diego in San Diego, California. Mr. Landeros served as a Damage Controlman during Operation Tomodachi, responsible for cleaning and replacing HEPA filters throughout the ship, and assisting the decontamination team on the flight deck by monitoring radiation levels of pilots and handling radioactive material. He experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein, including but not limited to a brain tumor requiring surgical removal, and mental and emotional stress. Mr. Landeros is married to Celina Landeros. As a result of the wrongful and negligent acts of the Defendants, Mr. and Mrs. Landeros were caused to suffer, and will continue to suffer in the future, loss of consortium, affection, and conjugal fellowship, all to the detriment of their marital relationship.

99. Plaintiff, MICHAEL LELAND, was born October 21, 1986, and is currently a resident of the State of California. At the time of Operation Tomodachi, he was a Petty Officer First Class stationed aboard the U.S.S. Tortuga, whose homeport was Joint Expeditionary Base Little Creek in Little Creek, Virginia. Mr. Leland served as an Aviation Electronics Technician during Operation Tomodachi, responsible for acting as the flight deck/flight line troubleshooter for launch and recovery operations, maintenance on 2 Mh-53E helicopters between flights, fireguard during helicopter launches and shutdowns, and loading pallets of supplies on the helicopters for humanitarian missions on the flight deck of the U.S.S Tortuga and on the ground at the Naval Air Facility Misawa in Misawa, Japan. He experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein including but not limited to mental stress over the potential lifelong effects from his radiation exposure.

100.    Plaintiff, MELISSA MARIE LESTER, was born July 4, 1988 and is currently a resident of the State of California. At the time of Operation Tomodachi, she was stationed aboard the U.S.S. Ronald Reagan, whose homeport was Naval Base San Diego in San Diego, California. She experienced injury as a result of Defendants'

INDIVIDUAL AND CLASS ACTION COMPLAINT

negligent and intentional acts and omissions described herein, including but not limited to mental health issues, sleep paralysis and women's health issues.

101.    Plaintiff, LAWRENCE MATTHEW LEVAN, was born March 29, 1989 and is currently a resident of the State of Texas.  At the time of Operation Tomodachi, he was a Seaman stationed aboard the U.S.S Ronald Reagan, whose homeport was Naval Base San Diego in San Diego, California.  Mr. Levan served as an Aviation Ordnanceman during Operation Tomodachi, responsible for conducting hatch watches, detecting radiated areas in various parts of the ship and assisting to decontaminate radiated areas.  He experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein, including chronic headaches, hematochezia, and asthma requiring prescription medication and use of an inhaler.

102.    Plaintiff, JOSEPH LEWIS, was born December 12, 1988 and is currently a resident of the State of Nevada.  At the time of Operation Tomodachi, he was stationed aboard the U.S.S Ronald Reagan, whose homeport was Naval Base San Diego in San Diego, California.  Mr. Lewis served as an Aviation Ordnanceman during Operation Tomodachi.  He experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein.  Mr. Lewis is married to Jazmene Lewis, and they have three children together. As a result of the wrongful and negligent acts of the Defendants, Mr. and Mrs. Lewis were caused to suffer, and will continue to suffer in the future, loss of consortium, affection, and conjugal fellowship, all to the detriment of their marital relationship.

103.    Plaintiff, SCOTT LIENG, was born on June 2, 1980 and is currently a resident of the Commonwealth of Pennsylvania.  At the time of Operation Tomodachi, he was a Lieutenant stationed aboard the U.S.S Ronald Reagan, whose homeport was Naval Base San Diego in San Diego, California.  Mr. Lieng served as the Material Division Officer for the Supply Department during Operation Tomodachi, responsible for loading supplies (water, food and clothing) for Operation Tomodachi.  He and his team worked

closely with the helicopters running deliveries to the Japanese on the beach. He experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein, including but not limited to hematochezia and gastrointestinal issues.

104.    Plaintiff, ARNULFO LIMON, was born November 28, 1965 and is currently a resident of the State of California. At the time of Operation Tomodachi, he was a Chief Warrant Officer 4 stationed aboard the U.S.S Ronald Reagan, whose homeport was Naval Base San Diego in San Diego, California. Mr. Limon served as a Food Service Officer during Operation Tomodachi, responsible for providing food to locals and bringing supplies to the flight deck to be loaded onto helicopters for distribution on land. He experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein, including but not limited to skin rashes, lumps and unexplained weight gain. Mr. Limon is married to Jennifer Limon, and they have two children together. As a result of the wrongful and negligent acts of the Defendants, Mr. and Mrs. Limon were caused to suffer, and will continue to suffer in the future, loss of consortium, affection, and conjugal fellowship, all to the detriment of their marital relationship.

105.    Plaintiff, ADRIAN LUCINA, was born July 8, 1977, and is currently a resident of the State of California. At the time of Operation Tomodachi, he was a Senior Chief Petty Officer stationed aboard the U.S.S Curtis Wilbur, whose homeport was Naval Base Yokosuka. Mr. Lucina served as a trainer and gas turbine technician during Operation Tomodachi, responsible for training other officers, conducting operations in the engine room and auxiliary spaces and inspecting engineering equipment. He experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein, including abdominal pain, chest pains, removal of gall bladder, and concern over long term health issues. Mr. Lucina is married to Jane Llagas Kurata. As a result of the wrongful and negligent acts of the Defendants, Mr. Lucina and Mrs. Kurata were caused to suffer, and will continue to suffer in the future, loss of consortium, affection, and conjugal fellowship, all to the detriment of their marital relationship.

106.    Plaintiff, ANNETTE LUCKEY, individually and as Administrator of the ESTATE OF DANYELLE LUCKEY, is a resident of the State of California.  Danyelle Luckey is the deceased daughter of Derrick and Annette Luckey.  Ms. Luckey was born May 18, 1993, and died on October 10, 2016.  Prior to her death, she was a resident of the State of California.  Danyelle served as a Personal Specialist, stationed aboard the U.S.S Ronald Reagan, whose homeport is Naval Base San Diego in San Diego, California.  Ms. Luckey died at age twenty-three of sepsis, and autopsy reports revealed a high concentration of heavy metals.

107.    Plaintiff, DERRICK LUCKEY, is the father of Danyelle Luckey, deceased. He is currently a resident of the State of California.

108.    Plaintiff, EDWIN MAHER, was born February 2, 1989, and is currently a resident of the State of Florida.  At the time of Operation Tomodachi, he was a Petty Officer Third Class stationed aboard the U.S.S. Ronald Reagan, whose homeport was Naval Base San Diego in San Diego, California.  Mr. Maher served as a Machinist's Mate during Operation Tomodachi, responsible for assisting the nuclear machinists in the shaft alley and engine room of the ship and assisting with the decontamination efforts.  He experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein, including but not limited to debilitating migraines and irritable bowel syndrome. Mr. Maher is married to Ashley Maher.  As a result of the wrongful and negligent acts of the Defendants, Mr. and Mrs. Maher were caused to suffer, and will continue to suffer in the future, loss of consortium, affection, and conjugal fellowship, all to the detriment of their marital relationship.

109.    Plaintiff, JORDAN MANN, was born February 10, 1984 and is currently a resident of State of Texas.  At the time of Operation Tomodachi, he was stationed at the Misawa Air Base. Mr. Mann served as a Senior Airman during Operation Tomodachi, responsible for maintaining and cleaning aircraft, accommodating people visiting the base, setting up cots for Japanese civilians temporarily housed at the base and supervising other

INDIVIDUAL AND CLASS ACTION COMPLAINT

Airmen.  He experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein, including but not limited to testicular cancer, migraines, back pain and herniated disc.  Mr. Mann is married to Ashley Chitty, and they have three children.  As a result of the wrongful and negligent acts of the Defendants, Mr. Mann and Ms. Chitty were caused to suffer, and will continue to suffer in the future, loss of consortium, affection, and conjugal fellowship, all to the detriment of their marital relationship.

110.    Plaintiff, FRANCISCO E. MARIGUNDON, JR., was born June 18, 1969 and is currently a resident of the State of California.  At the time of Operation Tomodachi, he was a Senior Chief Petty Officer stationed aboard the U.S.S. Ronald Reagan, whose homeport was Naval Base San Diego in San Diego, California.  Mr. Marigundon served as the leading Culinary Specialist during Operation Tomodachi, responsible for the food service for the entire ship, including supervising the proper operation of the Food Service Division and Wardroom Operation, which required that he spend substantial time on the hanger bay and flight deck.  He also helped prepare food and put in in pallets to be distributed to the tsunami victims on shore.  He experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein, including but not limited to high blood pressure, gout, abnormal heart rhythm and allergies.  Mr. Marigundon is married to Rosalie Marigundon, and they have two children together.  As a result of the wrongful and negligent acts of the Defendants, Mr. and Mrs. Marigundon were caused to suffer, and will continue to suffer in the future, loss of consortium, affection, and conjugal fellowship, all to the detriment of their marital relationship.

111.    Plaintiff, FRANCIS MARLON, was born October 12, 1982, and is currently a resident of the State of Georgia.  At the time of Operation Tomodachi, he was a Petty Officer Second Class stationed aboard the U.S.S. Essex, whose homeport was Naval Base San Diego in San Diego, California.  Mr. Marlon served as an Engineering Duty Officer and Electrician during Operation Tomodachi, responsible for surveying radiation levels on

the ship, monitoring the electrical switchboard, maintaining decontamination, conducting daily walk-throughs to ensure only essential personnel were allowed outside of the skin of the ship. He experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein, including but not limited to thyroid problems, hematochezia, sinus drainage issues and post-traumatic stress disorder.

112. Plaintiff, CHAD MARTINS, was born December 19, 1987 and is currently a resident of the State of California. At the time of Operation Tomodachi, he was an Airman stationed aboard the U.S.S. Ronald Reagan, whose homeport was Naval Base San Diego in San Diego, California. Mr. Martins served as an Aviation Machinist Mate during Operation Tomodachi, responsible for loading helicopters on the flight deck with rations and clothes. He experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein, including but not limited to chest pains, shortness of breath, syncope episodes and ventricular tachycardia. Mr. Martins has undergone three heart surgeries attempting to correct the condition, which have been unsuccessful. He has suffered severe mental and emotional distress from undergoing heart surgery at the age of twenty-nine. Mr. Martins is married to Amy Martins. As a result of the wrongful and negligent acts of the Defendants, Mr. and Mrs. Martins were caused to suffer, and will continue to suffer in the future, loss of consortium, affection, and conjugal fellowship, all to the detriment of their marital relationship.

113. Plaintiff, JANETH MASINDE, individually and as the Administrator of the ESTATE OF BRENDA DOWNING, is the mother of Brenda Downing, who served in Operation Tomodachi. During Operation Tomodachi, Ms. Downing experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein, including her death.

114. Plaintiff, TRAVIS MCKNIGHT, was born April 11, 1981 and is currently a resident of the State of California. At the time of Operation Tomodachi, he was a Petty Officer Third Class stationed aboard the U.S.S. Ronald Reagan, whose homeport was

Naval Base San Diego in San Diego, California.  Mr. McKnight served as an Aviation Boatswain's Mate during Operation Tomodachi, responsible for preparations on the flight deck for incoming aircraft and washing down the flight deck.  He experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein, including but not limited to intestinal problems, enlarged spleen, abnormal pancreatic enzymes and weakened joints.  Mr. McKnight is married to Andrea McKnight, and they have two children.  As a result of the wrongful and negligent acts of the Defendants, Mr. and Mrs. McKnight were caused to suffer, and will continue to suffer in the future, loss of consortium, affection, and conjugal fellowship, all to the detriment of their marital relationship.

115.    Plaintiff, EDWARD MELLO, was born July 14, 1953 and is currently a resident of the State of Washington.  At the time of Operation Tomodachi, he was a United States Department of Defense Scientist, stationed aboard the USNS Bridge, part of the U.S.S. Ronald Reagan Strike Force, whose homeport was Naval Base Kitsap in Bremerton, Washington.  Mr. Mello served as a Radiological Control Technician during Operation Tomodachi, responsible for monitoring airborne contamination to determine any changes in the contamination spread and helping decontaminate radiated helicopters returning from rescue missions. He experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein, including fatigue, idiopathic atrial fibrillation, and documented radiation exposure.

116.    Plaintiff, RACHEL MENDEZ, is the mother of Ruby Perez, who died from ovarian cancer that was caused by her exposure to radiation during Operation Tomodachi. Ms. Mendez is currently a resident of the State of Texas.

117.    Plaintiff, ANAIS MENDOZA-GASTELUM, was born April 11, 1990, and is currently a resident of the State of Texas.  At the time of Operation Tomodachi, she was a Petty Officer Third Class with the VAQ 139 Squadron attached to the U.S.S. Ronald Reagan, whose homeport was Naval Base San Diego in San Diego, California.   Ms.

Gastelum served as an Aviation Ordnanceman during Operation Tomodachi, responsible for maintenance on aircraft weapons and weapon systems, along with handling aircraft equipment.  She experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein, including but not limited reproductive issues, alopecia, rashes, and headaches.  Mrs. Gastelum is married to Blas Gastelum, and they have a child together.  Mr. and Mrs. Gastelum were caused to suffer, and will continue to suffer in the future, loss of consortium, affection, and conjugal fellowship, all to the detriment of their marital relationship.

118.    Plaintiff, ROBERT MEYER, was born July 26, 1986 and is currently a resident of the State of California.  At the time of Operation Tomodachi, he was a Petty Officer First Class stationed aboard the U.S.S. Ronald Reagan, whose homeport was Naval Base San Diego in San Diego, California.  Mr. Meyer served as an Aviation Support Equipment Technician during Operation Tomodachi, responsible for serving as primary decontamination technician.  He experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein, including but not limited to sleep problems, memory loss, and fear and anxiety over his radiation exposure.

119.    Plaintiff, JEREMY MICHAUD, was born November 8, 1989, and is currently a resident of the State of Connecticut.  At the time of Operation Tomodachi, he was a Seaman stationed aboard the U.S.S. Ronald Reagan, whose homeport was Naval Base San Diego in San Diego, California.  Mr. Michaud served as an Aviation Boatswainmate Handler in the V-1 division during Operation Tomodachi, responsible for working on the flight deck handling chalks and chains, driving tractors to park the aircraft and handling aircraft coming on and off the ship for aid missions to Japan, and stocking aircraft with pallets of food, water and other materials for delivery to the Japanese.  He experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein, including but not limited to chronic migraines and weight fluctuations.  Mr. Michaud is married to Emily Michaud.  As a result of the wrongful and negligent acts of

the Defendants, Mr. and Mrs. Michaud were caused to suffer, and will continue to suffer in the future, loss of consortium, affection, and conjugal fellowship, all to the detriment of their marital relationship.

120.    Plaintiff, ZACHARY MILLER, was born August 2, 1989 and is currently a resident of the State of California. At the time of Operation Tomodachi, he was a Petty Officer Third Class stationed aboard the U.S.S. Ronald Reagan, whose homeport was Naval Base San Diego in San Diego, California. Mr. Miller served as a technician during Operation Tomodachi, responsible for loading helicopters with food and supplies for humanitarian missions. He experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein, including but not limited to anxiety, depression, and symptoms of post-traumatic stress disorder. Mr. Miller is married to Rebecca Miller. Mr. and Mrs. Miller were caused to suffer, and will continue to suffer in the future, loss of consortium, affection, and conjugal fellowship, all to the detriment of their marital relationship.

121.    Plaintiff, BRANDON MONTGOMERY, was born June 13, 1982 and is currently a resident of the State of Arizona. At the time of Operation Tomodachi, he was a Petty Officer Third Class stationed aboard the U.S.S. Ronald Reagan, whose homeport was Naval Base San Diego in San Diego, California. Mr. Montgomery served as a Disbursing and Quality Assurance Officer in the Supply Division during Operation Tomodachi, responsible for overseeing disbursing operations onboard the ship. He experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein, including but not limited elbow issues requiring surgery, costochondritis, pain in chest, depression, insomnia, and severe night sweats.

122.    Plaintiff, HERBERT MOORE, was born December 3, 1981 and is currently a resident of the State of Minnesota. At the time of Operation Tomodachi, he was a Petty Officer Second Class stationed aboard the U.S.S. Ronald Reagan, whose homeport was Naval Base San Diego in San Diego, California. Mr. Moore served as a Machinist's Mate

during Operation Tomodachi, responsible for working in the ship's propulsion unit and assisting decontamination efforts by scrubbing down radiated areas. He experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein, including but not limited to multiple sclerosis, chronic fatigue, abnormal memory loss, slurred speech, headaches, balance problems and dizzy spells.

123.     Plaintiff, ESMERALDA MORALES, was born January 11, 1987 and is currently a resident of the State of California. At the time of Operation Tomodachi, she was a Seaman stationed aboard U.S.S. Ronald Reagan, whose homeport was Naval Base San Diego in San Diego, California. Ms. Morales served as an Undesignated Seaman V-4 Fuels during Operation Tomodachi, responsible for assisting the electrician mates and occasionally assisting with the humanitarian efforts on the flight deck. She experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein, including but not limited to chronic migraines, depression, anxiety, and symptoms of post-traumatic stress disorder.

124.     Plaintiff, JOSEPH MULDER, was born May 20, 1973 and is currently a resident of the State of Florida. At the time of Operation Tomodachi, he was a Senior Chief Petty Officer stationed aboard the U.S.S. Ronald Reagan, whose homeport was Naval Base San Diego in San Diego, California. Mr. Mulder served in the Supply Aviation Support Division during Operation Tomodachi, responsible for supervising work parties on the flight deck, repairing and decontaminating parts brought down to supply division, and measuring the levels of radiation of items going on and off aircrafts. He experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein, including but not limited to sleep apnea, increased thyroid levels, bulging herniated disc, shoulder and right arm pain, back and spinal arthritis and cartilage deterioration resulting in extensive rounds of injections and surgery. Mr. Mulder is married to Dianna Mulder. Mr. and Mrs. Mulder were caused to suffer, and will continue to suffer in the future, loss

of consortium, affection, and conjugal fellowship, all to the detriment of their marital relationship.

125.    Plaintiff, JONATHAN MULDOWNEY, is currently a resident of State of Georgia.  At the time of Operation Tomodachi, he was stationed aboard the U.S.S. George Washington.  Mr. Muldowney served as a Flight Deck Director with the Air department during Operation Tomodachi, responsible for dismantling the flagstaff and coordinating flight deck scrubs to remove as much radiation as possible from exposed equipment.  Mr. Muldowney spent most of his time on the flight deck, handled materials from that had high levels of radiation, and had his clothing confiscated due to high levels of radiation.  He experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein, including but not limited to an aggressive form of ulcerative colitis, requiring the removal of his entire colon, extreme weight lost, a reduced quality of life and six additional surgeries.

126.    Plaintiff, CHARLES R. MURPHY, was born May 22, 1988 and is currently a resident of the Commonwealth of Virginia.  At the time of Operation Tomodachi, he was a Petty Officer Second Class stationed aboard the U.S.S. Mustin, whose homeport was United States Fleet Activities Yokosuka.  Mr. Murphy served as an Operation Specialist during Operation Tomodachi, responsible for checking and repairing communication systems, and assisted in drawing the outlines and boundaries of zones for relief efforts to stay within.  He experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein, including but not limited to anxiety issues.  Mr. Murphy is married to Lucia Murphy.  Mr. and Mrs. Murphy were caused to suffer, and will continue to suffer in the future, loss of consortium, affection, and conjugal fellowship, all to the detriment of their marital relationship.

127.    Plaintiff, EION NELSON, was born June 15, 1989 and is currently a resident of State of Oregon.  At the time of Operation Tomodachi, he was a Lance Corporal attached to Combat Logistics Regiment 35 in Sendai, Japan.  Mr. Nelson served as Support Wide

Area Network Satellite Communications Operator during Operation Tomodachi, responsible for setting up primary communications with backside support for the operation on behalf of the Marine element, removing debris to help recreate a functioning airport, sifting through debris for personal effects to return to proper owners, reporting bodies discovered to local police for identification and notification of next of kin, and cleaning out a technical high school so students could return to classes.  He experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein, including but not limited to swollen veins, fibromyalgia, lupus, gastroparesis and degenerative disc disease.

128.    Plaintiff, GARRETT NELSON, was born May 2, 1991, and is currently a resident of the State of California.  At the time of Operation Tomodachi, he was a Petty Officer Second Class stationed aboard the U.S.S. Shiloh, whose homeport was Naval Base Yokosuka.  Mr. Nelson served as a Boatswain's Mate during Operation Tomodachi, responsible for landing helicopters for 6 weeks, coxswain duties, painting the ship and performing maintenance of the topside of the ship.  He experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein, including but not limited to insomnia, sleep apnea, and mental and emotional stress.  Mr. Nelson is currently married to Keila Nelson.  As a result of the wrongful and negligent acts of the Defendants, Mr. and Mrs. Nelson were caused to suffer, and will continue to suffer in the future, loss of consortium, affection, and conjugal fellowship, all to the detriment of their marital relationship.

129.    Plaintiff, ROBERT OCHOA, was born December 31, 1978 and is currently a resident of State of California.  At the time of Operation Tomodachi, he was a Petty Officer Second Class stationed aboard the U.S.S. Mustin.  Mr. Ochoa served as an Electricians Mate during Operation Tomodachi, responsible for preparing and repairing the rafts that helicopters would land on as they were coming on and off the ship for missions. He also served on the human remains recovery team, assisting in the search and recovery of bodies

in the debris-filled water in order to send them back to shore in caskets for proper burials. He experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein, including nightmares, aggravated joint issues, and mental health issues.

130.    Plaintiff, GLENN OFORI, was born September 23, 1978 and is currently a resident of the State of Maryland.  At the time of Operation Tomodachi, he was a Chief Petty Officer stationed at Yokosura and attached to the U.S.S. George Washington.  Mr. Ofori served as a personnel officer and transportation officer during Operation Tomodachi, responsible for coordinating the evacuation of dependents.  He experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein, including but not limited to skin conditions, sleeplessness, and knee problems.

131.    Plaintiff, LUKE OPYD, was born July 21, 1987 and is currently a resident of the State of New York.  At the time of Operation Tomodachi, he was a Seaman stationed aboard the U.S.S. McCampbell.  The U.S.S. McCampbell was the first US Navy vessel on station off northeastern Honshu, Japan to assist with relief efforts after the earthquake and deliver food and supplies directly to survivors, then aided in at-sea rescue efforts with Japanese authorities.  Mr. Opyd served as an Aviation Electricians Mate during Operation Tomodachi, responsible for ensuring the transport of supplies from the ship to the people on the ground by organizing the necessary supplies in the hanger and loading the supplies on the helicopter to do drop-offs.  He experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein, including but not limited to post-traumatic stress disorder, depression and anxiety over his radiation exposure, sleep apnea, and other sleep disorders.  Mr. Opyd is married to Myra Opyd, who has been impacted by his sleeping trouble and his mental health.  As a result of the wrongful and negligent acts of the Defendants, Mr. and Mrs. Opyd were caused to suffer, and will continue to suffer in the future, loss of consortium, affection, and conjugal fellowship, all to the detriment of their marital relationship.

132.     Plaintiff, TIM PALMER, was born May 28, 1990 and is currently a resident of the State of New York.  At the time of Operation Tomodachi, he was stationed aboard the U.S.S. Ronald Reagan, whose homeport was Naval Base San Diego in San Diego, California.  Mr. Palmer experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein, including but not limited to bleeding in his gastrointestinal tract and an acromioclavicular separation that required removal of part of his collar bone.  Mr. Palmer is married to Rachal Palmer and they have a child together. As a result of the wrongful and negligent acts of the Defendants, Mr. and Mrs. Palmer were caused to suffer, and will continue to suffer in the future, loss of consortium, affection, and conjugal fellowship, all to the detriment of their marital relationship.

133.     Plaintiff, JAYSEN PATAO, was born November 13, 1989 and is currently a resident of the State of Hawaii.  At the time of Operation Tomodachi, he was a Seaman stationed aboard the U.S.S. Ronald Reagan, whose homeport was Naval Base San Diego in San Diego, California.  Mr. Patao served as an Information Systems Technician during Operation Tomodachi, responsible for operating and maintaining global satellite telecommunications systems and serving as administrator on mainframe computers and local networks.  He experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein, including but not limited to atrophy in his right hand, deteriorating and thinning of his spinal cord, and mental stress over his exposure to radiation.

134.     Plaintiff, NATHAN PENA, was born May 30, 1991 and is currently a resident of the State of Washington.  At the time of Operation Tomodachi, he was a Seaman stationed aboard the U.S.S. Ronald Reagan, whose homeport was Naval Base San Diego in San Diego, California.  Mr. Pena served as an Airman during Operation Tomodachi, responsible for maintaining aviation support equipment and compartments, standing security watches, assisting the decontamination work party on the flight deck by cleaning equipment and helping officers with protective gear, and assisting in the lock-down of the

ship.  He experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein, including but not limited to mental and emotional stress over his known radiation exposure.  Mr. Pena is married to Sonia Pena.  Mr. and Mrs. Pena were caused to suffer, and will continue to suffer in the future, loss of consortium, affection, and conjugal fellowship, all to the detriment of their marital relationship.

135.    Plaintiff, JOSHUA PEOPLES, was born August 29, 1990 and is currently a resident of the State of Florida.  At the time of Operation Tomodachi, he was a Seaman stationed aboard the U.S.S. Chancellorsville, part of the U.S.S. Ronald Reagan Carrier Strike Group.  During Operation Tomodachi, Mr. Peoples's duties changed daily, but included distributing supplies and serving as lookout.  He experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein, including but not limited to gross hematuria, two cystoscopies, issues with his left knee requiring physical therapy, memory loss, mood swings, post-traumatic stress disorder, reproductive issues, restless leg syndrome, dead toe nails and cellulitis.  Mr. Peoples is married to Katie Peoples.  As a result of the wrongful and negligent acts of the Defendants, Mr. and Mrs. Peoples were caused to suffer, and will continue to suffer in the future, loss of consortium, affection, and conjugal fellowship, all to the detriment of their marital relationship.

136.    Plaintiff, ALEJANDRO PEREZ, was born October 24, 1981 and is currently a resident of the State of Texas.  At the time of Operation Tomodachi, he was a Chief Petty Officer stationed aboard the U.S.S. Ronald Reagan, whose homeport was Naval Base San Diego in San Diego, California.  Mr. Perez served as an Aviation Boatswain's Mate during Operation Tomodachi.  He experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein, including but not limited to throat pain, enlarged tonsils, onset of allergies, and reproductive issues.  Mr. Perez is married to Monica Perez, who has been directly impacted by the aforementioned injuries.  As a result of the wrongful and negligent acts of the Defendants, Mr. and Mrs. Perez were caused to suffer,

and will continue to suffer in the future, loss of consortium, affection, and conjugal fellowship, all to the detriment of their marital relationship.

137.    Plaintiff, TRANG PHAM, was born January 1, 1968, and is currently a resident of the State of Georgia.  At the time of Operation Tomodachi, she was a Petty Officer Second Class assigned to the Aircraft Intermediate Maintenance Detachment stationed at Naval Air Facility Atsugi.  Ms. Pham served as a Logistics Specialist during Operation Tomodachi, responsible for packaging frisked radiation aircraft and shipping parts to be repaired.  She experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein.

138.    Plaintiff, CHANRATHANA PHUN, was born March 6, 1988 and is currently a resident of the State of Washington.  At the time of Operation Tomodachi, he was a Seaman Apprentice stationed aboard the U.S.S. Mustin, whose homeport was United States Fleet Activities Yokosuka.  Mr. Phun served as a Gas Turbon Systems Electrician during Operation Tomodachi, responsible for scanning and recording radiation levels on the ship's air filters.  He experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein, including but not limited to mental and emotional stress over his radiation exposure.  Mr. Phun is married to Laura Phun.  Mr. and Mrs. Phun were caused to suffer, and will continue to suffer in the future, loss of consortium, affection, and conjugal fellowship, all to the detriment of their marital relationship.

139.    Plaintiff, TIMOTHY PIERCE, was born May 27, 1988 and is currently a resident of the State of Oregon.  At the time of Operation Tomodachi, he was a Petty Officer Second Class with the VAQ-13 unit attached to the U.S.S. Ronald Reagan, whose homeport was Naval Base San Diego in San Diego, California.  Mr. Pierce served as an Aviation Maintenance Administrationman during Operation Tomodachi, responsible for recording and maintaining aircraft logs and reports.  He experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein, including but not limited to frequent migraines.  Mr. Pierce is married to Desiree Pierce.  Mr. and Mrs.

INDIVIDUAL AND CLASS ACTION COMPLAINT

Pierce were caused to suffer, and will continue to suffer in the future, loss of consortium, affection, and conjugal fellowship, all to the detriment of their marital relationship.

140.     Plaintiff, CHELSEA QUINTOG, was stationed during Operation Tomodachi, aboard the U.S.S. Reagan, whose homeport was Naval Base San Diego in San Diego, California.  Ms. Quintog experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein.

141.     Plaintiff, CLINTON RAMSIARE, participated in Operation Tomodachi, and experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein.

142.     Plaintiff, BRIAN RAWLINS, was born November 20, 1988 and is currently a resident of the State of New York.  At the time of Operation Tomodachi, he was a Petty Officer Third Class stationed aboard the U.S.S. Ronald Reagan, whose homeport was Naval Base San Diego in San Diego, California.  Mr. Rawlins served as a Fire Control and Radar Technician during Operation Tomodachi, responsible for inspecting hatches and hanger doors for radiation.  He experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein, including but not limited to severe fatigue, sharp bodily pains in his chest, neck and shoulders, and painful swollen lymph nodes.

143.     Plaintiff, CYRUS REA, was born August 2, 1974 and is currently a resident of the State of Washington.  At the time of Operation Tomodachi, he was a Petty Officer Second Class stationed aboard the U.S.S. Mustin, whose homeport was United States Fleet Activities Yokosuka.  Mr. Rea served as a Gas Turbon Mechanic during Operation Tomodachi, responsible for cleaning and decontaminating the engines, served on the human remains recovery team, and was sent on the ground to Sendai, Japan to assist in relief efforts.  He experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein, including but not limited to mental stress over his radiation exposure.

144.     Plaintiff, TERESA READY, individually and as administrator of the ESTATE OF JESSE READY, is a resident of the State of Mississippi.  At the time of Operation Tomodachi, Ms. Ready was married to Jesse Ready.   During Operation Tomodachi, she and her two children lived with her husband in Yokosuka, Japan. Mr. Ready was a Lieutenant stationed aboard the U.S.S. Shiloh, part of the U.S.S. Ronald Reagan Carrier Strike Group.   During Operation Tomodachi, Mr. Ready worked as a System Test Officer, responsible for search and rescue mission, pulling deceased bodies out of the water gong up to Sendai, Japan.  He experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein, including tumors located in his throat and brain.  He was diagnosed with lymphoma, which resulted in his death on January 11, 2016.  Ms. Ready was exposed to radiation as a result of living with her husband in Japan at the time of Operation Tomodachi.

145.     Plaintiff, TERESA READY, on behalf of and for her minor daughter, A.R., is a resident of the State of Mississippi.  A.R. is the minor daughter of Teresa Ready and Jesse Ready, deceased.  At the time of Operation Tomodachi, A.R. lived with Jesse and Teresa Ready in Yokosuka, Japan, where Mr. Ready was stationed.  A.R. was thus exposed to radiation from the FNPP.

146.     Plaintiff, JACOB REED, was born August 15, 1990 and is currently a resident of the State of Oregon.  At the time of Operation Tomodachi, he was a Petty Officer Third Class stationed aboard the U.S.S. Ronald Reagan, whose homeport was Naval Base San Diego, in San Diego California.   Mr. Reed served as an Interior Communications Electrician during Operation Tomodachi, responsible for performing maintenance on interior communication systems, data conversion and distribution systems, and aviation monitoring.  He also conducted hatch watches on doors leading to the exterior of the ship, for six to eight hours every night.  He experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein, including but not limited to severe anxiety.

147.   Plaintiff, BALTHAZAR REFORSADO, is currently a resident of the State of Washington.  At the time of Operation Tomodachi, he was stationed aboard the U.S.S. Ronald Reagan, whose homeport was Naval Base San Diego, in San Diego California. He experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein.

148.   Plaintiff, CAMERON REID, was born April 20, 1990 and is currently a resident of the State of California.  At the time of Operation Tomodachi, he was a Lance Corporal assigned to the 31st Expeditionary Marine Unit stationed aboard the U.S.S. Essex, whose homeport was Naval Base San Diego in San Diego, California.  Mr. Reid served as an Intel Analyst during Operation Tomodachi, responsible for assisting in the cleanup efforts and decontamination work parties on the flight deck.  He experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein, including but not limited to chronic migraines, anxiety, post-traumatic stress disorder, and psoriasis.  Mr. Reid is married to Alaura Reid.  Mr. and Mrs. Reid were caused to suffer, and will continue to suffer in the future, loss of consortium, affection, and conjugal fellowship, all to the detriment of their marital relationship.

149.   Plaintiff, ANGELINA REYNA, was born April 2, 1989 and is currently a resident of the State of Nevada.  At the time of Operation Tomodachi, she was a Petty Officer Second Class stationed aboard the U.S.S. Curtis Wilber.  Ms. Reyna served as a Fire Controlman during Operation Tomodachi, responsible for topside observation and guns, management of a maritime GPS, and maintenance of the ship's weapons.  She experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein, including but not limited to fibromyalgia, joint problems, severe headaches and reproductive issues.

150.   Plaintiff, QUENTIN RICHARDSON, was born December 25, 1986 and is currently a resident of the Commonwealth of Virginia.   At the time of Operation Tomodachi, he was a Petty Officer Third Class stationed aboard the U.S.S. Ronald Reagan,

whose homeport was Naval Base San Diego in San Diego, California.  Mr. Richardson served as a Cook during Operation Tomodachi, responsible for preparing food for the crew and delivering lunches to Sailors in other locations.  He experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein, including but not limited to migraines, hair loss and hematochezia.

151.    Plaintiff, WILLIAM E. RIGBY, was born July 22, 1989 and is currently a resident of the State of New York.  At the time of Operation Tomodachi, he was a Petty Officer Third Class stationed aboard the U.S.S. Ronald Reagan, whose homeport was Naval Base San Diego in San Diego, California.  Mr. Rigby served as a Nuclear Electrician during Operation Tomodachi, responsible for maintenance of support equipment on the ship to ensure operation of engines and throttle control.  He experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein.

152.    Plaintiff, DEVIN RITCHEY, was born April 7, 1987 and is currently a resident of the State of Texas.  At the time of Operation Tomodachi, he was a Petty Officer Third Class stationed at the Naval Air Facility Atsugi in Atsugi, Japan and was assigned to the U.S.S. George Washington, whose homeport was Norfolk Naval Base in Norfolk, Virginia. Mr. Ritchey served as an Aviation Machinist's Mate during Operation Tomodachi, responsible for operation, maintenance and repairs of helicopters used in the relief efforts.  He experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein, including but not limited to anxiety, trouble sleeping, digestion issues and headaches. Mr. Ritchey is married to Brittney Wachner and they have one daughter.  As a result of the wrongful and negligent acts of the Defendants, Mr. Ritchey and Ms. Wachner were caused to suffer, and will continue to suffer in the future, loss of consortium, affection, and conjugal fellowship, all to the detriment of their marital relationship.

153.    Plaintiff, PEDRO RODRIGUEZ, participated in Operation Tomodachi, and experienced injury as a result of Defendants' negligent and intentional acts and omissions

described herein.  Mr. Rodriguez is married to Susan Rodriguez.  Mr. and Mrs. Rodriguez were caused to suffer, and will continue to suffer in the future, loss of consortium, affection, and conjugal fellowship, all to the detriment of their marital relationship.

154.    Plaintiff, CESAR SALGADO, was born August 13, 1988 and is currently a resident of the State of Florida.  At the time of Operation Tomodachi, he was a Culinary Specialist stationed at the United States Fleet Activities Naval Base in Yokosuka, Japan from July 2010 to March 2015.  He experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein, including but not limited to renal cell carcinoma requiring partial nephrectomy surgery to remove the cancerous tumor. He requires check-ups every six months to ensure the cancer has not returned.  Mr. Salgado is married to Lydia Salgado and they have two children together.  Mr. and Mrs. Salgado were caused to suffer, and will continue to suffer in the future, loss of consortium, affection, and conjugal fellowship, all to the detriment of their marital relationship.

155.    Plaintiff, TYLER SATTERWHITE, was born August 29, 1987 and is currently a resident of the State of North Carolina.  At the time of Operation Tomodachi, he was a Petty Officer Second Class stationed aboard the U.S.S. Cowpens, whose homeport was Naval Base San Diego in San Diego, California.  Mr. Satterwhite served as a Fire Controlman during Operation Tomodachi, responsible for operating and repairing missile systems, working with the counter piracy and anti-terrorism team, and packing and loading boxes onto carrier ships for humanitarian relief.  He experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein, including but not limited to femoroacetabular impingement in both hips, and mental and emotional stress from his exposure to radiation.

156.    Plaintiff, TIFFANY SCHAD, was born August 18, 1964 and is currently a resident of the Commonwealth of Virginia.  At the time of Operation Tomodachi, she was a Captain assigned to the 7th Fleet aboard the U.S.S. Ronald Reagan, whose homeport was Naval Base San Diego in San Diego, California.  Ms. Schad served as a Supply Captain

during Operation Tomodachi, responsible for the supervision and operation of the humanitarian effort for the Supply Department involving the loading of food, water, blankets and other relief supplies from the ship to the helicopters to the shore sites. Ms. Schad experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein.

157.    Plaintiff, BRETT SCHMIDT, was born October 20, 1988 and is currently a resident of the State of California.  At the time of Operation Tomodachi, he was a Petty Officer Third Class stationed aboard the U.S.S. Ronald Reagan, whose homeport was Naval Base San Diego in San Diego, California.  Mr. Schmidt served as an Information Systems Technician during Operation Tomodachi, responsible for working twelve-hour shift watches in security, in charge of maintaining boundaries between contaminated crew members and clean, non-contaminated spaces on the ship. He experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein, including but not limited to anxiety over his radiation exposure, back pain, headaches, lack of focus, trouble sleeping, vision issues, and psoriasis. He is married to Inez Schmidt, and they have two daughters.  Mr. and Mrs. Schmidt were caused to suffer, and will continue to suffer in the future, loss of consortium, affection, and conjugal fellowship, all to the detriment of their marital relationship.

158.    Plaintiff, MICHELLE SCOTT, was born July 3, 1990 and is currently a resident of the State of California.  At the time of Operation Tomodachi, she was a Petty Officer Third Class stationed aboard the U.S.S. Ronald Reagan, whose homeport was Naval Base San Diego in San Diego, California.   Ms. Scott served as an Operation Specialist during Operation Tomodachi, responsible for the operation of radar, navigation, and communications equipment aboard the ship.   She experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein.

159.    Plaintiff, JOSHUA SEGREE, was born January 5, 1990 and is currently a resident of the State of Florida.  At the time of Operation Tomodachi, he was a Petty Officer

Third Class stationed aboard the U.S.S. Ronald Reagan, whose homeport was Naval Base San Diego in San Diego, California.  Mr. Segree served as an Electrician's Mate during Operation Tomodachi, responsible for electrical receptacles throughout the ship, as well as the repair, cleaning, and maintenance of the ventilation systems after they had been contaminated during the radiation plume.  He also worked on the various load centers throughout the ship, which exposed him to all the designated contamination areas.  He experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein, including but not limited to severe abdominal pain, digestive issues, stabbing pains in his chest, stomach, and back, coughing up blood, spells of severe nausea, and hot flashes.  Mr. Segree is a loving father to his two minor children, M.S. and H.S.  His infant son, H.S., was born prematurely and with breathing problems due to his lungs not expanding properly.

160.    Plaintiff, JOSHUA SEGREE, on behalf and for his infant son, H.S. is currently a resident of the State of Florida.  H.S. was born in 2017, after his father participated in Operation Tomodachi.  Due to his father's exposure to radiation, H.S. was born prematurely and with breathing problems, due to his lungs not expanding properly.

161.    Plaintiff, ERIC SEIBERT, was born April 6, 1989 and is currently a resident of Dedeo, in the United States territory of Guam.  At the time of Operation Tomodachi, he was a Lance Corporal stationed at Marine Corps Air Station Iwakuni.  Mr. Seibert served as an Electrician during Operation Tomodachi, responsible for operating necessary generators and serving on the first responder team to go into Sendai, Japan, after the disaster.  He experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein, including but not limited to difficulty sleeping, asthma, fibromyalgia, stomach and gastrointestinal issues, and chronic migraines.  Mr. Seibert is married to Charlene Seibert.  Mr. and Mrs. Seibert were caused to suffer, and will continue to suffer in the future, loss of consortium, affection, and conjugal fellowship, all to the detriment of their marital relationship.

162.    Plaintiff, JERRID SEVART, was born July 14, 1983 and is currently a resident of the State of California.  At the time of Operation Tomodachi, he was a Petty Officer Second Class attached to the FRIA Radiation Decontamination Team First responders based out of Atsugi, Japan.  Mr. Sevart served as a Data Analyst for the detachment group during Operation Tomodachi, responsible for cleaning radioactive aircraft equipment.  He experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein, including but not limited to muscle spasms, skin problems, severe headaches, nosebleeds, and coughing up blood.

163.    Plaintiff, QUINCY SHEPHERD, was born January 22, 1987 and is currently a resident of the State of Arkansas.  At the time of Operation Tomodachi, he was stationed aboard the U.S.S. Ronald Reagan, whose homeport was Naval base San Diego in San Diego, California. He experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein, including but not limited to shortness of breath, headaches, depression and anxiety, and mental health problems.

164.    Plaintiff, CARL SLAUBAUGH, was born September 21, 1972 and is currently a resident of the State of Texas.  At the time of Operation Tomodachi, he was a Petty Officer Second Class stationed aboard the U.S.S. Ronald Reagan, whose homeport was Naval Base San Diego in San Diego, California. Mr. Slaubaugh served as a Logistics Specialist during Operation Tomodachi, responsible for custody of the tool room and maintenance of tools used to repair aircraft.  He experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein, including but not limited to headaches, swollen extremities, gastrointestinal problems and chronic cough.

165.    Plaintiff, AARON SMITH, participated in Operation Tomodachi, and experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein.

166.    Plaintiff, GREGORY SMITH, was born December 21, 1969 and is currently a resident of the State of Louisiana.  At the time of Operation Tomodachi, he was a

INDIVIDUAL AND CLASS ACTION COMPLAINT

Specialist in the United States Army stationed at Camp Zama, Japan. Mr. Smith served as a Military Food Inspection Specialist for the United States Army and Navy during Operation Tomodachi, responsible for conducting radiation detection services and inspecting all food and food deliveries for radiation contamination at Camp Zama in Zama, Japan, Sagamihara Housing in Sagamihara Japan, Naval Air Facility Atsugi in Atsugi, Japan, and the Sagami General Depot in Sagami, Japan.  He experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein, including but not limited to memory loss, headaches, and diagnosed with papillary thyroid cancer, with growths in his head, requiring the surgical removal of his thyroid.

167.     Plaintiff, JUSTIN SMITH, is currently a resident of the State of Texas.  He participated in Operation Tomodachi, and experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein.

168.     Plaintiff, MELLONY SNYDER, was born August 14, 1978 and is currently a resident of the State of Texas.  At the time of Operation Tomodachi, she was a Petty Officer Second Class stationed aboard the U.S.S. Ronald Reagan, whose homeport was Naval Base San Diego in San Diego, California.   Ms. Snyder served as an Anti-Surface/Subsurface Tactical Air Controller during Operation Tomodachi, responsible for assisting in daily search and rescue operations from sea combat, standing six hour watches to receive search and rescue reports from the pilots of P-3 Orions, F-18s and helicopters, and providing search pattern instructions from inside sea combat.  She experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein, including but not limited to a tumor on her left thyroid, requiring the removal of her left thyroid, and follicular thyroid carcinoma.  She will require a complete thyroidectomy in the future and radioiodine therapy for treatment of thyroid cancer.

169.     Plaintiff, SHENNY SOLIS, was born August 10, 1990 and is currently a resident of the State of California.  At the time of Operation Tomodachi, she was a Petty Officer Third Class stationed aboard the U.S.S. Ronald Reagan, whose homeport was

Naval Base San Diego in San Diego, California.   Ms. Solis served as an Aviation Boatswain's Mate during Operation Tomodachi, responsible for providing maintenance on launch and recovery equipment.   She experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein, including but not limited to a cyst on her right vocal cord and hair loss.

170.    Plaintiff, CRYSTAL SOUDER, was born August 10, 1988 and is currently a resident of the State of California.   At the time of Operation Tomodachi, she was a Seaman stationed aboard the U.S.S. Ronald Reagan, whose homeport was Naval Base San Diego in San Diego, California.   Mrs. Souder served as a Boatswain's Mate during Operation Tomodachi, responsible for conducting standing watches outside and ship preservation of the flight deck.   She experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein, including but not limited to women's health issues, the removal of her appendix, headaches, ringing in her ears, blurry vision, anemia, weigh fluctuation, and gastrointestinal system fissures. Mrs. Souder is married to James Souder, a fellow Sailor at the time of Operation Tomodachi, and they have a son together.   As a result of the wrongful and negligent acts of the Defendants, Mr. and Mrs. Souder were caused to suffer, and will continue to suffer in the future, loss of consortium, affection, and conjugal fellowship, all to the detriment of their marital relationship.

171.    Plaintiff, JAMES SOUDER, was born August 10, 1988 and is currently a resident of the State of California.   At the time of Operation Tomodachi, he was a Petty Officer First Class stationed aboard the U.S.S. Ronald Reagan, whose homeport was Naval Base San Diego in San Diego, California.   Mr. Souder served as an Operations Specialist during Operation Tomodachi, responsible for conducting contamination door watches, handling classified materials, tactical air control and material maintenance management. He experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein, including but not limited to radiation sickness, consistent nausea, acid reflux, frequent headaches, hematochezia, and regular exhaustion.   Mr. Souder

1    is married to Crystal Souder and they have a son together.  As a result of the wrongful and

2    negligent acts of the Defendants, Mr. and Mrs. Souder were caused to suffer, and will

3    continue to suffer in the future, loss of consortium, affection, and conjugal fellowship, all

4    to the detriment of their marital relationship.

5    172.    Plaintiff, KYLE SPURLOCK, was born October 19, 1989 and is currently a

6    resident of the State of Kansas.  At the time of Operation Tomodachi, he was a Seaman

7    stationed at the Naval Air Facility Misawa in Misawa, Japan.  Mr. Spurlock served as an

8    Aviation Ordnanceman assigned to the HS-14, Helicopter Anti-Submarine Squadron 14,

9    during Operation Tomodachi, responsible for humanitarian flights over the affected areas

10   of Japan to conduct search and rescue operations and disaster relief.  He experienced injury

11   as a result of Defendants' negligent and intentional acts and omissions described herein,

12   including but not limited to headaches, reproductive issues, and numbness in fingers and

13   lips.

14   173.    Plaintiff, JUSTIN STEINMETZ, was born August 9, 1985, and is currently a

15   resident of the State of Washington.  At the time of Operation Tomodachi, he was a Seaman

16   Recruit stationed aboard the U.S.S. Ronald Reagan, whose homeport was Naval Base San

17   Diego in San Diego, California.  Mr. Steinmetz served as an Aviation Boatswain's Mate

18   during Operation Tomodachi, responsible for supervising, spotting and securing aircrafts

19   and equipment for launches and landings, and helping to load the helicopters with food

20   supplies after the flight deck was deemed radiated.  Mr. Steinmetz worked about fourteen

21   hours on the flight deck per day during Operation Tomodachi.  He experienced injury as a

22   result of Defendants' negligent and intentional acts and omissions described herein,

23   including but not limited to trouble sleeping and severe anxiety.

24   174.    Plaintiff, AMANDA STEMEN, was born December 17, 1984 and is

25   currently a resident of the State of the Ohio.  She is married to Mr. Ronald Stemen, a Petty

26   Officer Second Class with the VAW-13 attached to the U.S.S. Ronald Reagan during

27   Operation Tomodachi.  Ronald Steman was diagnosed with testicular cancer, requiring

28

64

INDIVIDUAL AND CLASS ACTION COMPLAINT

surgery.  As result, he and Mrs. Stemen can no longer have natural born children without the assistance of very costly reproductive technology.  As a result of the wrongful and negligent acts of the Defendants, Mr. and Mrs. Stemen were caused to suffer, and will continue to suffer in the future, loss of consortium, affection, and conjugal fellowship, all to the detriment of their marital relationship.

175.    Plaintiff, RONALD STEMEN, was born October 14, 1986 and is currently a resident of the State of Ohio.  At the time of Operation Tomodachi, he was a Petty Officer Second Class with the VAW-13 attached to the U.S.S. Ronald Reagan, whose homeport was Naval Base San Diego in San Diego, California.  Mr. Stemen served as an Aviation Machinist's Mate during Operation Tomodachi, responsible for the final pre-flight checking of the aircrafts deploying for airborne relief missions.  He experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein, including but not limited to severe anxiety, sensitivity to light, testicular cancer requiring surgery, pain due to his cancer, reproductive issues, and removal of his appendix.  Mr. Stemen is married to Amanda Stemen.  As a result of his injuries, Mr. and Mrs. Stemen have lost the ability to have any natural born children together without the assistance of expensive reproductive technology.  As a result of the wrongful and negligent acts of the Defendants, Mr. and Mrs. Stemen were caused to suffer, and will continue to suffer in the future, loss of consortium, affection, and conjugal fellowship, all to the detriment of their marital relationship.

176.    Plaintiff, LOWELL STEWART, was born July 31, 1986 and is currently a resident of the State of Texas.  At the time of Operation Tomodachi, he was a Petty Officer Third Class in the United States Navy.  In 2012, he was stationed aboard the U.S.S. Ronald Reagan, whose homeport was Naval Base San Diego in San Diego, California.  After Operation Tomodachi, the U.S.S. Ronald Reagan was sent to Naval Base Kitsap in Bremerton, Washington for overhaul.  During this time, Mr. Stewart originally served as a Nuclear Decontamination Technician, responsible for cleaning and scraping the one-inch

1  thick radiation-active paint off the island of the ship, then repainting the island for its next

2  deployment.  He experienced injury as a result of Defendants' negligent and intentional

3  acts and omissions described herein, including but not limited to nose bleeds, complete loss

4  of all of his hair, chest pains, chronic headaches, chronic fatigue, eight deteriorated discs

5  and curvature of his spine, weight issues, severe digestive problems, depression and

6  anxiety.  Mr. Stewart is married to Venita Stewart, and together they have a son.  As a

7  result of the wrongful and negligent acts of the Defendants, Mr. and Mrs. Stewart were

8  caused to suffer, and will continue to suffer in the future, loss of consortium, affection, and

9  conjugal fellowship, all to the detriment of their marital relationship.

10  177.    Plaintiff, DANIEL STROHL, participated in Operation Tomodachi, and

11  experienced injury as a result of Defendants' negligent and intentional acts and omissions

12  described herein.

13  178.    Plaintiff, JOSE SUERO, was born September 13, 1989 and is currently a

14  resident of the State of Arizona.  At the time of Operation Tomodachi, he was a Seaman

15  stationed aboard the U.S.S. Ronald Reagan, whose homeport was Naval Base San Diego

16  in San Diego, California.  Mr. Suero served as an Aviation Boatswain's Mate during

17  Operation Tomodachi, responsible for assisting in the launch of helicopters providing relief

18  missions and delivering aid on land and conducting standing watches for hatches and doors

19  being monitored for radiation.  He experienced injury as a result of Defendants' negligent

20  and intentional acts and omissions described herein, including but not limited to

21  pancreatitis, appendicitis, removal of appendix, removal of gall bladder, hemorrhoids, high

22  blood pressure, bone pain and fragility, and depression.  After Operation Tomodachi, Mr.

23  Suero conceived a son, Y.S., who was born with asthma and has serious skin conditions.

24  179.    Plaintiff, MARK SURTEL, was born October 5, 1988 and is currently a

25  resident of the State of Ohio.  At the time of Operation Tomodachi, he was a Lance

26  Corporal with the 31st Marine Expeditionary Unit attached to the U.S.S. Harpers Ferry,

27  whose homeport was United States Fleet Activities Sasebo.  Mr. Surtel served as an

28

Intelligence Analyst during Operation Tomodachi, responsible for gathering intelligence, writing intelligence briefs, and assembling pallets and cargo nets for supplies to load on the helicopters on the flight deck. He experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein, including but not limited to chronic migraines and anxiety. Mr. Surtel is married to Erika Surtel. Mr. and Mrs. Surtel were caused to suffer, and will continue to suffer in the future, loss of consortium, affection, and conjugal fellowship, all to the detriment of their marital relationship.

180. Plaintiff, NICHOLAS SWANN, was born April 29, 1985 and is currently a resident of the State of Florida. At the time of Operation Tomodachi, he was a Petty Officer Second Class stationed aboard the U.S.S. Ronald Reagan, whose homeport was Naval Base San Diego in San Diego, California. Mr. Swann served as an Operations Specialist during Operation Tomodachi, responsible for operations and security ECP, and external door watches for a combination of ten hours a day. He experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein.

181. Plaintiff, BYRON SY, was born February 28, 1982, and is currently a resident of the State of Nevada. At the time of Operation Tomodachi, he was a Staff Sergeant, Petty Officer Second Class, for the United States Air Force stationed at Yokota Air Base in Tokyo, Japan. Mr. Sy served as a Wing HQ Protocol Officer during Operation Tomodachi, responsible for operating on the flight line, where he interacted with the aircrafts and helicopters that were running operations in Sendai and Fukushima. He experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein, including but not limited to post-traumatic stress disorder, sleep apnea, acid reflux, chronic sinusitis, and plantar fasciitis. Mr. Sy is married to Janelle Sy and they have two children. As a result of the wrongful and negligent acts of the Defendants, Mr. and Mrs. Sy were caused to suffer, and will continue to suffer in the future, loss of consortium, affection, and conjugal fellowship, all to the detriment of their marital relationship.

182.     Plaintiff, ALEXANDER TIDD, was born September 2, 1986, and is currently a resident of the State of California.  At the time of Operation Tomodachi, he was a Petty Officer Third Class stationed aboard the U.S.S. Ronald Reagan, whose homeport was Naval Base San Diego in San Diego, California.   Mr. Tidd served as a Mass Communication Specialist during Operation Tomodachi, responsible for serving as the ship's photographer.  He experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein, including but not limited to dizzy spells, fatigue, and short-term memory problems.

183.     Plaintiff, LOUIS TORRES, was born September 28, 1948 and is currently a resident of the State of California.  At the time of Operation Tomodachi, he was a Department of Defense civilian contracted with the United States Navy, assigned to the U.S.N.S. Bridge, whose homeport was Naval Base Kitsap in Bremerton, Washington.  Mr. Torres served as a Third Assistant Engineer during Operation Tomodachi, responsible for working in the ship's propulsion plant.  He experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein, including but not limited to cataract in his left eye requiring surgery, severe double vision (diplopia), limited movement in right eye, depression and anxiety, dizziness and disorientation, and myasthenia gravis, an autoimmune disease that weakens muscles under voluntary control, making it difficult to do regular chores and daily activities.  As a result of his eye conditions and autoimmune disorders, Mr. Torres can no longer drive an automobile or pursue any hobbies that require the use of his hands due to loss of strength and tiring of his arms, hands and fingers. Because of his illnesses, he has decreased earning capacity that has caused financial hardship.  Mr. Torres is married to Ines Torres, and together they have five children.  As a result of the wrongful and negligent acts of the Defendants, Mr. and Mrs. Torres were caused to suffer, and will continue to suffer in the future, loss of consortium, affection, and conjugal fellowship, all to the detriment of their marital relationship.

184.    Plaintiff, CASEY TUCKER, was born June 27, 1985 and is currently a resident of the State of Oregon.  At the time of Operation Tomodachi, he was a Petty Officer First Class stationed aboard the U.S.S. Ronald Reagan, whose homeport was Naval Base San Diego in San Diego, California.  Mr. Tucker served as a SSES Information Systems Technician during Operation Tomodachi, responsible for cleaning out the contaminated air filters.  He experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein, including but not limited to post-traumatic stress disorder.

185.    Plaintiff, RANDY VALENTIN, participated in Operation Tomodachi, and experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein.

186.    Plaintiff, GABRIEL VASQUEZ, was born September 7, 1989 and is currently a resident of the State of California.  At the time of Operation Tomodachi, he was a Seaman stationed aboard the U.S.S Ronald Reagan, whose homeport was Naval Base San Diego in San Diego, California.  Mr. Vasquez served as a Logistics Specialist during Operation Tomodachi, responsible for tracking, ordering, shipping and expediting all supplies including aviation parts and anything needed to keep the ship and its crew functioning.  He experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein, including hip and toe injuries, trouble sleeping, and headaches.

187.    Plaintiff, SHAWN VELASQUEZ, was born June 5, 1978 and is currently a resident of the State of California.  At the time of Operation Tomodachi, he was a Petty Officer Second Class stationed at Fleet Activities Okinawa Naval Base in Okinawa, Japan.  Mr. Velasquez served as an IMRL Program Manager during Operation Tomodachi, responsible for conducting search and reconnaissance missions flying over Fukushima.  Mr. Velasquez also served as a Tool Room Supervisor, responsible for tracking the daily use of tools used on helicopters and planes after they returned from missions.  After every mission, the used tools and rags returned to the tool room for inventory check, many of

which returned radiated.  He experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein, including but not limited to extreme fatigue, hematochezia, stomach pains, and mental stress.  Mr. Velasquez is married to Midien Velasquez, and they have experienced reproductive issues.  As a result of the wrongful and negligent acts of the Defendants, Mr. and Mrs. Velasquez were caused to suffer, and will continue to suffer in the future, loss of consortium, affection, and conjugal fellowship, all to the detriment of their marital relationship.

188.    Plaintiff, ROBERT VENABLE, is currently a resident of the Commonwealth of Kentucky.  He participated in Operation Tomodachi, and experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein.

189.    Plaintiff, DONALD VOORHEES, was born November 2, 1948 and is currently a resident of the State of Washington.  At the time of Operation Tomodachi, he was a Department of Defense civilian contracted with the United States Navy stationed aboard the U.S.N.S. Bridge, whose homeport was Naval Base Kitsap in Bremerton, Washington.  Mr. Voorhees served as a Seaman ABW in the Military Sealift Command Department during Operation Tomodachi, responsible cleaning various ventilation systems on the ship and standing as watchman on the flight deck from March 13, 2011 through March 30, 2011.  He experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein, including but not limited to colon cancer, requiring surgical removal.

190.    Plaintiff, BRITTNEY WACHNER, was born August 11, 1991 and is currently a resident of the State of Texas.  At the time of Operation Tomodachi, she was a Petty Officer Third Class assigned to the U.S.S. George Washington, whose homeport was Naval Station Norfolk in Norfolk, Virginia.  Ms. Wachner served as an Aviation Structural Mechanic during Operation Tomodachi, responsible for maintaining and repairing utility systems throughout the aircrafts. She also served on the radiation contamination work party, where she was required to scan parts of the airplanes for radiation that are exposed

INDIVIDUAL AND CLASS ACTION COMPLAINT

to ambient air, such as air filters and air-conditioning systems. If the parts being scanned reached a certain level of radiation, she would clean the part and re-scan the levels. Alternatively, if the part was highly radiated then she would remove and replace the part. She experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein, including but not limited to thyroid issues, reproductive issues, depression and anxiety. Ms. Wachner is married to Devin Ritchey and they have one daughter. As a result of the wrongful and negligent acts of the Defendants, Mr. Ritchey and Ms. Wachner were caused to suffer, and will continue to suffer in the future, loss of consortium, affection, and conjugal fellowship, all to the detriment of their marital relationship.

191.    Plaintiff, WILLIAM WALSH, was born May 5, 1978 and is currently a resident of the State of Maryland. At the time of Operation Tomodachi, he was a Petty Officer Second Class stationed aboard the U.S.S. Mustin, whose homeport was Naval Base Yokosuka. Mr. Walsh served as a Naval Aircrewman (Helicopter) during Operation Tomodachi, responsible for conducting operations in and out of contaminated zones. He experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein, including but not limited to mental stress due to his radiation exposure.

192.    Plaintiff, PATRICK WALTON, was born February 8, 1980, and is currently a resident of the State of Washington. At the time of Operation Tomodachi, he was a Petty Officer Third Class stationed aboard the U.S.S. Ronald Reagan, whose homeport was Naval Base San Diego in San Diego, California. Mr. Walton served as a Ship Serviceman during Operation Tomodachi, responsible for managing and operating the ship's retail and service activities and maintaining the supply inventory. He experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein. Mr. Walton is married to Christina Walton. As a result of the wrongful and negligent acts of the Defendants, Mr. and Mrs. Walton were caused to suffer, and will continue to suffer in the

future, loss of consortium, affection, and conjugal fellowship, all to the detriment of their marital relationship.

193.    Plaintiff, BRIDGET WATERS, was stationed at the time of Operation Tomodachi aboard the U.S.S. Essex, whose homeport was Naval Base San Diego in San Diego, California. She experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein, including a brain tumor.

194.    Plaintiff, KENNETH WETHERED, participated in Operation Tomodachi, and experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein.

195.    Plaintiff, CAROLYN FELIX WHITE, was born October 16, 1979, and is currently a resident of the State of California.  At the time of Operation Tomodachi, she was a Petty Officer First Class stationed aboard the U.S.S Ronald Reagan, whose homeport was Naval Base San Diego in San Diego, California.  Ms. Felix White served as an Aviation Machinist Mate during Operation Tomodachi, responsible for performing scheduled and unscheduled maintenance on SH-60F/HH-60H aircrafts on the flight deck that had been flying over Fukushima in direct support of Operation Tomodachi.  If the aircrafts were too radiated, she would clean the aircraft prior to carrying out her maintenance duties, acting as HS-4 Power plants Technician and Phase Coordinator.  She experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein, including but not limited to headaches, weight issues, fatigue, severe anxiety and post-traumatic stress disorder.

196.    Plaintiff, TIM WHITE, participated in Operation Tomodachi, and experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein.

197.    Plaintiff, ELOI WHITEMAN, was born December 1, 1949, and is currently a resident of the State of California.  At the time of Operation Tomodachi, he was a civilian-contracted TSA Officer (GS-13), stationed aboard the U.S.S. Ronald Reagan, whose

homeport was Naval Base San Diego in San Diego, California.  Mr. Whiteman served as a Customer Service Engineer during Operation Tomodachi, responsible for servicing and managing Xerox systems throughout the ship including all areas exposed to the environment.  He experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein, including but not limited to shortness of breath resulting in respiratory system failure, dysuria, elevated stress, and sleep problems.

198.    Plaintiff, JEFFREY A. WILLHOITE, was born March 10, 1990 and is currently a resident of the State of California.  At the time of Operation Tomodachi, he was a Petty Officer Third Class stationed aboard the U.S.S. Ronald Reagan, whose homeport was Naval Base San Diego in San Diego, California.  Mr. Willhoite served as in the Aviation Department during Operation Tomodachi.  He experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein, including but not limited to fear and anxiety about his health due to his exposure to radiation.

199.    Plaintiff, CHRISTOPHER WOODS, participated in Operation Tomodachi, and experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein.

200.    Plaintiff, DEREK YODER, was born June 11, 1991, and is currently a resident of the State of Florida.  At the time of Operation Tomodachi, he was a Petty Officer Third Class stationed aboard the USS Germantown, whose homeport was United States Fleet Activities Sasebo Base in Sasebo, Japan.  Mr. Yoder served as a Gunner's Mate during Operation Tomodachi, responsible for assisting in countermeasure wash downs of the ship, serving on the surface search and rescue squad, and working the gun mount on the flight deck.  He experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein, including but not limited to severe sleep problems, abnormal weight loss, high blood pressure, thyroid issues and vertigo.

201.    Plaintiff, BRANDON ZACHARIE, is currently a resident of the State of Texas.  He participated in Operation Tomodachi, and experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein.

202.    Plaintiff, EDWARD ZIMMERMAN, was born September 4, 1986, and is currently a resident of the State of Ohio.  At the time of Operation Tomodachi, he was a Petty Officer Third Class stationed aboard the U.S.S. Ronald Reagan, whose homeport was Naval Base San Diego in San Diego, California.  Mr. Zimmerman served as a Machinists Mate during Operation Tomodachi, responsible for operating and maintaining steam turbines and reduction gears used for ship propulsion and auxiliary machinery outside of main machinery spaces.  He experienced injury as a result of Defendants' negligent and intentional acts and omissions described herein, including depression, reproductive issues, and joint pain.

### CLASS PLAINTIFFS

203.    All Plaintiffs bring Counts 1-7 pursuant to Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure, seeking declaratory and injunctive relief on behalf of a PLAINTIFF CLASS of more than 70,000 members of the armed forces, their dependents, and support personnel, who served in a variety of capacities during Operation Tomodachi to provide aid to the people of Japan, and who are and were, at all times mentioned, citizens of the United States of America.

204.    One or more members of Plaintiffs' Class may sue as representative parties on behalf of the class because all four of the requirements set forth in Fed. R. Civ. P. 23(a) are satisfied:

    a.    *Numerosity*: the 70,000-person class is so numerous that joinder of all members is impracticable.  In addition, these individuals are all members of the United States armed forces who participated in the humanitarian mission to aid the people of Japan following the earthquake and tsunami of 2011.  Many of them have since parted from the military or would find it difficult to file a lawsuit due to their lack of resources.

b. *Commonality*:  there are questions of law or fact common to the class, including but not limited to (1) whether Defendant TEPCO was negligent and/or grossly negligent in its operation of the FNPP; (2) whether Defendant GE negligently and defectively designed the Mark 1 Boiling Water Reactors that melted down at the FNPP; (3) whether Defendants should be held strictly liable for Plaintiffs Class's injuries for engaging in an ultrahazardous activity of operating a nuclear power plant; (4) what law is applicable to this case, where American servicemen and women were injured as a result of the negligence of a Massachusetts Company and a Japanese utility; and (5) what damages are appropriate for the necessary, ongoing medical monitoring of Plaintiff Class.

c. *Typicality*:  the claims or defenses of the Representative Plaintiffs are typical of the claims or defenses of the class.  The claims that are common to all named plaintiffs above, Counts 1-7, are also common to the Plaintiff Class. While serving as a part of Operation Tomodachi in 2011, all members of the Plaintiff Class were exposed to radiation that was released from the Fukushima Nuclear Power Plant.  Those radioactive releases were caused by the negligence and gross negligence of Defendants TEPCO and GE, as detailed *infra*.  As a result of their exposure to harmful radiation, all members of the Plaintiff class have suffered physical and mental injury and will require ongoing medical monitoring for the remainder of their lives to timely detect and treat future illness and injury.

d. *Adequacy of Representation*:  The named Plaintiffs, their representatives and class counsel will fairly and adequately protect the interests of the class.  The interests of the 194 named Plaintiffs are co-extensive with those of the Class.   The Class Representatives seek compensation for their radiation exposure during Operation Tomodachi due to the negligence of Defendants, and the resultant injuries they have suffered.  The Class Representatives are willing and able to represent the Class fairly and vigorously as they pursue their claims in this action, and have retained counsel who are

qualified and experienced, capable of conducting this litigation, and able to meet the fiscal and time demands of a class action of this size and complexity.

205.     Questions of law or fact common to class members predominate over any questions affecting only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.  Pursuant to Federal Rule of Civil Procedure 23(b)(1), the prosecution of separate actions by individual Class Members would create a risk of: (A) inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the Defendants; or (B) would substantially impair or impede their ability to protect their interests.

206.     Class-wide declaratory and injunctive relief are appropriate under Fed. R. of Civ. P. 23(b)(2) because the Defendants have acted or refused to act on grounds generally applicable to the class.

## DEFENDANTS

207.     **DEFENDANT TOKYO ELECTRIC POWER COMPANY, INC. aka TEPCO**, (hereinafter, "TEPCO"), at all times herein mentioned, was and still is a foreign corporation, organized under the laws of Japan, with its principal place of business situated at 1-1-3 Uchisai wai-Cho, Chiyoda-Ku, in the city of Tokyo, Japan, and with its United States headquarters located at 2121 K Street NW, Suite 910, Washington, D.C. 20037.

208.     TEPCO is a wholly owned public benefit corporation, charged with the responsibility to provide electric power to persons living in Japan.

209.     TEPCO is the largest electric utility in Japan and the 4th largest electric utility in the world. TEPCO enjoys billions of dollars in revenue from electricity sales.

210.     In 2008, TEPCO registered as a business in the District of Columbia, where its business license remains active today.  In its registration, it listed as its business address its offices at 2121 K Street in Washington, D.C.  In 2003, TEPCO also registered as a California foreign corporation with the California Secretary of State.

INDIVIDUAL AND CLASS ACTION COMPLAINT

211.    TEPCO conducts business as a foreign Corporation in California.  Hence, TEPCO is subject to the jurisdiction of this United States Federal District Court, which is empowered to enforce any judgment against Defendant TEPCO.

212.    TEPCO wholly owns Eurus Energy America Corporation (hereinafter, "Eurus"), a United States energy company incorporated in Delaware with its principal executive office at 402 West Broadway, Suite 1750, San Diego, California 92101.

213.    TEPCO's subsidiary, Eurus, is registered to do business in several states throughout the United States, including Illinois, Iowa, Nebraska, Oregon, Texas, Wisconsin and Wyoming.

214.    TEPCO's subsidiary, Eurus, has registered land holdings in several states, including Illinois, Iowa, Nebraska, Oregon, Texas and Wisconsin.

215.    TEPCO's subsidiary, Eurus, has registered wind holdings in several states, including Illinois, Iowa, Oregon, Texas and Wyoming.

216.    TEPCO has also acquired substantial interests in nuclear projects in the United States.  TEPCO entered into an agreement, for example, with Nuclear Innovation North America LLC (NINA) to invest in the South Texas Project, in exchange for a 10% equity interest in NINA, amounting to a 9.75% interest in the South Texas Project.

217.    TEPCO has invested and acquired interests in other companies throughout the United States, including Via Science, a software application company headquartered in Cambridge, Massachusetts.

218.    TEPCO has also partnered with several United States companies to expand its energy interests and platforms throughout the United States.  These include partnerships with Energy Impact Partners, a private equity firm investing in energy throughout the United States; United Wind, a wind energy company based in Brooklyn, New York; and Elemental Accelerator, an energy innovation company headquartered in Honolulu, Hawaii and Palo Alto, California.

INDIVIDUAL AND CLASS ACTION COMPLAINT

219.    **DEFENDANT GENERAL ELECTRIC** (hereinafter, "GE"), at all times herein mentioned, was and still is a for-profit corporation, organized and existing under the laws of the United States of America, with its principal place of business and Corporate Headquarters located at General Electric Company, 41 Farnsworth Street, Boston, Massachusetts 02210.

220.    GE is an American multinational conglomerate corporation incorporated in New York.  The company operates through the following segments: Energy, Technology Infrastructure, Capital Finance as well as Consumer and Industrial.

221.    In 2011, GE ranked among the Fortune 500 as the 26th-largest firm in the U.S. by gross revenue, as well as the 14th most profitable. The company is listed as the fourth largest in the world among the Forbes Global 2000.

222.    Defendants TEPCO and GE were both responsible for the meltdown at the FNPP. References herein to Defendants GE and TEPCO include their respective servants, agents and employees.

223.    Defendant TEPCO contracted with Defendant GE, a United States company, for the design, construction and ongoing maintenance of the boiling water reactors at the Fukushima Nuclear Power Plant, which are the subject of this lawsuit.

224.    Upon information and belief, pursuant to TEPCO's contract with GE, the nuclear reactors located at Fukushima have been subjected to ongoing maintenance, training and improvements by GE.

225.    At all times herein relevant and up to 2005, GE Nuclear Energy, the unit of Defendant General Electric responsible for the conduct discussed herein, was headquartered in San Jose, California.  Plaintiffs are informed and believe that GE essentially oversaw and managed the entire design and development of the FNPP project and participated regularly in maintenance of the facility over many years, even having a large number of its employees and/or contractors present and on site to perform maintenance activities at the time of the Fukushima Nuclear Disaster on March 11, 2011.

INDIVIDUAL AND CLASS ACTION COMPLAINT

Plaintiffs are informed that all activity conducted before 2005 was based from GE Nuclear Energy's San Jose headquarters.

226.    Plaintiff is informed and therefore alleges that while headquartered in San Jose, California, GE Nuclear Energy, entered into multiple contracts for the design, construction and maintenance of the Fukushima Nuclear Power Plant.

227.    All of the described conduct, acts, and failures to act are attributed to agents and employees under the direction and control, and with the permission, consent and authorization of Defendants GE and TEPCO.  Said acts, conduct and failures to act were within the scope of such agency and/or employment, and each of Defendants ratified, endorsed, and agreed to the acts and omissions of the other Defendant. Each of these acts and failures to act is alleged against each Defendant, whether acting individually, jointly, or severally. At all times relevant herein, each Defendant was acting within the course and scope of his or her employment, agreement, and ratification.

228.    At all times herein mentioned, Defendants TEPCO and GE derived substantial revenue from their activities via goods used or consumed in the United States of America and its several States, including California, through the operation of the FNPP.

229.    At all times herein mentioned, Defendants TEPCO and GE expected or should reasonably have expected their acts to have consequences in California and elsewhere within the United States of America.

230.    At all times herein mentioned Defendants TEPCO and GE derived substantial revenue from interstate or international commerce.

231.    At all times herein mentioned, Defendant TEPCO owned the premises where the FNPP was situated, within the prefecture of Fukushima, Japan.

232.    At all times herein mentioned, Defendant TEPCO was one of the owners of the FNPP.

233.    At all times herein mentioned, Defendant TEPCO was a lessee of the FNPP.

234.    At all times herein mentioned, Defendants TEPCO and GE operated the FNPP.

235.    At all times herein mentioned, Defendants TEPCO and GE engineered, constructed, maintained, operated, managed and controlled the FNPP.

236.    At all times herein mentioned, Defendant TEPCO supervised the FNPP.

237.    On or before March 10, 2011, Defendant TEPCO negligently attempted to perform repairs at the FNPP.

238.    On or before March 10, 2011, Defendant TEPCO negligently inspected and negligently failed to inspect the FNPP.

239.    On or before March 10, 2011, the Defendants TEPCO and GE negligently engineered, constructed, maintained, operated, managed and controlled the FNPP.

240.    More than 40 years ago, Defendants TEPCO and GE negligently designed, engineered constructed, maintained, operated, managed, controlled and built the FNPP.

## **JURISDICTION**

241.    This Court has jurisdiction over this action pursuant to 28 U.S.C. §1332. The amount in controversy exceeds $75,000, exclusive of interest and costs.

242.    Pursuant to 28 U.S.C. §1332(d), this Court has jurisdiction because this is a civil action in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and is a mass and class action in which (A) any plaintiff is a citizen of a State different from any defendant; (B) any plaintiff is a foreign state or a citizen or subject of a foreign state and any defendant is a citizen of a State; or (C) any plaintiff is a citizen of a State and any defendant is a foreign state or a citizen or subject of a foreign state.

243.    This Court also has jurisdiction over this action pursuant to 28 U.S.C. §1331, and supplemental jurisdiction under 28 U.S.C. §1367(a) to hear Plaintiffs' state law claims. Plaintiffs' claims require that this Court administer rules of decision based on federal law,

including international treaties such as the London Convention, federal common law and maritime law.

## **STATEMENT OF FACTS**

244.    On March 11, 2011 at 14:46 Japan Standard Time, a 9.0 magnitude earthquake struck northeast Japan, centered on the sea floor 45 miles east of Tohoku, Japan.  As a result, less than an hour later, massive tsunami waves began to hit the

245.    In response to the earthquake and tsunami, Japan and the United States of America launched "Operation Tomodachi," a large-scale, cooperative relief effort to provide aid to the people of northeast Japan.  "Tomodachi" is the Japanese word for "friend."

246.    The U.S.S. Ronald Reagan arrived off the coast of Japan on March 11, 2011.

247.    U.S.S. Ronald Reagan Carrier Strike Group, which included the U.S.S. Chancelorsville, the U.S.S. Preble and U.S.N.S. Bridge, immediately departed for the Japanese island of Honshu and arrived on March 13, 2011.  Seven other naval ships, U.S. Forces Japan and Air Force and Marine units were also immediately deployed as part of Operation Tomodachi.

248.    Meanwhile, a cooling system failure at the Fukushima Nuclear Power Plant ("FNPP") resulted in a level-7 nuclear meltdown and the release of radioactive materials into the environment, including the air and water immediately surrounding the plant.  The earthquake that hit Japan was several times more powerful than the worst earthquake the nuclear power plant was defectively designed and built to withstand.  When the earthquake hit, the nuclear reactors all automatically shut down.  Within seconds after the earthquake started, the control rods had been inserted into the core and the nuclear chain reaction stopped. At this point, the cooling system was supposed to carry away the residual heat, about 7% of the full power heat load under normal operating conditions.

249.    The earthquake destroyed the external power supply of the nuclear reactor, and is referred to as a "loss of offsite power."  For the first hour, the first set of multiple emergency diesel power generators started and provided the electricity that was needed. However, when the tsunami arrived, it flooded the diesel generators, causing them to fail.

250.    One of the fundamental tenets of nuclear power plant design is "Defense in Depth." This approach leads engineers to design a plant that can withstand severe catastrophes, even when several systems fail.  Defendants failed to design a Defense in Depth system, resulting in a core meltdown.  Since the cooling cannot be restored, the core eventually melts.  Since hydrogen gas is extremely combustible, when enough hydrogen gas is mixed with air, it reacts with oxygen. If there is enough hydrogen gas, it will react rapidly, producing an explosion.  At some point during the venting process enough hydrogen gas built up inside the containment (where there is no air), so when it was vented to the air, an explosion occurred in four of the six reactors—Reactors 1-4.  These hydrogen explosions destroyed the top and some of the sides of the reactor buildings.

251.    TEPCO'S then President Masataka Shimizu, although knowing that his statements were factually untrue, repeatedly assured the public that "[t]here has been no meltdown," and that the meltdown was an unforeseeable disaster.  Both statements were patently false as the meltdowns were in fact already occurring at the very time Mr. Shimizu made those statements and, far from being unforeseeable, the disaster had been repeatedly forewarned by industry critics since 2008.

252.    This is the worst industrial accident in the history of the world, and is largely due to inherent design flaws, inaccurate risk assumptions, and the failure of every safety system designed to operate in such an event.  This tragedy was preventable, but corporate financial goals and engineering hubris put money and power before the lives and health of people, including the Plaintiffs.

253.    As described in detail below, the meltdown at FNPP was the result of negligence and gross negligence by Defendant TEPCO and GE, beginning long before March 11, 2011 and long before Plaintiffs arrived off the coast of Fukushima prefecture.

254.    Indeed, Prime Minister Yoshihiko Noda admitted that TEPCO created a man-made disaster, stating that "TEPCO must compensate those affected with sincerity and generosity as well as carry out a thorough reorganization," and he wants TEPCO to "speedily" pay compensation to victims of the Fukushima nuclear disaster."

## Massive Amounts of Radiation Were Released Into the Environment Due to the Meltdown

255.    TEPCO's spokesman, Masayuki Ono, admitted that "up to 300 tons of highly contaminated water from the FNPP site were seeping into the sea and had been leaking radioactive matter since the plant suffered a triple meltdown on 11 March 2011."

256.    The areas around the FNPP, including the Pacific Ocean, are contaminated to a point that could not be imagined; no method of mitigation exists. The Fukushima Daiichi site are expected to continue to bleed radiation into the Pacific for 100 years or longer.

257.    The initial nuclear meltdown from the Fukushima reactors released several radioactive isotopes, such as iodine-131, cesium-134 and cesium-137 and strontium-90. Cesium-137 has a half-life of 30 years and remains in the environment for decades. Nuclear fuel is loaded with noble gases.

258.    The noble gases, such as xenon or krypton, are called noble because they do not react with anything.  All the noble gases were released.  The data indicates that the concentration of xenon, a noble gas, in the Chiba prefecture was 400,000 times greater than normal immediately following the accident.  The concentration of xenon in Chiba was 1,300 Becquerels per cubic meter for eight days, meaning that inside every cubic meter of air over Chiba, there were 1,300 disintegrations emitting radioactivity every second, for eight days and each and every disintegration releases a radiation particle or gamma ray.

259.    The containments were leaking well before the vents were open.  There were four radiation detectors that continued to work after the FNPP disaster. Normal background on these radiation detectors was about 0.04 microsieverts.  At 5:00am on March 11, 2011, right after the accident, the radiation in the detectors was 10 times greater than background. At 6:00am, they were 60 times background; at 9:00am 150 times background; at 10:00am, 700 times background.  People in the vicinity received a yearly dose of radiation in just 12 hours.

260.    Then, the vents were opened. At 3:00pm, the same detectors were measuring 30,000 times background.  This means that people in the vicinity received a yearly dose of radiation in just ten minutes. Notably, this may not have been the worst. This happens to be where the detector was, but the main plume, for example, was not necessarily near the detector.

261.    Marco Kaltofen at Worcester Polytech analyzed five (5) soil samples and a piece of pavement from a children's park right next to a school in Tokyo, more than 100 miles from the FNPP.  Each of the samples exceeded 7,000 Becquerels per kilogram. That measure—7,000 becquerels/kg—qualifies as radioactive waste in the United States.

262.    The total available cesium at Chernobyl was 290 quadrillion petabecquerels of cesium (290,000,000,000,000,000 counts per minute of cesium).  There was almost three times more cesium available to be released at FNPP BWR 1, 2 and 3.  The releases of noble gases at Fukushima were three times the releases of Chernobyl, the containment leak rate was 300% per day, and the decontamination for cesium was zero.  Nothing was getting filtered out, or scrubbed out in the suppression pool, recombiners, or vent stack filters. TEPCO has stated that a groundwater sample taken from a well at the FNPP in July 2013 contained a record high 5 million becquerels per liter of radioactive strontium-90.  The radioactive liquid releases from the FNPP will continue for years into the future. The liquid releases are 10 times the amounts of Chernobyl.

263.    In a leaked TEPCO report dated June 2011, it was revealed that plutonium-238, -239, -240, and -241 were released "to the air" from the site during the first 100 hours after the earthquake, the total amount of plutonium said to be 120 billion becquerels (120 GBq) and perhaps as much as 50 grams.  The same report mentioned a release of 7.6 trillion becquerels of neptunium-23 -about 1 milligram), which becomes plutonium-239 as it decays.  TEPCO made this report for a press conference on June 6, 2011.  Plutonium-239 is particularly long-lived and toxic with a half-life of 24,000 years.  It remains hazardous for tens of thousands of years.

264.    The isotope iodine-131 is easily absorbed by the thyroid. Persons exposed to releases of iodine-131 from any source have a higher risk for developing thyroid cancer or thyroid disease, or both.  Iodine-131 has a short half-life at approximately eight days.

265.    Cesium-137 is also a particular threat because it behaves like potassium and is absorbed by cells throughout the body. Additionally, it has a long, 30-year half-life. Cesium-137 can cause acute radiation sickness, and increases the risk for cancer because of exposure to high-energy gamma radiation.  Internal exposure to Cesium-137, through ingestion or inhalation, allows the radioactive material to be distributed in the soft tissues, especially muscle tissue, exposing these tissues to the beta particles and gamma radiation and increasing cancer risk.

266.    The nuclear community has now created a special rating system for Fukushima– assigning it to a new category, above Chernobyl, as a Number 8 level nuclear disaster.  Fukushima is a [m]ulti-source major nuclear accident requiring international assistance and monitoring.

267.    Surveys and biological monitoring of children and adults exposed at Chernobyl point unambiguously to a steady, rapid and dramatic deterioration of health of all victims of the Chernobyl accident.  The exposures experienced at Fukushima could be much worse.  According to experts, "[t]here is a near universal acceptance that epidemiological data demonstrates an excess risk of delayed cancer incidence above a dose

INDIVIDUAL AND CLASS ACTION COMPLAINT

of 0.1 sieverts. All who met with Fukushima's radioactive fallout are probably to have some problem with the thyroid."

268.    Strontium-90 behaves like calcium, and tends to deposit in bone and blood-forming tissue (bone marrow). 20–30% of ingested Strontium-90 is absorbed and deposited in the bone. Internal exposure to Strontium -90 is linked to bone cancer, cancer of the soft tissue near the bone, and leukemia. The risk of cancer increases with increased exposure to Strontium-90.

269.    On July 11, 2014, Environmental Science & Technology, an authoritative source of information for professionals in a wide range of environmental disciplines, published *The Novel Insights into Fukushima Nuclear Accident from Isotopic Evidence of Plutonium Spread along Coastal Rivers,* 48 Environ. Sci. Technol., pp 9334–9340 (2014). The results of this study "indicated the presence of Plutonium ("Pu") from FNPP, in slight excess compared to the Pu background from global fallout…. These results demonstrate that this radionuclide has been transported relatively long distances (~45 km) from FNPP and has been deposited in rivers, representing a potential source of Pu to the ocean."

270.    The radioactive isotopes from the FNPP have already reached North America. Two radioactive cesium isotopes, cesium-134 and cesium-137, have been detected offshore Vancouver, British Columbia.

271.    Nuclear expert Claudia French was professor emeritus of molecular and cell biology at University of California-Berkeley, worked on the "Manhattan Project" on uranium effects, and established the Biomedical Research Division of the Lawrence Livermore National Laboratory. Dr. French wrote in his 1990 book that "by any reasonable standard of biomedical proof" there is no threshold level (no harmless dose) of ionizing radiation with respect to radiation mutagenesis and carcinogenesis—a conclusion supported in 1995 by a government-funded radiation committee.

272.    Plaintiffs, most of whom were aboard nearby ships, were trapped in the prevailing wind blowing out to sea, carrying the deadly plume of all these radioactive

INDIVIDUAL AND CLASS ACTION COMPLAINT

particles.  They were unable to avoid the radiation.  One Plaintiff explained that, "the ship was still taking in sea water, but obviously, the ship can't filter out the radiation. Water we all showered with, drank, brushed our teeth, and had our food cooked with…"

273.     On March 14, 2011, the Navy published: "The U.S. 7th Fleet has temporarily repositioned its ships and aircraft away from the Fukushima Dai-Ichi Nuclear Power Plant after detecting contamination in the air and on its aircraft operating in the area. The source of this airborne radioactivity is a radioactive plume released from the Fukushima Dai-Ichi Nuclear Power Plant. Using sensitive instruments, precautionary measurements of three helicopter air crews returning to USS Ronald Reagan after conducting disaster relief missions near Sendai identified [measureable] levels of radioactivity on 17 air crew members."

### GE's Nuclear Reactor Design Put Profits Above Safety

274.     In 1954, the Atomic Energy Act was amended to permit private sector development of nuclear power and nuclear technology and the Atomic Energy Commission (predecessor to the Nuclear Regulatory Commission) endorsed this new energy technology.  That same year, the U.S. Navy launched the USS Nautilus, the first nuclear-powered submarine.

275.     At that time, GE was at the forefront of nuclear reactor development, but was struggling with the high cost for customers interested in the production of energy making use of nuclear fission.  GE Nuclear Energy was based in San Jose, California.

276.     The cost of building nuclear reactors was of such concern to GE that, from its San Jose, California headquarters, it developed design plans for a cheap reactor, small and with a significantly smaller, and less safe, containment than industry standard.  This allowed GE to generate sales, become a major player in the market and make enormous profits at the expense of safety.  Displaying GE's determination to develop that product, in 1961 its Chief Executive Officer proclaimed, while working at the San Jose Headquarters of GE Nuclear Energy, "We're going to ram this nuclear thing through."

277.    The uranium core at the center of a nuclear reactor needs a containment structure to prevent deadly radioactive material from reaching the environment. Rather than use a large building to contain radiation, GE's Mark 1 uses a small containment building.  Unfortunately, GE's cheap design failed to prevent a meltdown and radioactive release at the FNPP in March 2011.

278.    From its Nuclear Energy headquarters in California, GE exerted enormous political and economic pressure so that the world would embrace the design and construction of BWR nuclear plants, giving the public and regulators no opportunity to pause and consider the concerns of design skeptics, who warned that the BWR products could not be made safe.

279.    Also from its Nuclear Energy headquarters in California, GE was soon selling dozens of its defectively-designed BWRs to power companies in the United States, Japan and elsewhere.  Included among them was the sale of the Mark 1 nuclear reactor and containment system in or around 1967 to TEPCO from GE Nuclear Energy.  GE designed the FNPP and then constructed several of the reactors there, including Units 1 and 3, and designed each of the three reactors that ultimately failed and melted down in March 2011, all while headquartered in San Jose, California.

**TEPCO Ignored Longstanding Problems at the FNPP**

280.    In 2000, Kei Sugaoka, an employee of Defendant GE working at the FNPP pursuant to a contract between GE and TEPCO, while conducting onsite inspections at the plant, was the first to blow the whistle on TEPCO'S data tampering.  In a letter to the Japanese government, dated June 28, 2000, he warned that TEPCO continued to operate a severely damaged steam dryer in the plant 10 years after he pointed out the problem.  "I always thought it was just a matter of time," he says of the disaster. Mr. Sugaoka later stated that he was not surprised by what happened in 2011: "This is one of those times in my life when I'm not happy I was right."  At the time of the warning, which was ignored

by Defendants, Mr. Sugaoka's employer was GE Nuclear Energy, then based in San Jose, California.

281.    Problems with the fractured, deteriorating, poorly repaired pipes and cooling system at the FNPP had been pointed out for years. In September 2002, TEPCO admitted covering up data about cracks in critically important circulation pipes. In their analysis of the cover-up, The Citizen's Nuclear Information Centre wrote: "The records that were covered up had to do with cracks in parts of the reactor known as recirculation pipes. These pipes are there to siphon off heat from the reactor. If these pipes were to fracture, it would result in a serious accident in which coolant leaks out."

282.    Katsunobu Onda, in his 2007 expose, *TEPCO: The Dark Empire*, explained that a government or industry admission "raises suspicions about the safety of every reactor they run. They are using a number of antiquated reactors that have the same systematic problems, the same wear and tear on the piping."

283.    TEPCO's negligence was uncovered by Mr. Onda's research.  Mr. Onda spoke with several engineers who worked at the TEPCO plants. One told him that often piping would not match up to the blueprints. In that case, the only solution was to use heavy machinery to pull the pipes close enough together to weld them shut. Inspection of piping was often cursory and the backs of the pipes, which were hard to reach, were often ignored. Repair jobs were rushed.

284.    Mr. Onda adds: "When I first visited the Fukushima Power Plant it was a web of pipes. Pipes on the wall, on the ceiling, on the ground. You'd have to walk over them, duck under them-sometimes you'd bump your head on them. The pipes, which regulate the heat of the reactor and carry coolant, are the veins and arteries of a nuclear power plant; the core is the heart. If the pipes burst, vital components don't reach the heart and thus you have a heart attack, in nuclear terms: meltdown. In simpler terms, you can't cool a reactor core if the pipes carrying the coolant and regulating the heat rupture - it doesn't get to the core."  This is precisely what happened when the earthquake struck the FNPP.

285.     TEPCO operators of the FNPP negligently and repeatedly ignored warnings that the complex was at risk of damage from a tsunami of the size that hit north-east Japan in March, negligently dismissing the need for better protection against seawater flooding. TEPCO officials rejected and scoffed at "unrealistic" estimates made in a 2008 internal report that the plant could be threatened by a tsunami of up to 10.2 meters. The tsunami that crippled backup power supplies at the plant on the afternoon of 11 March, leading to the meltdown of three (3) reactors, was more than 14 meters high, yet a tsunami of that height and higher had happened more than once in Japan's recent history.  The meltdown was caused by design and manufacturing defects, which resulted in catastrophic "Loss of Coolant Accidents," resulting from the reactors' piping failing, breaking, splitting apart and cracking during the earthquake.

286.     Tooru Hasuike, a TEPCO employee from 1977 until 2009 and former general safety manager of the Fukushima plant, stated: "The emergency plans for a nuclear disaster at the Fukushima plant had no mention of using seawater to cool the core. To pump seawater into the core is to destroy the reactor. The only reason you'd do that is that no other water or coolant was available."

287.     TEPCO had a history of negligently causing other nuclear accidents including, but not limited to, the following:

  a.   1981: almost 300 workers were exposed to excessive levels of radiation after a fuel rod ruptured during repairs at the Tsuruga Nuclear Power Plant.

  b.   December 1995: the fast breeder Monju Nuclear Power Plant sodium leak. State-run operator Donen was found to have concealed videotape footage that showed extensive damage to the reactor.

  c.   March 1997: the Tokaimura nuclear reprocessing plant fire and explosion, northeast of Tokyo. Thirty-seven workers were exposed to low doses of radiation. Donen later acknowledged it had initially suppressed information about the fire.

d.   In 1999: A fuel loading system malfunctioned at a nuclear plant in the Fukui Prefecture and set off an uncontrolled nuclear reaction and explosions.

e.   September 1999: the critical accident at the Tokai fuel fabrication facility. Hundreds of people were exposed to radiation; three workers received doses above legal limits, two of whom later died.

f.   In 2000: Three Tokyo Electric Power Co. executives were forced to quit after the company in 1989 ordered an employee to edit out footage showing cracks in nuclear plant steam pipes in a video being submitted to regulators.

g.   August 2002: a widespread falsification scandal started, which led to the shutdown of all Tokyo Electric Power Company's 17 nuclear reactors; Tokyo Electric's officials had falsified inspection records and attempted to hide cracks in reactor vessel shrouds in 13 of its 17 units.

h.   In 2002: Two workers were exposed to a small amount of radiation and suffered minor burns during a fire at Onagawa Nuclear Power Station in northern Japan.

i.   In August 2004: four workers were killed after a steam explosion at the Mihama-3 station; the subsequent investigation revealed a serious lack in systematic inspection in Japanese nuclear plants, which led to a massive inspection program.

j.   In 2006: A small amount of radioactive steam was released at the Fukushima Daiichi plant and it escaped the compound.

k.   On July 16, 2007: a severe earthquake (measuring 6.8 on the Richter scale) hit the region where Tokyo Electric's Kashiwazaki-Kariwa Nuclear Power Plant is located and radioactive water spilled into the Sea of Japan; as of March 2009, all of these reactors remain shut down for damage verification and repairs; the plant with seven units was the largest single nuclear power station in the world.

288.    On March 2, 2011, only nine days before the meltdown, the government watchdog, the Nuclear Industrial Safety Agency (NISA), warned TEPCO about its failure to inspect critical pieces of equipment at the plant, including recirculation pumps. TEPCO was ordered to make the inspections and perform repairs if needed.

289.    NISA found that Defendant TEPCO negligently "failed to correctly develop the most basic safety requirements-such as assessing the probability of damage, preparing for containing collateral damage from such a disaster, and developing evacuation plans."

**TEPCO and GE's Negligence Led Directly to the Meltdown**

290.    At 3:42pm on March 11, 2011, when the first tsunami waves hit the FNPP, the plant lost power.

291.    At 9:51pm, under the chief executive's orders, the inside of the reactor building was declared a no-entry zone. At around 11 pm, radiation levels for the inside of the turbine building, which was next door to the reactor, reached levels of 0.5 to 1.2 mSv per hour. In other words, the meltdown was already underway. The reactors were already melted or deeply involved in melting down.

292.    Seawater was not pumped in until hours after a hydrogen explosion occurred, at roughly 8:00 pm on March 11, 2011. Sometime between 4:00 and 6:00 am on March 12, 2011 Masao Yoshida, the plant manager, decided it was time to pump seawater into the reactor core. By then, it was already too late.

293.    Before dawn on March 12, 2011, as the water levels at the reactor began to plummet and the radiation began rising, a TEPCO press release published just past 4:00 am stated: "The pressure within the containment vessel is high but stable." This was willfully false information.

***Defendants' Failure to Provide Appropriate Power Sources at the FNPP***

294.    Nuclear power plants must continuously cool their unstable, radioactive fuel. These cooling systems run on electricity, which the plants ordinarily pull from the nation's

power grid. If the grid fails, on-site diesel generators kick on to keep the cooling systems running. If the diesel generators don't kick on, the plant is in danger of melting down. It is therefore a basic rule of nuclear power plant operation that emergency generators should be installed at high elevations or in watertight chambers.

295. TEPCO and GE failed to have 12-volt batteries on the premises at FNPP to provide auxiliary power. The Isolation Condenser (IC), which relied on convection and gravity to perform its cooling function, should have helped keep the water level high in Unit 1's core through the crisis. Operators, however, had turned off the system just before the tsunami by closing its valves. Thereafter, the electrical outage prevented the operators from re-opening them to allow for the release of steam and the flow of cooling water. Workers struggled to manually open the valves on the IC system.

296. "There's no doubt TEPCO should have applied new designs" throughout Fukushima, says Masatoshi Toyota, 88 years old and a retired top TEPCO executive who helped oversee the building of the reactors. Because TEPCO's first reactor buildings were too small, the generators had to be located somewhere else. Therefore, engineers located them in neighboring structures which housed turbines. The reactor buildings were fortress-like, with thick concrete walls and dual sets of sturdy doors, but the turbine buildings were far less sturdy, especially their doors. "Backup power generators are critical safety equipment, and it should've been a no-brainer to put them inside the reactor buildings," Mr. Toyota says. "It's a huge disappointment that nobody at TEPCO—including me—was sensitive enough to notice and do something about this discrepancy."

297. TEPCO was not prepared with backup power. In the plant's parking lots, workers raised car hoods, grabbed their car batteries, and lugged them back to the control rooms. They found cables in storage rooms and studied diagrams. They were vainly hoping if they could connect the batteries to the instrument panels, they could at least determine the water levels in the pressure vessels.

***Defendants Located Backup Power Supplies Far Offsite, Making Them Inaccessible***

298.     If a cooling system is intended to operate without power, the operator must ensure that all of its parts can be manipulated without power.  TEPCO did have a backup for the emergency generators: power supply trucks outfitted with high-voltage dynamos. That afternoon, emergency managers at TEPCO's Tokyo headquarters sent 11 power supply trucks racing toward Fukushima Daiichi, 250 km. away. They promptly got stuck in traffic. The roads that were not damaged by the earthquake or tsunami were clogged with residents fleeing the disaster sites.

299.     TEPCO and GE negligently designed, maintained, managed, and prepared the reactor buildings by designing and building them too small to accommodate emergency equipment.  Power trucks, generators, and batteries should be kept on or very close to the power plant site. This emergency equipment was not stored close by, but rather more than 55 km. away from the plant.

300.     The containment vessel, which surrounds the pressure vessel, is a crucial line of defense: it is a thick steel hull meant to hold in any tainted materials that have escaped from the inner vessel.  At 11:50 p.m., operators in the control room finally connected car batteries to the pressure gauge for the primary containment vessel. But the gauge revealed that the containment vessel had already exceeded its maximum operating pressure, increasing the likelihood that it would leak, crack, or even explode.

301.     TEPCO and GE should have installed independent and secure battery systems to power crucial instruments during emergencies, but failed to do so.  In their initial, improvised response, the fire crew pumped water into the trucks' storage tanks, then drove close to the side of the reactor building and injected the water into the fire protection system's intake lines.  It was 5:46 a.m. on March 12, 2011 when the first drops of water sprayed across the molten fuel.  Then the workers drove back to the water tanks and began the slow, arduous operation all over again. Eventually workers managed to use the fire engines' hoses to connect the water tanks directly to the intake lines and established a

steady flow of water. By mid-afternoon, they had injected 80,000 liters of water into the pressure vessel using this makeshift system. But it was too little, too late.

### Defendants' Failures to Properly Vent Reactors

302.     TEPCO and GE should also have ensured that catalytic hydrogen re-combiners (power-free devices that turn dangerous hydrogen gas back into steam) were positioned at the tops of reactor buildings where gas would most likely collect.

303.     At 3:45 a.m., the crew in charge of the venting operation tried to measure the radiation dose inside the reactor building, which had been off limits for 6 hours.  The vent crew workers wore protective head-to-toe suits, had face masks connected to air tanks, and took iodine tablets in an attempt to combat against the radiation they would soon encounter. Armed with handheld dosimeters, they opened the air lock, only to find a malevolent white cloud of some "gaseous substance" billowing toward them. Fearing a radiation steam bath, they slammed the door shut. They did not get their reading, but they had a good indication that things had already gone seriously wrong inside the reactor.

304.     Defendants also failed to install power-free filters on vent lines to remove radioactive materials and allow for venting that would not harm nearby residents and persons providing emergency aid.  The failure of Reactor 1 made efforts to stabilize the other reactors exponentially more difficult, because workers then had to labor in a radioactive hot zone littered with debris. In addition, when work crews returned to the power truck sometime after the explosion, they couldn't get the power flowing.  As a result, the meltdown continued.

### Subsequent Investigations Found Negligence and Gross Negligence by TEPCO

305.     A ten-member Japanese Parliamentary Panel, The Fukushima Nuclear Accident Independent Investigation Commission, was convened to investigate the nuclear meltdown at the FNPP.  On Thursday, July 5, 2012, the Commission released a report following a six-month investigation involving more than 900 hours of hearings, and interviews with more than 1,100 people.

306.    The Commission's report concluded that TEPCO was negligent in creating the meltdown that "occurred 5 hours after the earthquake."    Unaware of either the meltdown or any radioactive release, the Plaintiff responders arrived off the coast of Fukushima during the afternoon of March 12, 2011 to carry out their mission of providing humanitarian aid to the victims of the earthquake and tsunami disaster. At no time did this mission include, nor expand into, a response to a meltdown or a nuclear emergency. Rather, Plaintiffs were carrying out their orders of providing humanitarian aid by delivering clean water, blankets, food, and other relief to the inhabitants of Fukushima affected by the earthquake and resultant tsunami.

307.    The Commission determined that TEPCO had negligently failed to take adequate precautions, despite evidence that the area was susceptible to powerful earthquakes and tsunamis.    The Commission concluded that "the accident was clearly 'man-made'" and that "the root causes were the organizational and regulatory systems that supported faulty rationales for decisions and actions…."    The Commission further found that TEPCO showed a negligent "disregard for global [safety] trends and a disregard for public safety."

308.    The Commission's chairman, Kiyoshi Kurokawa, a professor emeritus at Tokyo University, also wrote a scathing introduction to the report, which stated that the cultural traits displayed by TEPCO management had caused the disaster.

309.    The Commission outlines TEPCO'S "errors and willful negligence" at the FNPP before the earthquake and tsunami on March 11, 2011, bluntly stating that TEPCO negligently created a "man-made disaster."    The Commission found that plant operators at the FNPP "weren't prepared for nuclear accident," that TEPCO had failed to properly prepare for the earthquake and tsunami, and that "the direct causes of the accident were all foreseeable prior to March 11, 2011." One related concern was the "lack of training and knowledge of the TEPCO workers at the facility [which] reduced the effectiveness of the response to the situation at a critical time."

310.      Former Prime Minister Naoto Kan of Japan disclosed that TEPCO and the nuclear safety agency had hidden key details from him in the days after March 11, 2011, adding that he had been as open as possible with the public, based on the information he had been given.   Mr. Kan said he feared further meltdowns that could result in the evacuation of Tokyo, a metropolitan area of more than 30 million people. Deserting the capital, he added, would have brought the government to a standstill and led to "a collapse of the nation's ability to function."

311.       The Commission's report details "assessments of the aftermath of Fukushima [that] tell a story of confusion at the site, and a lack of communication between TEPCO and safety officials."   TEPCO's managers were ineffective in "preventing or limiting the consequential damage" at Fukushima Daiichi.

312.      TEPCO has since publicly admitted that it "was not fully prepared for the nuclear disaster."   TEPCO's final report on the disaster said it "did not have sufficient measures to prevent the accident. TEPCO's final report also acknowledged criticism that TEPCO took too long to disclose critical information.

313.      Naomi Hirose, president of TEPCO, made further admissions about the company's negligence in statements made to the press:

After I became president [in 2012], we formed a nuclear safety review committee.  We focused mainly on what we could do, what we could learn.  We had a lot of data by then.  Three other reports, one from the Diet [Japan's parliament], one from government. We had a lot of information. TEPCO's own report, too. We concluded that we should have avoided that catastrophic accident, and we could have. We could see what we should have done. Preventative measures included fitting waterproof seals on all the doors in the reactor building, or placing an electricity-generating turbine on the facility's roof, where the water might not have reached it. In addition, wrong assumptions were made.

### Significant Design Defects Plague the Mark 1 Boiling Water Reactors

INDIVIDUAL AND CLASS ACTION COMPLAINT

314.    The Fukushima Daiichi nuclear power plant consists of six reactors.  All six reactors were designed by Defendant GE, a United States company.  Defendant GE negligently and defectively designed, engineered and constructed the Mark 1 Boiling Water Reactors ("BWR"), creating several manufacturing and design defects in these reactors. Units 1 through 5 are based on the flawed Mark 1 design by GE, which caused the 2011 meltdown at the FNPP.

315.    The FNPP Reactors 1-3 came into commercial operation from 1971-75. Reactor power is 460 MWe for unit 1, 784 MWe for units 2-5, and 1100 MWe for unit 6. The fuel assemblies are about 4 m long, and there are 400 fuel rods in unit 1; 548 in units 2-5; and 764 in unit 6. Each assembly has 60 fuel rods containing the uranium oxide fuel within zirconium alloy cladding.  Reactor 3 has a partial core of mixed-oxide (MOX) fuel (32 MOX assemblies, 516 LEU).  They all operate normally at 286°C at core outlet under a pressure of 6930 kPa and with 115-130 kPa pressure in dry containment. The four reactors all began operation in the 1970s. Units 1, 3 and 4 were built by Defendant GE, while Unit 2 was a joint GE-Toshiba project.

| Reactor | Design | Size | Commercial Operation |
|---|---|---|---|
| Fukushima I-1 | General Electric Mark 1 BWR | 439MW | March 1971 |
| Fukushima I –2 | General Electric Mark 1 BWR | 760 MW | July 1974 |
| Fukushima I - 3 | General Electric Mark 1 BWR | 760 MW | March 1976 |
| Fukushima I - 4 | General Electric Mark 1 BWR | 760 MW | Oct. 1978 |
| Fukushima I - 5 | General Electric Mark 1 BWR | 760 MW | April 1978 |
| Fukushima I - 6 | General Electric Mark 2 BWR | 1067 MW | Oct. 1979 |

316.    Defendants TEPCO and GE have both been involved in maintenance and servicing of the nuclear power plant during the past decades.

INDIVIDUAL AND CLASS ACTION COMPLAINT

317.     The BWR produces electricity by boiling water, and spinning a turbine with that steam. The nuclear fuel heats water, the water boils and creates steam, the steam then drives turbines that create the electricity, and the steam is then cooled and condensed back to water, and the water returns to be heated by the nuclear fuel. The reactor operates with the nuclear fuel that is uranium oxide. Uranium oxide is a ceramic with a very high melting point of about 2800 °C. The fuel is manufactured in pellets (cylinders that are about 1 cm tall and 1 cm in diameter). These pellets are then put into a long tube made of Zircaloy (an alloy of zirconium) with a failure temperature of 1200 °C (caused by the auto-catalytic oxidation of water), and sealed tight. This tube is called a fuel rod. These fuel rods are then put together to form assemblies, several hundred of which make up the reactor core. The solid fuel pellet (a ceramic oxide matrix) is the first barrier that retains many of the radioactive fission products produced by the fission process.  The Zircaloy casing is the second barrier to release that separates the radioactive fuel from the rest of the reactor. The core is then placed in the pressure vessel. The pressure vessel is a thick steel vessel that operates at a pressure of about 7 MPa [2](1000 psi), and is designed to withstand the high pressures that may occur during an accident. The pressure vessel is the third barrier to radioactive material release.

318.     The entire primary loop of the nuclear reactor-the pressure vessel, pipes, and pumps that contain the coolant (water) are housed in the containment structure. This structure is the fourth barrier to radioactive material release. The containment structure is

---

[2] Megapascal (MPa) is a metric pressure unit and equals to 1,000,000 force of newton per square meter which is known as a Pascal. Pound-per-square-inch (abbreviated as PSI) is a unit of pressure, which measures the quantity of pressure per square inch of area. It is defined as the pressure of a force of 1 pound applied homogeneously above an area of 1 square inch. Pound or pound force per square inch (psi, pfsi, lb/in², or lbf/in²) is a commonly used British plus American unit of measurement for pressure. (1 psi = 6,894.76 Pascal).

a hermetically (air tight) sealed, very thick structure made of steel and concrete. This structure is designed, built and tested for one single purpose: To contain, indefinitely, a complete core meltdown. To aid in this purpose, a large, thick concrete structure is poured around the containment structure and is referred to as the secondary containment. Both the main containment structure and the secondary containment structure are housed in the reactor building. The reactor building is an outer shell that is supposed to keep the weather out, but nothing in. (this is the part that was damaged in the explosions).

319.    The uranium fuel generates heat by neutron-induced nuclear fission. Uranium atoms are split into lighter atoms (aka fission products). This fission process generates heat and more neutrons (one of the particles that forms an atom). When one of these neutrons hits another uranium atom, that atom can split, generating more neutrons and so on. That is called the nuclear chain reaction. During normal, full-power operation, the neutron population in a core is stable (remains the same) and the reactor is in a critical state. There is a multitude of fission products that are produced in a reactor, including cesium and iodine.  Others decay more slowly, like some cesium, iodine, strontium, and argon.

### Design Defects Made Containment Difficult or Impossible

320.    One design and manufacturing defect of the Mark 1 BWRs is that the containment vessel, which is supposed to contain radioactive material, was designed, manufactured and built too small for its purpose.

321.    The Torus is the doughnut shaped structure at the bottom of the containment. The defectively designed Torus—a water-filled vessel encircling the primary containment vessel that is used to prevent reactor water from slamming directly into the reactor core—could potentially jump off the floor when reactor water rushes back from the steam turbines. Thus, the Torus prevents reactor water from rushing from the steam turbines directly into the reactor core under high pressure.

322.    The reactor water returning from the steam turbines has a much lower temperature than the steam leaving at the top of the reactor, and this much cooler water

could cause thermal damage and actual cracking of the reactor fuel rods if it were to impinge directly onto the reactor core.   In addition, the Mark 1 containment vessel is insufficient to contain radioactive leaks by allowing radioactive materials to leak into the ground water and into the Pacific Ocean. This reactor was designed to contain these radioactive materials, and it has failed to do that.  This is a fatal design defect.

323.    Defendants were aware of the problem.  The first attempt to ameliorate this defect by Defendants in 1976 was to attach large straps to hold the Torus down against inevitable uplift forces.

324.    In 1989, due to the likelihood of hydrogen generation, Defendants attempted a second Band-Aid fix.  They installed vents on the side of the containment vessel to prevent over-pressurization.  This installation was another negligent and defective design and construction since the purpose of the containment is to contain radiation releases in the event of an accident, yet these vents allow for the release of such radiation. Additionally, once open, it is unlikely that they can be closed.  These vents failed catastrophically three times at Fukushima Daiichi.

325.    The second design and manufacturing defect of the Mark 1 Boiling Water Reactors is that their control rods[3] enter through holes in the floor of the reactor vessel, presenting a myriad of opportunities for melted core materials to leak directly onto the containment floor. This is exactly what happened at Fukushima Daiichi. The BWR design is uniquely prone to melt through because it is built in a containment that is already inadequate by being too small to contain normal reactive forces.

---

[3] Control rods are used for rapid changes to the reactor power (e.g. shutdown and startup). They maintain the desired state of fission reactions within a nuclear reactor. They constitute a real-time control of the fission process, which is crucial for both keeping the fission chain reaction active and preventing it from accelerating beyond control.

INDIVIDUAL AND CLASS ACTION COMPLAINT

326.     A third design and manufacturing defect of the Mark 1 Boiling Water Reactor is the positioning of the spent fuel pools at the top of the reactor buildings.  The reactor buildings have their fuel pools more than 100 feet in the air, exposing them and releasing radioactive material directly into the atmosphere.

327.     Three reactor buildings blew up at Fukushima.  As a result of the hydrogen explosions, there was no more available containment, directly exposing the spent fuel rods and making them highly susceptible to an explosion. This scenario was especially dangerous in the case of Reactor 4, as it contained fuel rods equivalent to those of all the other reactors combined.

### *The Safety Release Valve Design Defect Caused a Chain of Meltdowns*

328.     At the FNPP there was a "the chain of meltdowns," with Hydrogen explosions at Reactors 1 and 3, and then in 2 and 4, one after another. The explosion in Reactor 1 occurred on Saturday, March 12, 2011 at 3:36pm; the next explosion in Reactor 3 took place on Monday, March 14, 2011 at 11:01am; the third explosion in Reactor 2 was on Tuesday, March 15, 2011 at 6:10am and was followed by the final explosion in reactor 4 later that same day, Tuesday, March 15, 2011 at 9:38am.  This is the first time in history that a meltdown of multiple reactor cores in succession has occurred.

329.     A fourth design and manufacturing defect of the Mark 1 BWR that contributed to the chain meltdown was a pipe connecting Reactors 3 and 4.  Even though the core had been completely unloaded from Reactor 4, the last explosion was due to a buildup of hydrogen, which entered the Reactor via this joint pipe from Reactor 3.

330.     A fifth design and manufacturing defect of the Mark 1 BWR was the inoperable safety release ("SR") valves, each of which failed to open in each of the reactors, largely contributing to "the chain of meltdowns."  The SR valves are used to release steam from a reactor when the cooling system breaks down. There are eight SR valves attached to the outside of each reactor. Every one of them failed.  Had even one of these valves

opened, the internal pressure would have been lowered enough to allow for the necessary and urgent injection of water as a coolant. Instead, each of the 32 SR valves failed to open.

331.    The SR valves are located in the primary containment vessel that houses the reactor, where no one is allowed access, and therefore they must be opened remotely from the main control room. If the pressure in the containment vessel surges, the pressure inside the SR valve also goes up, which, in effect, prevents the valve from opening. The nitrogen pressure line must be greater than the pressure inside the SR valve in order for it to be able to open the SR valve. Unless the pressure in the nitrogen valve increases, the pressure from above (inside the SR valve) will keep the valve from opening. If the SR valves remain closed, there is no way to prevent a meltdown, and the situation will deteriorate as the meltdown progresses. This is because the temperature will keep surging, and the pressure within the primary containment vessel will also continue to rise. The purported safety mechanism was supposed to prevent a meltdown, and yet it became less effective as the meltdown worsened. Due to the increase of heat from the melting fuel, the higher pressure within the primary containment vessel prevented the SR valves from opening.

332.    A sixth design and manufacturing defect of the Mark 1 BWR is the failure to design a periodic testing of the SR valves to ensure they would open under different emergent conditions. TEPCO and GE never tested the SR valves under these circumstances. The failure of the SR Valves caused the Drywell and Suppression Chamber pressures to go down to zero, resulting in a massive release of radioactive materials.

333.    A seventh design and manufacturing defect of the Mark 1 BWRs is the lack of a storage facility for auxiliary electric power, including 12-volt batteries, which are highly portable and weigh as little as 10 kilograms. Ten batteries provide enough power to open an SR valve. In addition to this omission in design by GE, TEPCO failed to prevent a meltdown. Two (2)-volt batteries were delivered rather than the desperately needed 12-volt batteries which had been requested at the onset of the disaster.

334.      Atsufumi Yoshizawa, TEPCO's senior official in charge of procurement, gave the excuse that he and his team were not able to prioritize the request for 12 volt batteries. He stated: "People responding to the disaster needed all kinds of things, we were trying to juggle all of the requests at the same time trying to get them delivered as quickly as we could, we didn't have time to prioritize. We just tried to grab whatever was on the list regardless of quantity…I believe we were in a situation where screening each request according to priority was very difficult." This failure glaringly displays TEPCO's recklessness in the training, preparation and response to a foreseeable disaster such as a nuclear meltdown.  TEPCO's chaotic and ill-designed approach to providing essential materials worsened the disaster.  The workers at Fukushima were left without the necessary batteries to prevent a meltdown.

335.      On March 13, 2011, just after the U.S.S. Reagan and many of the Plaintiffs arrived, the radiation rate at the main gate rose to 281 microSieverts/hour, at which rate the annual exposure rate would be reached in four hours, at this dangerous and inappropriate level.  The 12-volt batteries TEPCO had procured were at a stock plant more than 55 kilometers away from the plant…there were over 1,000 of them, unavailable when desperately needed. There were also small generators and pumps stranded at the distribution center, but no plan or adequate training existed to ensure their transport to the contaminated plant.

### The Design of the BWR's Isolation Condensers Is Deeply Flawed

336.      An eighth design and manufacturing defect of the Mark 1 BWR is the failure to build into the design isolation condensers that operate continuously.[4]  The Reactors were

---

[4] An isolation condenser is a heat exchanger located above containment in a pool of water open to atmosphere. In operation, decay heat boils steam, which is drawn into the heat exchanger and condensed; then it falls by weight of gravity back into the reactor. This process keeps the cooling water in the reactor, making it unnecessary to use powered feed-water pumps.

INDIVIDUAL AND CLASS ACTION COMPLAINT

equipped with two isolation condensers for cooling. They were designed to continue cooling without power, once engaged. Hot steam from the reactor cools and condenses as it passes through a tank of water. At the time of the meltdown, TEPCO workers had been operating the machinery at intervals, turning the machinery on and off, repeatedly. The machinery happened to be in the idle position when the plant lost power. From that point on, Reactor 1 headed into meltdown, about four hours after the earthquake and tsunami. Rapid cooling could damage the reactor, so the workers turned the cooling system on and off at intervals. In the confusion, the operators forgot that they had turned the isolation condensers off before the loss of power.

337.    When the power went out, the operators in the main control center could not tell if the cooling system was operating or not, since the indicators are lights powered by electricity, with no back up or auxiliary power—another design defect. Operators at the FNPP mistakenly and negligently assumed that the isolation condensers were operating and providing cooling after the power outage. TEPCO communicated falsely to the public that Reactor 1 was safe and that the Isolation Condensers were operating 5.5 hours after the power loss.

338.    A ninth design and manufacturing defect of the Mark 1 BWRs is the lack of periodic testing of the isolation condensers. Neither Defendant had ever tested the isolation condensers in the 40 years since the FNPP had been in operation. Consequently, none of the operators had ever seen or even been briefed on what kind of steam should be visible when the condensers are turned on. In comparison, at the Nine Mile Point Nuclear Plant in the United States, the Mark 1 reactors are put through a start-up test every four years.

339.    TEPCO operators twice missed obvious signs that the isolation condensers were not working. First, one hour after the power outage, the water level gauges came back online and it became apparent that the water level had dropped two meters in one hour. The operators in the earthquake-proof room calculated that it was only going to take another hour until the water dropped down to the top of active fuel. Failing to verify that

the condensers were on, and indeed cooling the reactor without power as they are designed to do was a major design and manufacturing defect in training and preparation for emergency situations as presented. Second, operators observed only "faint" steam coming out of the "pig nose," the two release valves of the condensers. This phenomenon indicates that the condensers are failing, compared to the blast of a major rush/cloud of steam when they are functioning properly and provide cooling to the reactor.  Faint steam emerges two to three hours after the condensers have been turned off.  When it appeared after the FNPP, TEPCO operators should have recognized that the condensers had not been working for a full three hours.

340.    Even if the isolation condensers had been online and functioning, they would not have prevented the meltdowns because there were ruptures in the reactor piping, which was draining all the reactor water out of the reactor vessel.  The isolation condensers can only function properly when there is proper water-tight integrity within the reactor piping system; but with leaks in the reactor piping and the operators unable to keep sufficient water in the reactor vessels, the isolation condensers were rendered ineffective.

### GE Egregiously Erred By Failing to Account for the Obvious Tsunami Risks

341.    A tenth design and manufacturing defect of the Mark 1 BWRS was that GE reduced the height of the cliff on which the plant was built.  Defendants failed to understand and consider this most devastating and egregious oversight.  Originally, in 1960, the cliff at Fukushima Daiichi was 35 meters high (about 115 feet), a buffer from the sea.  The engineers at GE reduced this natural barrier to 10 meters, making it a 30-foot cliff.

342.    "Tsunami" is a Japanese word derived from "Tsu" meaning harbor; and "Nami" meaning waves.  On a boat at sea one is not aware of a tsunami because the entire ocean rises. However, when a tsunami hits a harbor, it travels at close to the speed of sound and has enormous destructive power.  Defendants knew that tsunamis, throughout history, have periodically hit the coast of Japan.  In 1896, there was a 40-meter high tsunami.  In 1923, there was a 13-meter tsunami.  In 1933, there was a 28-meter tsunami, the deadliest

before the Daiichi tsunami.  In 1944, there was a 12-meter tsunami.  In 1946, there was another 12-meter tsunami.  In 1954 and 1955, 10 years before Fukushima Daiichi was designed, there were 3 tsunamis, and all of them were over 13 meters. Defendants could not claim ignorance of the height of previous tsunamis.

343.   The tsunami that hit Fukushima Daiichi in 2011 was a middle-of-the-road tsunami compared to those that came in the hundred years before it. Yet, despite that history and knowledge, the tsunami wall originally built by the Defendants was a mere 4 meters, later only slightly raised to 5.7 meters.   The 14-meter high tsunami foreseeably overwhelmed the plant's 5.7-meter-high seawall.

344.   The tsunami water flooded the low-lying rooms in which the emergency generators were housed.  The diesel generators were quickly flooded and soon began to fail, their job being taken over by emergency battery-powered systems. When the batteries for the emergency system ran out the next day, on March 12, 2011, the active cooling systems stopped and the reactors began to heat up. The power failure also initiated the failure of many of the vital reactor control instruments.

345.   These defective design decisions were all made intentionally and negligently. The lowered height of the sea wall was intended to keep the operating costs of the seawater pumps low, to increase bottom line profits.  Lowering the bluff was meant to allow the base of the reactors to be constructed on solid bedrock in order to mitigate the threat posed by earthquakes, but resultantly increased the reactors' vulnerability to a tsunami. This catastrophic design defect was easily preventable, since there had clearly been many tsunamis far higher.

### Additional Design Defects Exacerbated the Meltdown

346.   An eleventh design and manufacturing defect of the Mark 1 BWRs is that GE designed and placed the emergency power diesel generators in the basement, and without any waterproof container.  Consequently, when the tsunami hit, the emergency power diesel generators were flooded.  The emergency pumps, also called service water pumps,

were placed in a location where they ended up under water. And finally, the diesel tanks were placed in a location where they too were flooded. In addition, the service water pumps had to be at the water, but they were so badly designed that in any tsunami they would be flooded. So essentially it doesn't matter that the diesels were in the basement.

347.    A twelfth design and manufacturing defect of the Mark 1 BWRs is the absence of a fraud-proof system that oversees inspection and repair reports in order to ensure compliance with safety standards and guidelines. In 2008, the IAEA (International Atomic Energy Agency) warned TEPCO that the FNPP was built using outdated safety guidelines and could be a "serious problem" during a large earthquake.

348.    On Feb 28, 2011, TEPCO submitted a report to the Japanese Nuclear and Industrial Safety Agency, admitting that the company had previously submitted fake inspection and repair reports. The report revealed that TEPCO failed to inspect more than 30 technical components of the six reactors, including power boards for the reactor's temperature control valves, as well as components of the cooling systems such as water pump motors and emergency power diesel generators.

349.    A thirteenth design and manufacturing defect is the GE's omission of an emergency back-up manual cooling system in order to allow fresh water to be pumped directly into the reactors by fire hoses. TEPCO's workers attempted to inject water from fire trucks into piping leading to the reactor, only to discover, after hours into this failed effort, that 55 percent of the water they injected was being diverted into auxiliary pipes. Consequently, the meltdown raged unabatedly because the injected water never reached the targeted reactor as it was actively melting down. This design defect was also magnified by the failure of TEPCO and GE to provide adequate training at periodic intervals. The workers who were attempting to inject water from the fire trucks had an utter lack of understanding of the piping system, as well as a lack of training. None of the workers had ever practiced any of these emergency procedures.

### Defendants Knew of Design Defects, But Were Profit-Driven

INDIVIDUAL AND CLASS ACTION COMPLAINT

350.     Defendants knew of the design and manufacturing defects and intentionally, recklessly and negligently failed to take corrective and remedial action for the protection of the public, including Plaintiffs, foreseeable rescuers.

351.     Mitsuhiko Tanaka, a former engineer with Hitachi (a GE partner), says the company covered up faults in the pressure vessel it produced for Fukushima's Reactor 4. When Tanaka tried to make this information public after the Chernobyl disaster in 1986, the company threatened him, "think of your family."  Tanaka says other engineers in Japan were also concerned about the Reactor's safety.

352.     Defendants knew that the FNPP's GE Mark 1 BWRs were vulnerable to catastrophic accidents due to a flawed reactor containment structure. Defendants have known since the early 1970s that the Mark 1 BWR could likely explode during a meltdown, releasing massive quantities of toxic radiation and radioactive particles, endangering the lives of millions of people and making large areas of land uninhabitable for generations to come.

353.     GE, whose motto in the 1960s was, "progress is our most important product," succumbed to the financial attraction of the nuclear energy business. GE's chairman is quoted as saying, in 1961, "we're going to ram this nuclear thing through." By 1965, scientists in the United States recognized that this Mark 1 design had flaws, but GE threatened to go out of business unless the Mark 1 design was continued.  One scientist, Dr. David Okrent, openly said he believed this was a threat.

354.     Engineers at GE resigned because they "didn't have the power to stop GE's faulty design in 1966."  Dale G. Bridenbaugh and two of his colleagues at General Electric resigned from their jobs after becoming increasingly convinced that the nuclear reactor design they were reviewing—the Mark 1—was so flawed that it could lead to a devastating accident.

355.     Questions persisted for decades about the ability of the Mark 1 to handle the immense pressures that would result if the reactor lost cooling power.  As early as the

1970s, its own engineers, including Mr. Bridenbaugh, warned GE about critical flaws in the design of some reactors when they were being built in Fukushima. These are the same flaws in the design of the reactor Mark 1, the same defects which have contributed to the radioactive contamination after the tsunami.

356.    In addition, GE did not even bother to properly incorporate Japanese anti-seismic standards to the Mark 1 construction. The Mark 1 also included an absolutely unreasonable design element: storing huge quantities of radioactive fuel rods 100 feet up in the air. Mr. Bridenbaugh stated:

> The problems we identified in 1975 were that, in planning the design of the containment, they did not take into account the dynamic loads that could be experienced with a loss of coolant. The impact loads the containment would receive by this very rapid release of energy could tear the containment apart and create an uncontrolled release.

357.    In 1972, Stephen H. Hanauer, then a safety official with the Atomic Energy Commission, recommended that the Mark 1 system be discontinued because it presented unacceptable safety risks. Among the concerns cited was the smaller containment design, which was more susceptible to explosion and rupture from a build-up in hydrogen: the exact situation that unfolded at the Fukushima Daiichi plant. Later that same year, Joseph Hendrie, who would later become chairman of the Nuclear Regulatory Commission, a successor agency to the Atomic Commission, said the idea of a ban on such systems as the Mark 1 was attractive.

358.    In 1986, Harold Denton, then the NRC's top safety official, told an industry trade group, "the Mark 1 containment, especially being smaller with lower design pressure, in spite of the suppression pool, if you look at the WASH 1400 safety study, you'll find something like a 90% probability of that containment failing."

359.    GE never made any serious effort to revise the design and tackle the safety flaws of those reactors. Instead, GE willfully chose to ignore these issues. It built five Mark 1 reactors at Fukushima Daiichi. Forty years later, on March 11, 2011, four of them failed.

360.    Interviews with a dozen current and former senior TEPCO engineers, including several who were intimately involved when the fateful design decisions were made in the 1960s and 1970s, reveal that both Defendants had many opportunities over the decades to retrofit the oldest reactors. The engineers blame a combination of complacency and cost-cutting pressures. All the Reactors in the Fukushima plant were based on the GE designs. GE maintained lucrative contracts to service GE reactors in Japan, including with Hitachi.

361.    To keep the reactor compact and economical, EBASCO (a former GE holding company) made the reactor building too small, said Mr. Toyota, the TEPCO engineer who helped to oversee the construction: "Over the years, a lot of engineers have come up with different ideas to improve safety.  But my guess is that they couldn't come forward and point their ideas out to management because of the high costs associated with back-fitting older reactors with new designs."

362.    Another TEPCO engineer who visited the FNPP many times, starting in the 1970s, says the cramped reactor buildings barely allowed room to install a valve during routine work.  "It was super inefficient," this engineer says. One of TEPCO's top engineers, who guided the company's nuclear division, said: "some of us knew all along and were concerned about the inconsistent placements of diesel generators at Fukushima Daiichi between reactor No. 6 and the older reactors 1 through 5, and their potential vulnerability." The engineer says that when he was preparing for a regularly scheduled government inspection in 1987, the inconsistent placement of the backup generators "stood out like a sore thumb."

363.    In 1990, the U.S. Nuclear Regulatory Commission (NRC) ranked the failure of the emergency electricity generators and subsequent failure of the cooling systems of plants in seismically very active regions as one of the most likely risks.  The Japanese Nuclear and Industrial Safety Agency (NISA) cited this report in 2004.  According to Jun

Tateno, a former NISA scientist, TEPCO did not react to these warnings and did not respond with any measures.

364.    In 1976, Defendants knew that the Mark 1 system had not been designed to withstand the accident it was supposed to contain.  In 2011, Reactors 1, 2, and 3 were operating at the time and blew up, spewing radiation worldwide.  In the case of Reactor 1, during the loss of coolant, the pressure inside the containment vessels exceeded their design capacity almost up to twice.  Radioactive cesium, strontium, iodine, and hot particles including molten uranium, from the four reactors spread through Northern Japan, and the resulting radioactive plume blew across the ocean and was measured around the world.

## **Defendants Placed the Mark 1 BWRs Into the Stream of Commerce**

365.    Today, in the United States, there are 23 aging Mark 1 reactors identical to those at Fukushima, including Vermont Yankee on the Connecticut River in Vermont. These plants pose a particular hazard with their over-crowded, high-level nuclear waste spent fuel pools that are not in hardened containment structures, making them vulnerable to natural disasters and terrorist attacks. These highly poisonous nuclear waste materials need to be kept out of the environment for 250,000 years.  There are 23 BRW Nuclear Power Plants in the United States and 10 additional around the world, similar in design to those at FNPP.

366.    The NRC database of nuclear power plants shows that 23 of the 104 nuclear plants in the U.S. are GE boiling-water reactors with GE's Mark 1 systems for containing radioactivity, the same containment system used by the Reactors at the Fukushima Daiichi plant. The locations of the United States GE Mark 1 reactors are:

1. Browns Ferry 1, Athens, Alabama, operating license since 1973, reactor   type GE 4.

2. Browns Ferry 2, Athens, Alabama, 1974, GE 4.

3. Browns Ferry 3, Athens, Alabama, 1976, GE 4.

4.Brunswick 1, Southport, North Carolina, 1976, GE 4.

INDIVIDUAL AND CLASS ACTION COMPLAINT

5. Brunswick 2, Southport, North Carolina, 1974, GE 4.

6. Cooper, Brownville, Nebraska, 1974, GE 4.

7. Dresden 2, Morris, Illinois, 1970, GE 3.

8. Dresden 3, Morris, Illinois, 1971, GE 3.

9. Duane Arnold, Palo, Iowa, 1974, GE 4.

10. Fermi 2, Monroe, Michigan, 1985, GE 4.

11. FitzPatrick, Scriba, New York, 1974, GE 4.

12. Hatch 1, Baxley, Georgia, 1974, GE 4.

13. Hatch 2, Baxley, Georgia, 1978, GE 4.

14. Hope Creek, Hancock's Bridge, New Jersey, 1986, GE 4.

15. Monticello, Monticello, Minnesota, 1970, GE 3.

16. Nine Mile Point 1, Scriba, New York, 1969, GE 2.

17. Oyster Creek, Forked River, New Jersey, 1969, GE 2.

18. Peach Bottom 2, Delta, Pennsylvania, 1973, GE 4.

19. Peach Bottom 3, Delta, Pennsylvania, 1974, GE 4.

20. Pilgrim, Plymouth, Massachusetts, 1972, GE 3.

21. Quad Cities 1, Cordova, Illinois, 1972, GE 3.

22. Quad Cities 2, Moline, Illinois, 1972, GE 3.

23. Vermont Yankee, Vernon, Vermont, 1972, GE 45

## FIRST CAUSE OF ACTION
### (Negligence)
### Against All Defendants

367.     Plaintiffs hereby incorporate the allegations contained in the preceding paragraphs as though fully set forth herein.

113
INDIVIDUAL AND CLASS ACTION COMPLAINT

368.    California Code of Civil Procedure, Section 1714 provides, in pertinent part, the following: "Everyone is responsible, not only for the result of his or her willful acts, but also for an injury occasioned to another by his or her want of ordinary care or skill in the management of his or her property or person, except so far as the latter has, willfully or by want of ordinary care, brought the injury upon himself or herself."

369.    At all times herein mentioned, Defendant TEPCO and its servants, agents and/or employees owed Plaintiffs the same duty of care it owed to those in the vicinity of FNPP by reasonably and safely operating FNPP.  Defendant GE and its servants, agents and/or employees, owed Plaintiffs the same duty of care they owed to those in the vicinity of FNPP to reasonably and safely design, maintain, manage and control the BWR at FNPP in a safe and suitable condition, and in good repair.

370.    Defendants controlled all activities at the FNPP, and therefore are responsible for the enhanced threat of radiation exposure and for causing the damages alleged in this Complaint. The negligent, intentional and tortious conduct of the Defendant TEPCO was aimed at and encompassed the entire area surrounding the FNPP, including the waters, land and air adjacent to the Fukushima FNPP, where the Plaintiffs were employed and operating.

371.    The facts above make abundantly clear that Defendants TEPCO and GE, and their servants, agents and/or employees, breached the duties owed to people in the vicinity of FNPP and breached the duties owed to Plaintiffs.  The breach of the duties owed by Defendants directly resulted in FNPP's radioactive releases, causing the Plaintiffs to incur severe, life-threatening harm.  Specifically, Defendant TEPCO negligently maintained, managed, and controlled FNPP, and these negligent actions and omissions caused direct and proximate harm to Plaintiffs.  Defendant GE negligently designed, maintained, managed, and controlled FNPP and these negligent actions and omissions caused direct and proximate harm to Plaintiffs.

372.     This is further substantiated by the Japanese Independent Commission's determination that TEPCO was grossly negligent in creating a "man-made disaster" by failing to adequately prepare and respond to a nuclear accident.  Such conduct included a failure to inspect and repair vital components of the coolant system, and failing to have emergency backup power sources to measure and monitor temperatures inside the reactors.  The Independent Commission concluded that "the direct causes of the accident were all foreseeable prior to March 11, 2011."

373.     As a direct and proximate consequence of the negligence of the Defendants, the reactors were damaged, and power to the cooling mechanism of the FNPP was interrupted, resulting in a meltdown of the fuel and reactors themselves, thereby triggering the release of high levels of ionizing radiation, including radioactive cesium.[6]

374.     Defendant TEPCO knew or should have known that the Plaintiffs would be directly and harmfully impacted by its conduct.  In the aftermath of a natural disaster, it is foreseeable that foreign military and aid-workers would be among those in the vicinity.  At all relevant times, Defendant TEPCO was actually aware that the U.S. Navy and its personnel would provide rescue and humanitarian relief operations, including performance of their efforts to provide humanitarian assistance during its relief mission to ferry food, blankets and water to the inhabitants of the ravaged city of Sendai, located within the prefecture of Fukushima, Japan, following the earthquake and tsunami on March 11, 2011.

375.     On March 11, 2011, before the U.S.S. Ronald Reagan and Carrier Strike Group 7 arrived off the coast, Fukushima Reactor 1 blew up. Prior to March 12, 2011, TEPCO knew that the U.S. Navy rescue mission personnel were in danger of being

_____

[6] At Fukushima, large releases of radioactivity apparently came from the concrete pools, where spent fuel rods, clad with a special alloy, were placed to cool down after their use in the reactors.  These spent fuel rods were extremely hot – up to 2,000 degrees Fahrenheit – and needed a constant circulation of cold water to keep them from burning up.

INDIVIDUAL AND CLASS ACTION COMPLAINT

irradiated by the spreading radiation from Reactor 1 at the six-reactor FNPP. At least three other Reactors were in danger of failing, including the spent fuel pool of Reactor 4, which held 1,535 bundles of irradiated fuel.  Indeed, Reactor 3 exploded, releasing plumes of hydrogen gases migrating through a shared vent, which destroyed the containment building at Reactor 4, exposing the spent fuel pool to the air.  Reactor 2 soon followed suit.

376.    TEPCO knowingly and falsely announced that most of the fuel rods in Units 1, 2, and 3 were intact. They were not intact. This was a false, misleading, consciously negligent act and omission.  To the contrary, the fuels in Reactors 1, 2, and 3 had fused into a molten mass and were oozing through the bottom of their destroyed reactors.  The radiation produced at the FNPP does not occur naturally. Rather, the radiation releases were admittedly TEPCO's and GE's negligent "man-made disaster," as described *supra*.

377.    Defendants knew, or should have known, that the system they were using for storing spent fuel rods and for the containment of radiation and utilization of nuclear material at the FNPP was faulty, inadequate and leaking.

378.    The FNPP was constructed at Fukushima more than 40 years ago. According to a local labor commission, low-skilled workers, illegally recruited in Japan's poorest areas, were used in building the nuclear power plant in the 1960s. The poor quality of construction, as well as structural and design defects, negligent maintenance and personnel negligence eventually triggered the disastrous consequences on March 11, 2011.

379.    Upon information and belief, Defendants constructed and operated the FNPP with the knowledge that the nuclear fuel had a potential to leak, or in reckless disregard as to whether the FNPP could leak radiation into the environment.  When radiation from a reactor is spilled or leaks, it contaminates the environment and poses a serious health threat to humans and other species. The greater the concentration of radiation that escapes from the reactor or fuel rods, the higher the risk to humans, creating an enhanced threat to human health.

380.     Defendants also knew or should have known that the radiation released at the FNPP is remarkably recalcitrant to natural degradation and, once dispersed into the environment, it is extremely difficult to clean up.

381.     Defendants' negligence proximately caused widespread contamination of Plaintiffs' environs, including their air and water supply.

382.     Upon information and belief, Defendant TEPCO failed to timely and adequately test the water to which the Plaintiffs were exposed in order to detect contamination.   Upon information and belief, Defendant TEPCO, its agents, servants and/or employees failed to perform proper and adequate testing within the theater of their operation of the radiation levels to which the Plaintiffs and/or their vessels would be exposed, to the Plaintiffs' detriment.

383.     At all relevant times, Defendants were aware that exposure to even a low dose of radiation creates grave danger to people's health, as scientific studies have long-indicated.  Defendant TEPCO was also aware of the importance of accurately reporting actual radiation release levels.

384.     Nuclear radiation is a known human carcinogen that is linked to many human health problems.   The U.S. Environmental Protection Agency classifies it as a human carcinogen.  Radiation does not readily break down and does not biodegrade in the ground or water or apparatus exposed to it.  Research shows that it will persist in the environment for decades, since it has a half-life in excess of 77 years, far longer than the life expectancy of humans exposed to it.

385.     According to data existing at that time, and uniquely known to Defendant TEPCO at the time, Plaintiffs' consequent exposure to radiation within their zone of operation indicated that radiation levels had already reached levels exceeding the levels of exposure which the people living the same distance from Chernobyl experienced, and who subsequently developed cancer.  Consequently, the potential for the development of cancer

in the Plaintiffs has also been dangerously heightened, due to the levels of exposure experienced by them during Operation Tomodachi.

386.    Plaintiffs suffered and continue to suffer the harm, damage and injuries, described herein, as a direct and proximate result of Defendants' negligence.  During their lifetimes before March 12, 2011, the Plaintiffs, and each of them, had never been exposed to harmful levels of radiation, including the time they served aboard the U.S.S. Ronald Reagan, aboard other vessels within the strike force, on land or air or sea, or at any other time or place.

387.    Upon information and belief, based upon currently available data, through their conduct, Defendants rendered Plaintiffs infirm and poisoned their bodies.  Plaintiffs, who were healthy servicemen and women prior to their arrival off the coast of Japan in 2011, must now endure a lifetime of radiation poisoning and suffering that should have been avoided. Plaintiffs must now fear, as any reasonable person who has been irradiated would, for their future health and the health of their children, born and unborn.

388.    Upon information and belief, as a further direct and proximate result of Defendants' negligence, Plaintiffs have been and will be required to undergo further medical testing, evaluation and medical procedures, including but not limited to chelation therapy, bone marrow transplants and/or genetic re-programming for leukemia, in an effort to seek cure, and will be required to employ extraordinary means to achieve cure.

389.    As a further direct and proximate result of Defendants' negligence, Plaintiffs incurred losses and damages for personal injury and property damage, and loss of use and enjoyment of life and their property.  Solely as a result of the Defendants' negligence, carelessness and recklessness, Plaintiffs suffered severe and serious personal injuries to mind and body, and further, Plaintiffs were subjected to great physical pain and mental anguish.  Some of Plaintiffs' injuries are believed to be permanent in nature and duration, and Plaintiffs will permanently suffer pain, inconvenience and other effects of such

injuries. Plaintiffs also face additional and irreparable harm to their life expectancy, which has been shortened and cannot be restored to its prior condition.

390.     Plaintiffs have also suffered economic losses as a result of Defendants' negligence, including but not limited to wage losses, medical expenses and other costs associated with their injury.  Plaintiffs have incurred and will continue to incur medical expenses associated with the aforementioned injuries.  Plaintiffs will be unable to pursue their usual duties with the same degree of efficiency as prior to this incident, all to Plaintiffs' great damage.

391.     Due to Defendants' negligence, each of the Plaintiffs is entitled to compensatory damages in a sum to be determined by the jury.

Wherefore, Plaintiffs request relief as hereinafter provided.

### SECOND CAUSE OF ACTION
### (Gross Negligence)
### Against Defendants TEPCO and GE

392.     Plaintiffs hereby incorporate the allegations contained in the preceding paragraphs as though fully set forth herein.

393.     Defendants, through their agents, servants, employees and representative, were grossly negligent in the design, implementation, operation, maintenance and oversight of the FNPP, as described in the preceding paragraphs.

394.     Defendants knew or should have known about the safety threats presented at the FNPP and the Mark 1 BWRs—they received numerous warnings and reports regarding the potential for the very disaster that occurred. Defendants intentionally and recklessly ignored those reports and warnings, and failed to address the problem.  As a result, the Reactors melted down and released massive amounts of radioactive materials into the surrounding areas, directly exposing Plaintiffs to this poisonous matter.

395.     Plaintiffs suffered and continue to suffer the harm, damage and injuries, described herein, as a direct and proximate result of Defendants' gross negligence.

396.     Defendants' conduct was willful, wanton, reckless, malicious and/or exhibited a gross indifference to, and a callous disregard for human life, safety and the rights of others, including the rights, life and safety of Plaintiffs. Defendants' actions and omissions were motivated by consideration of profit, financial advantage, monetary gain, economic aggrandizement and/or cost avoidance, to the virtual exclusion of all other considerations.

397.     As a result of Defendants' conduct, Plaintiffs are entitled to punitive damages as a means of protecting the public by deterring such wanton, callous and intentionally injurious conduct.

Wherefore, Plaintiffs request relief as hereinafter provided.

### THIRD CAUSE OF ACTION
**(Strict Liability—Manufacturing Defect)**
**Against Defendant GE**

398.     Plaintiffs hereby incorporate the allegations contained in the preceding paragraphs as though fully set forth herein.

399.     Defendant GE manufactured, distributed, and sold the subject defective Mark 1 BWRs, an unreasonably dangerous product.

400.     The BWRs, which malfunctioned, melted down, exploded, and released copious quantities of radiation at the FNPP on March 11, 2011, contained manufacturing defects when each of the subject reactors left the possession of GE.

401.     As manufacturers, designers, distributors, suppliers, sellers and marketers, Defendant GE breached this duty by manufacturing, distributing, selling and marketing the BWRs with the actual and constructive knowledge that the product posed a high degree of risk to the safety and well-being of all persons within the vicinity of the FNPP, including Plaintiffs.

402.     Defendant GE had actual and constructive knowledge of the properties of radiation that would ensure that, once released into the environment, such radiation would

spread further and in concentrations that would cause injury to all persons within the vicinity of the FNPP, including Plaintiffs.

403.    Defendant GE's conduct was unreasonable under the circumstances.  As set forth *supra*, available scientific data, of which GE had actual and constructive knowledge, gives rise to the reasonable inference that the manufacturing defects created foreseeable dangers to all persons within the vicinity of the FNPP, including Plaintiffs.

404.    The BWRs' manufacturing defects were substantial factors in causing Plaintiffs' injuries, damages, and harm. The BWRs' manufacturing defects proximately caused reasonably foreseeable damages to the Plaintiffs.

405.    As a further direct and proximate result of Defendant GE's conduct, Plaintiffs incurred losses and damages, as detailed *supra*, for personal injury and property damage, loss of use and enjoyment of life and their property, physical pain and mental anguish, economic losses and future medical expenses.

406.    Each of the Plaintiffs is entitled to compensatory damages in a sum to be determined by the jury.

407.    At all times herein mentioned, Defendant GE acted with malice, fraud and oppression, and engaged in despicable conduct that should not be tolerated in a civilized society, displaying a conscious, willful and intentional disregard for the health, safety and welfare of the public, the environment and the Plaintiffs.  As a result of Defendant GE's conduct, Plaintiffs are entitled to punitive damages as a means of protecting the public by deterring such wanton, callous and intentionally injurious conduct.

Wherefore, Plaintiffs request relief as hereinafter provided.

**FOURTH CAUSE OF ACTION**
**(Strict Liability—Design Defect)**
**Against Defendant GE**

408.    Plaintiffs hereby incorporate the allegations contained in the preceding paragraphs as though fully set forth herein.

409.    Defendant GE, during the relevant time period, was the designer, manufacturer, distributor, seller, and creator of the BWRs.

410.    Defendant GE had a duty of due care to design and manufacture reasonably safe Nuclear Power BWRs.

411.    GE had a duty of care to test the Nuclear Power BWRs to determine the risks posed to all persons within the vicinity of the FNPP, including the Plaintiffs, the environment, water, and the air in the surrounding vicinity. The BWRs did not perform as safely as an ordinary consumer would have expected it to perform when used or misused in an intended or reasonably foreseeable way.

412.    Defendant GE had a duty not to put on the market an unsafe and defectively designed product that posed a serious danger to all persons within the vicinity of the FNPP, including the Plaintiffs.

413.    GE breached said duties of due care when it manufactured a defectively designed product, namely the BWRs, with actual or constructive knowledge of the defects. Due to the design and manufacturing defects, the FNPP was not reasonably safe or protective of the environment generally or of Plaintiffs' health and well-being.

414.    The defective design of the GE's BWRs, as alleged herein, actually and proximately caused reasonably foreseeable damages to the Plaintiffs. The BWRs' failure to perform safely was a substantial factor in causing Plaintiffs harm.

415.    Defendant GE's conduct in the design, manufacture, and maintenance of the BWRs, a defective or unreasonably dangerous product, makes GE strictly liable to the Plaintiffs.

416.    Plaintiffs incurred losses and damages, as detailed *supra*, for personal injury and property damage, loss of use and enjoyment of life and their property, physical pain and mental anguish, economic losses and future medical expenses.

417.    Each of the Plaintiffs is entitled to compensatory damages in a sum to be determined by the jury.

Wherefore, Plaintiffs request relief as hereinafter provided.

### FIFTH CAUSE OF ACTION
**(Strict Liability for Ultrahazardous Activities)**
**Against All Defendants**

418.    Plaintiffs hereby incorporate the allegations contained in the preceding paragraphs as though fully set forth herein.

419.    Defendants engaged in producing nuclear power at the FNPP, an ultra-hazardous activity.

420.    As a result, Plaintiffs suffered harm, damages, losses and injuries described *supra*, for which Defendants are responsible because they engaged in producing nuclear power, an ultra-hazardous activity, at FNPP.

421.    Plaintiffs' harm, injuries, losses and damages are of the kind that should be anticipated as a result of the risk created by exposure to a radiation release such as that from the FNPP.

422.    Defendants' acts proximately caused harm and damage to the Plaintiffs, including personal injury, property damage, loss of enjoyment of their property and life, the need for periodic examination and treatment, as well as economic losses including loss of earnings, stigma damages, medical costs and other necessary expenditures of time and money.  Plaintiffs will continue to incur losses and damage in the future.  Based on

Plaintiffs' repeated exposure to ionizing radiation, Plaintiffs also have a reasonable fear that said exposure more likely than not increases their risk of developing cancer in the future.

423.   Each of the Plaintiffs is entitled to compensatory damages in a sum to be determined by the jury.

424.   Defendants intended to cause or acted with conscious disregard of the probability of causing injury to Plaintiffs, and therefore, are liable for punitive damages.

Wherefore, Plaintiffs request relief as hereinafter provided.

## SIXTH CAUSE OF ACTION
### (Negligence *Per Se*: *Res Ipsa Loquitur*)
### Against All Defendants

425.   Plaintiffs hereby incorporate the allegations contained in the preceding paragraphs as though fully set forth herein.

426.   Plaintiffs' harm was caused by a release of radiation from the FNPP, which only Defendants controlled.

427.   Plaintiffs' voluntary actions did not cause or contribute to the events which harmed them.

428.   Plaintiffs' harm, injuries, damages and losses ordinarily would not have happened unless someone was negligent.

429.   Plaintiffs' injuries, damages, losses and harm are the kind of harm that would be anticipated as a result of the risk created by exposure to a radiation release of the nature and kind that was released at Fukushima.

430.   Defendants' acts actually and proximately caused Plaintiffs to incur losses and damages, as detailed *supra*, for personal injury and property damage, loss of use and enjoyment of life and their property, physical pain and mental anguish, economic losses and future medical expenses.

431.    Each of the Plaintiffs is entitled to compensatory damages in a sum to be determined by the jury.

Wherefore, Plaintiffs request relief as hereinafter provided.

## SEVENTH CAUSE OF ACTION
### (Presumption of Negligence *Per Se*)
### Against DEFENDANTS TEPCO and GE

432.    Plaintiffs hereby incorporate the allegations contained in the preceding paragraphs as though fully set forth herein.

433.    Defendants' illegal, intentional, reckless and negligent conduct as herein above alleged, violated several State, Federal, and International laws, regulations, and statutes, which were enacted to protect the public, the communities and the environment, including the class of individuals to which Plaintiffs belong: Good Samaritans, rescue workers, and "Tomodachis" (friends) who provided help to the victims of the Fukushima earthquake and tsunami.

434.    The 1972 Convention on the Prevention of Marine Pollution by Dumping of Wastes and Other Matter, to which Japan is a signatory, bans the dumping of pollution at sea.  The Inter-Governmental Conference on the Convention on the dumping of Wastes at Sea, which met in London in November 1972, adopted this instrument, generally known as the London Convention. The London Convention, one of the first international conventions for the protection of the marine environment from human activities, came into force on August 30, 1975.

435.    The London Convention contributes to the international control and prevention of marine pollution by prohibiting the dumping of certain hazardous materials. In addition, a special permit is required prior to dumping of a number of other identified materials and a general permit for other wastes or matter.

436.    "Dumping" has been defined as the deliberate disposal at sea of wastes or other matter from vessels, aircraft, platforms or other man-made structures, as well as the deliberate disposal of these vessels or platforms themselves. Annexes list wastes which cannot be dumped and others for which a special dumping permit is required.

437.    Amendments adopted in 1993 (which entered into force in 1994) banned the dumping into sea of low-level radioactive wastes. In addition, the amendments phased out the dumping of industrial wastes by December 31, 1995 and banned the incineration at sea of industrial wastes.

438.    Defendant TEPCO engaged in intentionally dumping in excess of 11,500 tons of radioactive water into the Pacific Ocean during and following the meltdown of the FNPP.

439.    Plaintiffs' injuries, damages, losses and harm are of the kind that would be anticipated as a result of the risk created by exposure to a radiation release of the nature and kind that was released at Fukushima.

440.    Defendants' acts actually and proximately caused Plaintiffs to incur losses and damages, as detailed *supra*, for personal injury and property damage, loss of use and enjoyment of life and their property, physical pain and mental anguish, economic losses and future medical expenses.

441.    Each of the Plaintiffs is entitled to compensatory damages in a sum to be determined by the jury.

Wherefore, Plaintiffs request relief as hereinafter provided.

### EIGHTH CAUSE OF ACTION
**(Wrongful Death)**
**By All Estate Plaintiffs**
**Against All Defendants**

442.    Plaintiffs hereby incorporate the allegations contained in the preceding paragraphs as though fully set forth herein.

INDIVIDUAL AND CLASS ACTION COMPLAINT

443.    The Estate of Donald Dellinger alleges that Mr. Dellinger was exposed to radiation during Operation Tomodachi, caused by the negligent, willful, wanton and reckless conduct of Defendants described *supra*. His exposure caused his untimely death.

444.    Defendants owed a duty to Donald Dellinger, and all of those in the immediate area surrounding the FNPP, to ensure the FNPP was safe for the purposes for which it was to be used, was properly operated and maintained, was appropriately designed and would withstand foreseeable natural disasters. Defendants breached its duty to the decedent by, *inter alia*, failing to take such actions.

445.    Donald Dellinger's death was the direct and proximate result of Defendants' acts and omissions.

446.    Plaintiff, the Estate of Donald Dellinger, has sustained economic damages, including the loss of funeral and burial expenses, the loss of income that Mr. Dellinger would have earned during his lifetime, and the reasonable value of household services that Mr. Dellinger would have provided. The heirs to the Estate of Donald Dellinger have also lost the financial support, gifts and benefits that Mr. Dellinger would have contributed to them during his life expectancy.

447.    Plaintiff, the Estate of Donald Dellinger has also suffered the following noneconomic damages:

> 1. The loss of Donald Dellinger's love, companionship, comfort, care, assistance, protection, affection, society, moral support;

> 2. The loss of Donald Dellinger's training, guidance and the loss as a role model for adulthood.

448.    Defendants' acts and omissions were willful, wanton, and reckless, and Mr. Dellinger died as a result of such conduct. Accordingly, the Estate of Donald Dellinger, also seeks punitive damages against Defendants TEPCO and GE.

449.    The Estate of Ruby Perez, by Kirk Godair, as the Administrator of the Estate of Ruby Perez alleges that Ruby Perez was exposed to radiation during Operation Tomodachi, caused by the negligent, willful, wanton and reckless conduct of Defendants described *supra*. Her exposure caused her to develop ovarian cancer, from which she died on December 7, 2016. Ruby Perez is survived by her minor daughter, C.G., and her mother, Rachel Mendez.

450.    Defendants owed a duty to Ruby Perez, and all of those in the immediate area surrounding the FNPP, to ensure the FNPP was safe for the purposes for which it was to be used, was properly operated and maintained, was appropriately designed and would withstand foreseeable natural disasters. Defendants breached its duty to the decedent by, *inter alia*, failing to take such actions.

451.    Ruby Perez's death was the direct and proximate result of Defendants' acts and omissions.

452.    Plaintiff, the Estate of Ruby Perez, has sustained economic damages, including the loss of funeral and burial expenses, the loss of income that MMs. Perez would have earned during her lifetime, and the reasonable value of household services that Ms. Perez would have provided. C.G., Rachel Mendez and any other heirs to the Estate of Ruby Perez have also lost the financial support, gifts and benefits that Ms. Perez would have contributed to them during her life expectancy.

453.    Plaintiffs, the Estate of Ruby Perez, C.G. and Rachel Mendez have also suffered the following noneconomic damages:

    1. The loss of Ruby Perez's love, companionship, comfort, care, assistance, protection, affection, society, moral support;

    2. The loss of Ruby Perez's training, guidance and the loss as a role model for adulthood.

454.     Defendants' acts and omissions were willful, wanton, and reckless, and Ms. Perez died as a result of such conduct.    Accordingly, Plaintiff Kirk Godair, as the Administrator of the Estate of Ruby Perez, also seeks punitive damages against Defendants TEPCO and GE.

455.     The Estate of Danyelle Luckey, by Annette Luckey, as the Administrator of the Estate of Danyelle Luckey alleges that Danyelle Luckey was exposed to radiation during Operation Tomodachi, caused by the negligent, willful, wanton and reckless conduct of Defendants described *supra*.  Her exposure caused her to develop sepsis, from which she died on October 10, 2016.  Danyelle Luckey is survived by her parents, Annette and Derrick Luckey.

456.     Defendants owed a duty to Danyelle Luckey, and all of those in the immediate area surrounding the FNPP, to ensure the FNPP was safe for the purposes for which it was to be used, was properly operated and maintained, was appropriately designed and would withstand foreseeable natural disasters.  Defendants breached its duty to the decedent by, *inter alia*, failing to take such actions.

457.     Danyelle Luckey's death was the direct and proximate result of Defendants' acts and omissions.

458.     Plaintiff, the Estate of Danyelle Luckey, has sustained economic damages, including the loss of funeral and burial expenses, the loss of income that Ms. Luckey would have earned during her lifetime, and the reasonable value of household services that Danyelle Luckey would have provided.  Annette and Derrick Luckey have also lost the financial support, gifts and benefits that Danyelle Luckey would have contributed to them during her life expectancy.

459.     Plaintiffs, the Estate of Danyelle Luckey, Annette Luckey and Derrick Luckey have also suffered the following noneconomic damages:

1. The loss of Danyelle Luckey's love, companionship, comfort, care, assistance, protection, affection, society, moral support;

2. The loss of Danyelle Luckey's training, guidance and the loss as a role model for adulthood.

460.    Defendants' acts and omissions were willful, wanton, and reckless, and Ms. Luckey died as a result of such conduct.  Accordingly, Plaintiff Annette Luckey, as the Administrator of the Estate of Danyelle Luckey, also seeks punitive damages against Defendants TEPCO and GE.

461.    The Estate of Brenda Downing, by Janeth Masinde, as the Administrator of the Estate of Brenda Downing alleges that Brenda Downing was exposed to radiation during Operation Tomodachi, caused by the negligent, willful, wanton and reckless conduct of Defendants described *supra*.  Her exposure caused her death.  Brenda Downing is survived by her mother, Janeth Masinde.

462.    Defendants owed a duty to Brenda Downing, and all of those in the immediate area surrounding the FNPP, to ensure the FNPP was safe for the purposes for which it was to be used, was properly operated and maintained, was appropriately designed and would withstand foreseeable natural disasters.  Defendants breached its duty to the decedent by, *inter alia*, failing to take such actions.

463.    Brenda Downing's death was the direct and proximate result of Defendants' acts and omissions.

464.    Plaintiff, the Estate of Brenda Downing, has sustained economic damages, including the loss of funeral and burial expenses, the loss of income that Brenda Downing would have earned during her lifetime, and the reasonable value of household services that Brenda Downing would have provided.  Janeth Masinde and any other heirs to the Estate of Brenda Downing have also lost the financial support, gifts and benefits that Ms. Downing would have contributed to them during her life expectancy.

INDIVIDUAL AND CLASS ACTION COMPLAINT

465.     Plaintiffs, the Estate of Brenda Downing and Janeth Masinde have also suffered the following noneconomic damages:

      1. The loss of Brenda Downing's love, companionship, comfort, care, assistance, protection, affection, society, moral support;

      2. The loss of Brenda Downing's training, guidance and the loss as a role model for adulthood.

466.     Defendants' acts and omissions were willful, wanton, and reckless, and Ms. Downing died as a result of such conduct.  Accordingly, Plaintiff Janeth Masinde, as the Administrator of the Estate of Brenda Downing, also seeks punitive damages against Defendants TEPCO and GE.

467.     The Estate of Jesse Ready, by Teresa Ready, as the Administrator of the Estate of Jesse Ready alleges that Jesse Ready was exposed to radiation during Operation Tomodachi, caused by the negligent, willful, wanton and reckless conduct of Defendants described *supra*.  His exposure caused him to develop lymphoma, from which he died January 11, 2016.  Jesse Ready is survived by his wife, Teresa Ready, and their two children, Brenden Beskow and A.R.

468.     Defendants owed a duty to Jesse Ready, and all of those in the immediate area surrounding the FNPP, to ensure the FNPP was safe for the purposes for which it was to be used, was properly operated and maintained, was appropriately designed and would withstand foreseeable natural disasters.  Defendants breached its duty to the decedent by, *inter alia*, failing to take such actions.

469.     Jesse Ready's death was the direct and proximate result of Defendants' acts and omissions.

470.     Plaintiff, the Estate of Jesse Ready, has sustained economic damages, including the loss of funeral and burial expenses, the loss of income that Mr. Ready would have earned during his lifetime, and the reasonable value of household services that Mr.

Ready would have provided. Teresa Ready, Brenden Beskow and A.R. have also lost the financial support, gifts and benefits that Mr. Ready would have contributed to them during his life expectancy.

471.     Plaintiff, the Estate of Jesse Ready has also suffered the following noneconomic damages:

> 1. The loss of Jesse Ready's love, companionship, comfort, care, assistance, protection, affection, society, moral support;
>
> 2. The loss of Jesse Ready's training, guidance and the loss as a role model for adulthood.

472.     Defendants' acts and omissions were willful, wanton, and reckless, and Mr. Ready died as a result of such conduct.  Accordingly, Plaintiff Teresa Ready, as the Administrator of the Estate of Jesse Ready, also seeks punitive damages against Defendants TEPCO and GE.

473.     Each of the Plaintiffs is entitled to compensatory and punitive damages in a sum to be determined by the jury.

Wherefore, Plaintiffs request relief as hereinafter provided.

## NINTH CAUSE OF ACTION
### (Survival Action)
### By All Estate Plaintiffs
### Against All Defendants

474.     Plaintiffs hereby incorporate the allegations contained in the preceding paragraphs as though fully set forth herein.

475.     Estate Plaintiffs bring this Survival Action pursuant California Code of Civil Procedure Section 377.30, providing: "A cause of action that survives the death of the person entitled to commence an action or proceeding passes to the decedent's successor in

interest, and an action may be commenced by the decedent's personal representative or, if none, by the decedent's successor in interest."

476. Defendants owed a duty to each Decedent, and all of those in the immediate area surrounding the FNPP, to ensure the FNPP was safe for the purposes for which it was to be used, was properly operated and maintained, was appropriately designed and would withstand foreseeable natural disasters. Defendants breached their duty to the decedents by, *inter alia*, failing to take such actions.

477. The acts and omissions of the Defendants proximately caused the death of each decedent.

478. The Estate of Donald Dellinger alleges that Mr. Dellinger was exposed to radiation during Operation Tomodachi, caused by the negligence of Defendants described *supra*. His exposure caused his untimely death.

479. Defendants' negligent and intentional conduct are the actual and proximate cause of the decedent's damages, injuries, losses and harms, including the following: ALL loss or damage that the decedent sustained or incurred before death, including any penalties or punitive or exemplary damages that the decedent would have been entitled to recover had the decedent lived, and including medical expenses and lost wages, as well as penalties, punitive or exemplary damages. Mr. Dellinger, by and through his Estate, seeks damages from Defendants for decedent's pain, suffering, loss of income, any and all medical expenses and other losses and expenses allowed by law.

480. The Estate of Donald Dellinger makes claims against Defendants on behalf of Mr. Dellinger, any statutory beneficiaries and the Estate of Donald Dellinger for all recoverable damages, including but not limited to:

   a. Donald Dellinger's conscious pain and suffering from the time of the injury to the time of his death;

   b. Donald Dellinger's loss of enjoyment of life;

c. Donald Dellinger's loss of net future earnings after subtracting amounts he would have spent on his own living expenses and on support of his family.

481.    The Estate of Ruby Perez, by Kirk Godair, as the Administrator of the Estate of Ruby Perez alleges that Ruby Perez was exposed to radiation during Operation Tomodachi, caused by the negligence of Defendants described *supra*. Her exposure caused her to develop ovarian cancer, from which he died on December 7, 2016. Ruby Perez is survived by her minor daughter, C.G., and her mother, Rachel Mendez.

482.    Defendants' negligent and intentional conduct are the actual and proximate cause of the decedent's damages, injuries, losses and harms, including the following: ALL loss or damage that the decedent sustained or incurred before death, including any penalties or punitive or exemplary damages that the decedent would have been entitled to recover had the decedent lived, and including medical expenses and lost wages, as well as penalties, punitive or exemplary damages. Ms. Perez, by and through Kirk Godair, as representative of the Estate, seeks damages from Defendants for decedent's pain, suffering, loss of income, any and all medical expenses and other losses and expenses allowed by law.

483.    Mr. Godair make claims against Defendants on behalf of Ms. Perez, the Estate of Ruby Perez and any statutory beneficiaries for all recoverable damages, including but not limited to:

a. Ruby Perez's conscious pain and suffering from the time of the injury to the time of her death;

b. Ruby Perez's loss of enjoyment of life;

c. Ruby Perez's loss of net future earnings after subtracting amounts she would have spent on her own living expenses and on support of her family.

484.    The Estate of Danyelle Luckey, by Annette Luckey, as the Administrator of the Estate of Danyelle Luckey alleges that Danyelle Luckey was exposed to radiation during Operation Tomodachi, caused by the negligence of Defendants described *supra*.

Her exposure caused her to develop sepsis, from which she died on October 10, 2016. Danyelle Luckey is survived by her parents, Annette and Derrick Luckey.

485.    Defendants' negligent and intentional conduct are the actual and proximate cause of the decedent's damages, injuries, losses and harms, including the following: ALL loss or damage that the decedent sustained or incurred before death, including any penalties or punitive or exemplary damages that the decedent would have been entitled to recover had the decedent lived, and including medical expenses and lost wages, as well as penalties, punitive or exemplary damages.   Ms. Luckey, by and through Annette Luckey, as representative of the Estate, seeks damages from Defendants for decedent's pain, suffering, loss of income, any and all medical expenses and other losses and expenses allowed by law.

486.    Ms. Luckey make claims against Defendants on behalf of Danyelle Lucky, the Estate of Danyelle Luckey, and any statutory beneficiaries for all recoverable damages, including but not limited to:

     a.  Danyelle Luckey's conscious pain and suffering from the time of the injury to the time of her death;

     b.  Danyelle Luckey's loss of enjoyment of life;

     c.  Danyelle Luckey's loss of net future earnings after subtracting amounts she would have spent on her own living expenses and on support of her family.

487.    The Estate of Brenda Downing, by Janeth Masinde, as the Administrator of the Estate of Brenda Downing alleges that Brenda Downing was exposed to radiation during Operation Tomodachi, caused by the negligence of Defendants described *supra*. Her exposure caused her untimely death.   Brenda Downing is survived by her mother, Janeth Masinde.

488.    Defendants' negligent and intentional conduct are the actual and proximate cause of the decedent's damages, injuries, losses and harms, including the following: ALL

loss or damage that the decedent sustained or incurred before death, including any penalties or punitive or exemplary damages that the decedent would have been entitled to recover had the decedent lived, and including medical expenses and lost wages, as well as penalties, punitive or exemplary damages.  Ms. Downing, by and through Janeth Masinde, as representative of the Estate, seeks damages from Defendants for decedent's pain, suffering, loss of income, any and all medical expenses and other losses and expenses allowed by law.

489.    Ms. Masinde makes claims against Defendants on behalf of Brenda Downing, the Estate of Brenda Downing, and any statutory beneficiaries for all recoverable damages, including but not limited to:

    a.  Brenda Downing's conscious pain and suffering from the time of the injury to the time of her death;

    b.  Brenda Downing's loss of enjoyment of life;

    c.  Brenda Downing's loss of net future earnings after subtracting amounts she would have spent on her own living expenses and on support of her family.

490.    The Estate of Jesse Ready, by Teresa Ready, as the Administrator of the Estate of Jesse Ready alleges that Jesse Ready was exposed to radiation during Operation Tomodachi, caused by the negligence of Defendants described *supra*.  His exposure caused him to develop lymphoma, from which he died January 11, 2016.  Jesse Ready is survived by his wife, Teresa Ready, and their two children, Brenden Beskow and A.R.

491.    Defendants' negligent and intentional conduct are the actual and proximate cause of the decedent's damages, injuries, losses and harms, including the following: ALL loss or damage that the decedent sustained or incurred before death, including any penalties or punitive or exemplary damages that the decedent would have been entitled to recover had the decedent lived, and including medical expenses and lost wages, as well as penalties, punitive or exemplary damages.  Mr. Ready, by and through Teresa Ready as

representative of the Estate, seeks damages from Defendants for decedent's pain, suffering, loss of income, any and all medical expenses and other losses and expenses allowed by law.

492.    Ms. Ready makes claims against Defendants on behalf of Jesse Ready, the Estate of Jesse Ready and any statutory beneficiaries for all recoverable damages, including but not limited to:

      a.    Jesse Ready's conscious pain and suffering from the time of the injury to the time of his death;

      b.    Jesse Ready's loss of enjoyment of life;

      c.    Jesse Ready's loss of net future earnings after subtracting amounts he would have spent on his own living expenses and on support of his family.

493.    Each of the Estate Plaintiffs is entitled to compensatory damages in a sum to be determined by the jury.

Wherefore, Plaintiffs request relief as hereinafter provided.

### TENTH CAUSE OF ACTION
**(Loss of Consortium)**
**Against All Defendants**

494.    Plaintiffs hereby incorporate the allegations contained in the preceding paragraphs, as though fully set forth herein.

495.    Each spouse of each Plaintiff herein alleges he/she has been harmed by the injury to his/her husband/wife/domestic partners. Each spouse/domestic partner of each Plaintiff seeks to be reasonably compensated for the loss of his/her husband/wife's/domestic partner's companionship and services, past and future, including: the loss of love, companionship, comfort, care, assistance, protection, affection, society, moral support and the loss of the enjoyment of sexual relations and/or the ability to have children.

Wherefore, Plaintiffs request relief as hereinafter provided.

### **PRAYER FOR RELIEF**

1. For a judgment ordering, requiring and compelling the DEFENDANTS to establish a fund in an amount not less than one BILLION ($1,000,000,000.00) DOLLARS as to each DEFENDANT available to advance and pay all costs and expenses for each of the PLAINTIFFS for medical examination, medical monitoring, and treatment by physicians of PLAINTIFFS' choice; And for the payment of costs and expenses for each of the PLAINTIFFS for medical examination, medical monitoring, and treatment by physicians of PLAINTIFFS' choice for their offspring who are at risk for birth defects caused by genetic gene mutation.

2. For special and economic damages, including lost wages, for all Causes of Action;

3. For general and non-economic damages for all Causes of Action;

4. For punitive damages for all Causes of Action;

5. For prejudgment interest at the prevailing legal rate;

6. For costs of the suit including reasonable attorneys' fees; and

7. For such other and further relief, including injunctive relief, as the Court may deem proper.

### **DEMAND FOR JURY TRIAL**

The Plaintiffs hereby demand a jury trial of all issues as provided by Rule 38(a) of the Federal Rules of Civil Procedure.

INDIVIDUAL AND CLASS ACTION COMPLAINT

DATED:  March 14, 2018       RESPECTFULLY SUBMITTED,


                          By:     /s/ CHARLES A. BONNER
                                  CHARLES A. BONNER


                                  /s/  JOHN R. EDWARDS
                                  JOHN R. EDWARDS


                                   /s/  A. CABRAL BONNER
                                  A. CABRAL BONNER


                                  /s/  CATHARINE E. EDWARDS
                                  CATHARINE E. EDWARDS


                                  /s/  PAUL C. GARNER
                                  PAUL C. GARNER


                                  Attorneys for Plaintiffs